1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
                                  :
UNITED STATES OF AMERICA
                                      CR-10-0074


           -against-          :
                                  United States Courthouse
                                  Central Islip, New York

HERBERTO MARTINEZ, LUIZ RUIZ,
FRANKLIN VILLATORO, YANES
ACOSTA-YANES and CARLOS ORTEGA,


      Defendants.          :
                                  January 17, 2013
- - - - - - - - - - - - - - - X   12:30 p.m.

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JOSEPH F. BIANCO
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:      LORETTA E. LYNCH
                         United States Attorney
                         100 Federal Plaza
                         Central Islip, New York 11722
                         BY:  JOHN DRUHAM, ESQ.
                              RAYMOND TIERNEY, ESQ.
                              CARRIE CAPWELL, ESQ.
                         Assistant United States Attorney


For the Defendants:      ELIZABETH MACEDONIO, ESQ.
                         ARNOLD LEVINE, ESQ.
                         For Mr. Martinez

                         ANDREW MUCCIGROSSO, ESQ.
                         For Mr. Villatoro

                         STEVE ZISSOU, ESQ.
                         MICHAEL BACHRACH, ESQ.
                         For Mr. Ruiz

2

For the Defendants:

                              LLOYD NADEL, ESQ.
                              For Mr. Acosta-Yanes

                              IRA LONDON, ESQ.
                              MARIANNE RANTALA, ESQ.
                              For Mr. Ortega

                              JOSEPH KILADA, ESQ.
                              For Mr. Valle

Court Reporter:               Mary Ann Steiger
                              100 Federal Plaza
                              Central Islip, New York 11722
                              (631) 712-6101

             Proceedings recorded by mechanical stenography.
                   Transcript produced by computer.

3

1          THE CLERK:  Calling criminal case 10-0074,

2     U.S.A. versus Herberto Martinez, Luiz Ruiz, Franklin

3     Villatoro, Yanes Acosta-Yanes and Carlos Ortega.

4          Will counsel note their appearances for the

5     record.

6          MR. DURHAM:  John Durham, Raymond Tierney and

7     Carrie Capwell for the United States.

8          Good morning, your Honor.

9          THE COURT:  Good afternoon.

10          MR. DURHAM:  Good afternoon.

11          MS. MACEDONIO:  Good afternoon, your Honor.

12          Elizabeth Macedonio and Arnold Levine for

13     Mr. Martinez.

14          THE COURT:  Good afternoon.

15          MS. RANTALA:  Good afternoon.

16          Marianne Rantala for Carlos Ortega along with

17     Ira London.

18          THE COURT:  Good afternoon.

19          MR. BACHRACH:  Good afternoon, your Honor.

20          Michael Bachrach and Steve Zissou on behalf of

21     Mr. Ruiz.

22          MR. MUCCIGROSS: Andrew Muccigrosso appearing for

23     Sanford Talkin who is counsel for Mr. Villatoro.

24          THE COURT:  Good afternoon.

25          MR. KILADA:  Appearing for Mr. Valle, Joseph

4

1   Kilada.

2         Good afternoon, your Honor.

3         MR. NADEL:  For Mr. Acosta-Yanes, Lloyd Nadel.

4         Good afternoon.

5         THE COURT:  Good afternoon.

6         We have the Spanish interpreter who is on staff

7   here interpreting for a number of the defendants.  I'll

8   ask that she identify herself and state which defendant

9   she's interpreting for.

10        THE INTERPRETER:  Maya Gray, Certified Spanish

11  Federal Court Interpreter, interpreting for

12  Mr. Acosta-Yanes, Herberto Martinez, and Carlos Ortega.

13        THE COURT:  We have the second Spanish

14  interpreter here who I'll give the affirmation to and ask

15  him to please state his name.

16        THE INTERPRETER: J. Carlos Venant.

17        THE COURT:  As you know this was on initially

18  for argument with respect to Mr. Herberto Martinez and

19  Mr. Ortega with respect to various motions that were being

20  made.

21        A number of the group five defendants indicated

22  they wanted to participate in connection with the

23  questionnaire issue as well as the motion to preclude the

24  government's expert, and I invited any group five

25  defendant, or any defendants in the case for that matter,

5

1    to participate if they wished to.  And I think in terms of

2    the other group we're missing one defendant who is not

3    participating.

4           MR. DURHAM:  That's correct, your Honor.

5           His attorney, Mr. Kilada, is here.  Mr. Kilada

6    called me yesterday afternoon, but it was too late in the

7    day to have Mr. Valle produced.  Mr. Kilada is here to

8    represent his interests.

9           The remaining group five defendants are all

10   present in addition to the January trial group of the

11   remaining three defendants as well as Mr. Ortega who was

12   indicted separately and then joined for trial.

13          THE COURT:  Mr. Kilada, you want to proceed even

14   though your client is not present today?

15          MR. KILADA:  Yes, sir.

16          THE COURT:  I want to make clear, with respect

17   to that, that if you want to make argument in connection

18   with this, I think we should postpone it for another date

19   for you to do so.  I'm concerned about you raising things

20   that your client is not present for.  Obviously you can

21   participate in the conference, but you can also have him

22   come in on another day as well, okay?

23          MR. KILADA:  Thank you, your Honor.

24          THE COURT:  Also, there was back and forth in

25   the letters about the issue of the expert and whether or

6

1    not group five should participate with respect to the

2    motion regarding the expert because the government hasn't

3    decided whether or not to call the expert.

4              I want to say two things with respect to that.

5    The first is that I agree with the defense to the extent,

6    even though the government hasn't decided that, I'm more

7    than happy to have participation by anyone on these issues

8    given that some issues are common to all the groups, but I

9    will say and I understand why, Mr. Zissou, the concern was

10   about potentially law of the case, but I don't view any of

11   this as law of the case for each particular group.  Every

12   group obviously is different, that's why they're in

13   different groups.

14             So to the extent I made a ruling with respect to

15   a particular group, I would not view that as law of the

16   case with respect to other groups.  I'm prepared to look

17   at the issues de novo with respect to each group.

18             So although I will allow full participation in

19   the argument, I don't want there to be any concern or

20   confusion that necessarily whatever the Court rules with

21   respect to Mr. Martinez and Mr. Ortega will necessarily

22   apply when the trial comes up for group five.

23             In terms of the order, my intention was to go

24   forward first with the argument with respect to the

25   questionnaire and the expert since that I think is why the

7

1   group five lawyers are here, and then proceed to the

2   motions that are related to Mr. Martinez and Mr. Ortega.

3           Is everybody in agreement with that?

4           MR. DURHAM:  We agree, your Honor.

5           THE COURT:  Given that it's 12:30, I think what

6   we will do is handle those two motions, break for lunch,

7   and then the lawyers who aren't going to participate in

8   the other issues can go home.

9           Does everybody agree with that?

10          MR. ZISSOU:  Yes, your Honor.

11          MS. MACEDONIO:  I had filed a motion for

12  severance of counts.  The government responded last night

13  to that.

14          I haven't had the opportunity, because I've been

15  here all morning, to download that and print it, so

16  perhaps we can argue that particular motion at another

17  time.

18          THE COURT:  The response is not long.  During

19  the lunch break I'll ask Mr. Durham to give it to you.  I

20  would like to discuss that.

21          MS. MACEDONIO:  Mr. Durham is giving it to me

22  now.

23          THE COURT:  You can read it during the lunch

24  break and if possible I would like to discuss that today,

25  so let me know if you're prepared to do that.

8

1      MS. MACEDONIO:  Thank you, Judge.

2      THE COURT:  So let's start with the

3  questionnaire issue and I read the papers and reviewed the

4  questionnaire.

5      I've again given considerable thought to this

6  issue and anyone who wants to highlight anything from

7  their papers, I'll give them a chance to do that now.

8      Anyone from the defense?

9      MR. ZISSOU:  Judge, it is our view that for this

10  issue that I would address it, but that's not to suggest

11  that others should not.

12      It is quite clear that we simply cannot fairly

13  select a jury and uncover any hidden bias that they have

14  with an anonymous panel in the absence of a questionnaire.

15      And while we're not wedded to the particular

16  questionnaire that we submitted to the Court, we do

17  believe an extensive questionnaire is required.

18      We're more than happy to sit down with counsel

19  for the government to work out a questionnaire that is

20  satisfactory to both sides.

21      Indeed we have broached the topic a number of

22  times, but as I think we expressed clearly in our papers

23  that we believe that it's absolutely imperative.

24      Indeed I think looking over the last 10 years or

25  more of practice just in the Eastern District it has

9

1    become, let's say, a de facto presumption that in a case

2    of an anonymous jury, judges in the Eastern District of

3    New York routinely use a questionnaire.

4            The list that we gave you, while it includes

5    some cases from the Southern District of New York, those

6    cases in the Eastern District some were capital trials,

7    but others were not.

8            Persico, for example, was not a capital case,

9    Gioli was not a capital trial, and although there were

10   some of our own in fact where the government was actually

11   seeking death as a penalty, many of those were not.

12           So we think, given the nature of the charges in

13   this case and your Honor's having granted an anonymous and

14   partially sequestered voir dire and in order to balance

15   all of the factors that apply in this case, your Honor

16   should allow us to at least in the threshold matter have a

17   questionnaire which details the background.

18           THE COURT:  Thank you.

19           Anybody else want to add to that from the

20   defense side?

21           The government.

22           MS. CAPWELL:  Your Honor, I'll address this

23   issue for the government.

24           The government's position is that a juror

25   questionnaire is not necessary here, it's not required by

10

1  the Second Circuit even in cases where an anonymous jury

2  has been impaneled.

3         The defendants' right to an impartial jury will

4  be protected through thoroughly and probing voir dire by

5  your Honor and the defense can suggest questions to your

6  Honor that they want asked in order to probe into

7  different areas, including many of the questions that they

8  included in their questionnaire.

9         I cited the case of United States versus Tamaro

10  in our papers.  That was a Southern District of New York

11  case.  It was an organized crime case.

12         There was an anonymous jury impaneled and it was

13  partially sequestered as well, and there Judge Kaplan

14  found that he denied the defendant's request for

15  questionnaires as unnecessary and basically said that the

16  defense can suggest questions for voir dire which he would

17  be willing to ask, that the jurors could still be

18  questioned as to their occupations and other issues

19  without revealing their identities, but still allowing the

20  parties to learn about the jurors and to probe into any

21  possible biases they might have.

22         Judge Kaplan further found that the defense

23  would not have any problem assessing juror bias through

24  the oral voir dire that he would conduct and the same

25  would hold true in this case, your Honor.

11

1     A thorough oral voir dire would be more than

2 sufficient here to explore possible biases by the jurors.

3     And the jurors, although they're anonymous,

4 really the only pieces of information which we would not

5 learn would simply be their names, the town they reside

6 in.  We would ask it be limited to just the county where

7 they reside and not specify who their employer is.  They

8 could still speak about what they do for a living and they

9 could answer all of the other questions which your Honor

10 asks through standard voir dire and any other question

11 that the defense and government might think that are

12 reasonable to ask in this case.

13     The fact that they're not having to reveal their

14 names and identities would actually, our position would

15 be, allow them to be more honest with the Court about any

16 possible biases they might have during oral voir dire.

17     And to the extent that they might have some kind

18 of fear, this notion of fear because of being an anonymous

19 jury, as we noted in our papers, if a juror truly and

20 honestly has a fear of serving on a jury, that is

21 something that they would bring to the Court's attention

22 during voir dire in order to be removed from the jury.

23     For those reasons, your Honor, and the other

24 reasons that were in our papers, the government's position

25 is that a questionnaire is not required in this case.

12

1        The Second Circuit has made clear that it's not

2   required or mandatory even in cases involving an anonymous

3   jury.

4        MR. ZISSOU:  It seems Judge Kaplan is both sides

5   favorite judge today.

6        And after that, in United States against Gialani

7   Judge Kaplan, despite his inclination otherwise, decided

8   to use a questionnaire and we did.

9        Just to give a little background to that, we had

10  1200 questionnaires delivered to us on a Friday or a

11  Thursday.  We went through them the entire weekend and by

12  Monday afternoon we had a jury selected from that group

13  after the first three or 400 jurors came through the well.

14       It is a time saving process, and one that I

15  think insures fairness.

16       One of the cases that Mr. Levine was kind enough

17  to remind me of is Skilling against the United States.

18  It's not in our papers.  It's 130 Supreme Court 2896.

19       There the Supreme Court, in rejecting the

20  challenge from Skilling's counsel, pointed out the

21  extensive questionnaire that the Court used to uncover

22  bias followed by oral voir dire to insure and reject the

23  challenge that Skilling was unable to select a fair panel

24  from the veneer in Texas at the time.

25       And so, again, we urge the Court to grant our

13

1   application.

2          THE COURT:  Okay.  I am going to utilize a jury

3   questionnaire in this case.  I agree with the government

4   that it's not required.  There's no question that even

5   with an anonymous jury that a fair and impartial jury can

6   be impaneled through a thorough oral voir dire.

7          However, I do agree with the defense that in

8   this case, in this particular case, the fact that we're

9   having an anonymous jury combined by the publicity

10  associated with some of the crimes in the indictment and

11  the nature of the crimes that are in the indictment, I

12  think as a matter of discretion I'll use the

13  questionnaire.

14         And my hope is, as Mr. Zissou indicated, is that

15  it will be more efficient.  If we do it in the manner that

16  he suggests, it will save time.

17         So I think that efficiency is an additional

18  reason, but I also believe that given the other reasons

19  that I noted in terms of an anonymous jury, publicity and

20  the nature of some of the murders, that it will alleviate

21  concerns that the voir dire was not thorough enough.

22         And the questionnaire, I have some issues that I

23  want to get to.  I think the questionnaire is too long.

24  It's too many questions.  So I do want the government and

25  defense counsel to try to shorten it.

14

1          The government raised an objection to certain

2    questions which seem to be reasonable objections to me so

3    I want both sides to sit down to see if they can address

4    those objections and shorten it significantly.

5          In connection with that, I would ask the

6    government, I did look at the Tarantino questionnaire that

7    Judge Seybert used -- I think it was last year -- which

8    was significantly shorter.  It wasn't an MS-13 case, but a

9    lot of the questions are similar.

10          So it might be helpful if you could post that on

11    ECF here so defense counsel can look at that one and sort

12    of use that as a base.

13          MS. CAPWELL:  There were two trials, a trial and

14    a retrial.  Do you know if it was the 2011 version or the

15    2010 version.  I can always check which one was shorter.

16          THE COURT:  The version I have doesn't have a

17    date on it, so I can't tell you.  It was 64 questions.  I

18    see a date on the question.  April 3rd, 2012.

19          That might be helpful to incorporate some of the

20    more case specific questions.  I think that was more along

21    the length that I thought would be necessary in this case.

22          So we should set a date for a new version to

23    come in some time next week.  Again, the group five

24    lawyers are here but this is something I'm doing for group

25    three.  If it doesn't work well, I'll reassess whether or

15

1   not it makes sense to do it for group five.  Hopefully it

2   will work well and I'll do it again for group five.

3          MS. MACEDONIO:  Judge, I drafted the

4   questionnaire.  I'll be happy to work with Ms. Capwell to

5   shorten it.

6          THE COURT:  Great.  If you could e-mail to

7   chambers your version and maybe the Tarantino version so

8   to the extent there is disagreement, I'm hoping there will

9   be agreement, to the extent there is disagreement, my

10   staff can type the questionnaires and cut and paste.

11          MS. MACEDONIO:  I think we could send it to

12   chambers in a form that could be manipulated in the red

13   line format so you know what questions are objected to.

14          THE COURT:  Okay.  Let's set a date for that for

15   group three.  If the group five lawyers want to chime in

16   on that, fine.  The focus should be dealing with defense

17   counsel for group three, so maybe by the end of the day on

18   Tuesday.

19          MS. MACEDONIO:  That's fine, your Honor.

20          THE COURT:  Anything else related to the jury

21   selection before we leave that issue?  I think there would

22   be a timing issue.

23          MR. DURHAM:  That's what I was going to suggest,

24   that the Court's ruling will require some adjustment to

25   the current trial schedule.

16

1      As it stands now, we're supposed to do jury

2  selection on January 28 with trial beginning the following

3  Monday, which is February 4th.

4      I talked to Ms. Macedonia about this before and

5  we discussed how we saw the process playing out in the

6  event that your Honor granted the motion.

7      Our thought was, and I think I'm speaking for

8  both parties, is that the jurors would come in on Monday,

9  January 28, they would complete the jury questionnaire and

10  that evening we would send those for copying.

11      It's defense counsel's motion, so the defense

12  will arrange for those to be copied.  They will provide a

13  set to the Court, a set to the government, a set for each

14  defense counsel and then we would take a couple of days to

15  review those questionnaires and again the oral voir dire

16  on Monday, February 4th, and we would start trial

17  immediately following the selection of the jury or we

18  could, as we have it now, schedule it for a date certain

19  on February 11th.

20      I don't want to delay this any more than

21  necessary.  However, given it's difficult to predict how

22  long jury selection will take, we have some witnesses who

23  will be traveling from out of town.

24      We would ask the Court to rule today in terms of

25  when you would like to begin the evidence so we can make

1    the necessary arrangements.

2             THE COURT:  What's your estimate?  Now we have

3    two defendants rather than three.  Does that change your

4    estimate of the length of the trial?

5             MR. DURHAM:  I think it would be marginally

6    short.  It didn't result in the subtraction of any counts.

7    All the same murders still have to be proven.  I would

8    still estimate in the neighborhood of five to six weeks.

9             THE COURT:  I don't think, once we call back the

10   jurors, that it's necessarily going to take more than a

11   day or two.  You can correct me if I'm wrong.

12            MR. DURHAM:  My questionnaire experience is it

13   took a full week, notwithstanding the questionnaires.  It

14   took five days to select a jury.

15            MS. MACEDONIO:  Putting aside the last comment,

16   my experience as well has been it takes a week for the

17   parties to go through the questionnaires.

18            THE COURT:  That part I understand.  After that

19   process is completed about how many days do you think for

20   actual selection, one to two days or do you think it will

21   be longer?

22            MS. MACEDONIO:  I would think it would be

23   shorter.  That's the whole purpose in this.  It depends on

24   the way jurors are answering particular questions that are

25   raised.  The government is looking for a date certain.

18

1    THE COURT:  So you're okay starting with the

2  opening statements on February 11?

3    MS. MACEDONIO:  With respect to Mr. Martinez,

4  yes.

5    THE COURT:  How about Mr. Ortega?

6    MS. RANTALA:  That would be fine, your Honor.

7    THE COURT:  That's what we will do.

8    My understanding from the jury department is

9  that on the 28th they would come in and fill out the

10  questionnaire.  That could be done in the ceremony

11  courtroom or in the jury assembly room.  I assume

12  everybody agrees on that.

13    MS. RANTALA:  That's fine, your Honor.

14    MR. DURHAM:  Yes, your Honor.

15    MS. MACEDONIO:  Yes, your Honor.

16    THE COURT:  The questionnaire will be issued to

17  the panel on January 28th.  We will meet during that week

18  to go over any disagreement over who should be excused and

19  we will call the remaining jurors back in on the 4th and

20  take whatever days that week that are necessary to go

21  through any questions and the selection with respect to

22  them and then have opening statements beginning at 9:30 on

23  February 11th.

24    MR. DURHAM:  Your Honor, maybe -- Friday is

25  February 1.  Would it make sense to have a status

19

1   conference on that Friday?  At that point the parties will

2   have reviewed all of the questionnaires we have.  We may

3   have a list of jurors that we could excuse for cause

4   without bringing them in.

5            MS. MACEDONIO:  May I have a moment, Judge?

6            THE COURT:  I would prefer to do it the day

7   before if you thought it would be ready by the 31st.

8            (Pause in proceedings.)

9            MS. MACEDONIO:  Judge, what we're contemplating

10  hopefully is we won't need a status conference, we will

11  agree on the challenges for cause, and for those folks who

12  shouldn't come back to the extent we will need a status

13  conference I would prefer we do it Thursday.

14           THE COURT:  We will meet next week, so let's

15  leave that for then and we can set the date then.

16           Let's move to the MS-13 expert.  I have reviewed

17  the papers on that.  I went back and looked at the Second

18  Circuit's opinion in United States versus Mejia.

19           I did have some questions for the government, so

20  let me hear from any defense counsel if you want to add

21  anything on that.

22           MR. BACHRACH:  I think this issue is probably a

23  little less controversial than the last one, to the extent

24  the government has conceded to a hearing at this point.

25           And so our question would be how to proceed with

20

 1   the hearing since there are several issues that are

 2   involved.

 3           There is, first, whether or not the expert

 4   actually has the requisite expertise in the specific six

 5   areas that the government wishes him to testify to.

 6           And then once passing that threshold, to what

 7   extent will his testimony be limited, marshaled, or

 8   whether or not your Honor wants to get into that point,

 9   the second question, the marshalling, with respect to both

10   Mejia, but also with respect to Mejia as well which

11   cautions against bolstering an aider's testimony or having

12   an expert witness testify to something that a lay jury

13   would understand.

14           And that, I guess, is more of us asking your

15   Honor's guidance.  I believe the government has consented

16   to the hearing.

17           THE COURT: Anyone else want to add to that from

18   the defense standpoint?

19           I agree there are two issues.  One is a hearing

20   with respect to this particular expert's qualifications

21   with respect to New York as opposed to Maryland, but I do

22   want to ask the government some threshold questions

23   because these wouldn't be dependent upon this particular

24   expert, but based upon the Second Circuit's Mejia

25   decision.

1         And I understand the government, in terms of

2    what it's proposing this expert would do, is more limited

3    than what the expert did in Mejia.

4         But two of the issues that the Court has to

5    consider that defense counsel pointed out is, one, whether

6    or not the testimony is beyond the lay person's

7    understanding.  That's the first issue.

8         For some of this proposed testimony it's not

9    self-evident to me that a jury would have difficulty

10   understanding some of these concepts.

11        But in connection with that and this also then

12   goes into a Rule 403 balancing and it depends on the case.

13        If in fact there's going to be numerous

14   cooperating witnesses which I believe based upon various

15   motions I have seen, I want the government to explain to

16   me what this expert adds to that proposed testimony that

17   the cooperating witnesses could not do themselves to avoid

18   the bolstering that defense counsel alluded to.

19        I want the government to explain to me what he

20   would be testifying to that the cooperators would be

21   unable to testify to.

22        MR. TIERNEY:  Your Honor, the expert would

23   establish the larger criminal organization that is the

24   MS-13 as well as its national and international reach

25   which perhaps the individual cooperators aren't able to

22

1   do.

2        THE COURT:  First of all, I'm not sure how

3   probative that is in the case.  I'm not sure, if the

4   cooperators aren't able to discuss the international

5   reach, I'm not sure how probative it is to this particular

6   case in terms of the crimes that are charged and the

7   enterprise that's charged.  So that's one issue.

8        Some of the things that I think that you're

9   proposing that the expert cover would be the rules of the

10  gang, terminology of the gang, symbols, tattoos of the

11  gang.  Isn't that also correct?

12       MR. TIERNEY:  Yes.

13       THE COURT:  I think cooperating witnesses

14  obviously are usually in a position to talk about what the

15  rules are of the gang are, the symbols of the gang, the

16  terminology of the gang.  That's why it's a case specific

17  thing.

18       Obviously I'm fully aware that notwithstanding

19  Mejia that experts in these types of cases are often

20  utilized and for good reason but it depends on the

21  particular case.

22       Sometimes you may have a case where it's a lot

23  of wiretapping and you don't have a lot of cooperating

24  witnesses and therefore a lay person may not have any

25  context for understanding some wiretap evidence.

23

1      But in a case where you will have multiple

2 cooperating witnesses, I'm not sure how much an expert

3 would add.

4      If it's just trying to establish that the gang

5 originated in El Salvador in whatever time period, I'm not

6 sure how much that adds to the government's proof.

7      MR. TIERNEY:  Your Honor, I will say with regard

8 to when the government fashioned its response they looked

9 at it in terms of the Crawford issue in establishing the

10 expert's expertise and at a threshold level that would

11 have to be established.  That's why we consented to the

12 hearing.

13      And with regard -- and one of the reasons why we

14 consented to the hearing, we didn't want a situation where

15 there are constantly objections with regard to every

16 question that's asked.  So with regard to the specifics of

17 the testimony, that's why we consented to the hearing and

18 we were prepared to make an argument with regard to the

19 relevance after the Court heard the evidence for itself.

20      THE COURT:  Okay.  Again, I don't want to go

21 through a useless exercise of a hearing.  I'm telling you,

22 unless you can articulate how the expert testimony would

23 be different than what the cooperators would testify, I

24 think, especially in light of Mejia, this is a matter of

25 discretion, not something that is necessary in this case.

24

1            I don't want to go through a hearing about his

2    expertise in Maryland versus New York if the more

3    fundamental question is what is he going to add to the

4    case that the cooperators are not going to cover or that a

5    jury can't understand on their own.

6            One thing I was thinking was in the Mejia case

7    was there a retrial after that?

8            MR. TIERNEY:  Yes, your Honor.

9            THE COURT:  Was there an expert at the retrial?

10           MR. TIERNEY:  There was.  It was a different

11   expert.

12           THE COURT:  It might be helpful for me to see

13   that expert's testimony and/or the expert from Maryland

14   you say testified in other cases.

15           MR. TIERNEY:  He did.

16           THE COURT:  If you want to provide a transcript

17   of some other case where he's testified, then I can see

18   what the scope is.  It would be helpful if you tell me if

19   I look at such transcript something that he said in

20   connection with the background of the gang that the

21   cooperators aren't able to cover and I can assess whether

22   I agree with that and how probative that is in light of

23   the other issues.

24           MR. TIERNEY:  We can provide you with that

25   information and we can supplement our response.

25

1    THE COURT:  If you think it would be better to

2    have him explain that in a hearing, I'm prepared to do

3    that.

4         Given what my issues are, I'm not sure a hearing

5    would add or subtract as long as you can provide me with

6    similar testimony by him or another expert.

7         MR. TIERNEY:  Yes, your Honor.

8         THE COURT:  I want you to address what areas the

9    cooperation would not cover.

10        Does defense counsel want to add anything on

11   that?

12        MR. BACHRACH:  No, your Honor.

13        THE COURT:  It's 1:00.  Let's break for lunch

14   and then deal with the suppression hearing.

15        Do any of the group five counsel have any issues

16   before they depart?

17        MR. ZISSOU:  No, your Honor.  Thank you.

18        MS. MACEDONIO:  So we're clear, other than the

19   hearing this afternoon, we're dealing with my severance

20   point and Ms. Rantala's motions that she filed?

21        THE COURT:  Yes.

22        I would say, Mr. Kilada, what I want you to do,

23   I'll authorize this pursuant to CJA, I want you to get a

24   copy of the transcript quickly and provide it to your

25   client because next time I do see him I'll ask whether or

26

1    not he's had a chance to review it and if there's any

2    issues he wants you to address in light of what transpired

3    with respect to the other defendants.

4         I haven't made any decision regarding group

5    five, which is why I made this optional.  It's a group

6    three proceeding where group five could participate.  I

7    don't want him to feel that he's missing anything.

8         MR. KILADA:  Yes.  It's my intention to leave

9    here after we break.  I'm going to report to Mr. Valle in

10   person and relate the event.  I will do that by way of

11   transcript as well.

12        Secondly, your Honor, just to facilitate,

13   Mr. Valle is being housed in a different facility from one

14   of his codefendants, Luiz Ruiz.  Mr. Ruiz and Mr. Valle

15   are wedded in the serious counts affecting the two of

16   them.

17        I make respectful application of your Honor to

18   perhaps consider scheduling not so much a status next

19   week, but a date for Mr. Valle and Mr. Ruiz perhaps next

20   Tuesday so they can confer in person and we can further

21   discuss plea negotiations and our roadmap in the case.

22        MR. DURHAM:  If I can offer a suggestion, the

23   group five defendants are on for status conference and

24   oral argument next Friday anyway.  Mr. Ruiz is at MDC, so

25   the marshals don't do MDC pick up normally other than

27

1    Wednesday and Friday, so both Mr. Valle and Mr. Ruiz will

2    be in the building next Friday.

3              THE COURT:  Is that sufficient or do you want to

4    do something earlier than that?

5              MR. KILADA:  That's fine, your Honor.  We're

6    scheduled for 1:30 on Friday.  I think we can certainly

7    make that work.

8              THE COURT:  That will give you time to get the

9    transcript.  I want you to get the transcript.

10             MR. KILADA:  I will order it today, your Honor.

11             THE COURT:  Thank you.

12             So I'll see counsel for Mr. Ortega and

13   Mr. Martinez at 2:00 and if any of the group five lawyers

14   want to stay, I'm happy to have you stay.

15             MR. LONDON:  Can we make that 2:15?

16             THE COURT:  Yes, that's fine.

17             (Proceedings in this matter are recessed.)

18

19

20

21

22

23

24

25