1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X
                                 :
UNITED STATES OF AMERICA
                                        CR-10-0074


          -against-              :
                                      United States Courthouse
                                      Central Islip, New York

CARLOS ORTEGA,

     Defendant.                  :
                                      January 17, 2013
- - - - - - - - - - - - - - - - X    2:15 p.m.

                TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE JOSEPH F. BIANCO
            UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:          LORETTA E. LYNCH
                             United States Attorney
                             100 Federal Plaza
                             Central Islip, New York 11722
                             BY:  JOHN DURHAM, ESQ.
                                  RAYMOND TIERNEY, ESQ.
                                  CARRIE CAPWELL, ESQ.
                             Assistant United States Attorney




For the Defendant:           IRA D. LONDON, ESQ.
                             MARIANNE S. RANTALA, ESQ.




Court Reporter:              Mary Ann Steiger
                             100 Federal Plaza
                             Central Islip, New York 11722
                             (631) 712-6101


        Proceedings recorded by mechanical stenography.
           Transcript produced by computer.

2

1          MR. LONDON:  Judge, while we're waiting, I have

2    some CJA requests if you don't mind.

3          Firstly, I would like permission to have the

4    transcript of today's proceeding.

5          THE COURT:  Yes.

6          MR. LONDON:  I have already submitted the

7    request for it.

8          THE COURT:  I may have signed it already.

9          MR. LONDON:  Thank you so much.

10          THE COURT:  Sure.

11          MR. LONDON:  Also, I know I don't need specific

12    authorization, I want to alert the Court my client has no

13    ability to get courtroom clothing and I'm going to

14    purchase as economically as possible some clothing for him

15    to wear in the courtroom.

16          THE COURT:  That's fine.

17          MR. LONDON:  It shouldn't exceed more than $150.

18          THE COURT:  That's fine.

19          MR. LONDON:  Thank you.

20          THE COURT:  We will now proceed with the Ortega

21    motion.

22          I want to go through the non-suppression motions

23    for a moment and rule on those and hear any additional

24    argument to the extent anyone has anything to add.

25          First, we're going to go through the motions.

3

1   There's a motion requesting a list of trial exhibits and

2   transcripts of recorded conversations the government

3   intend to use.  Based upon the government's response, I

4   think this is moot; is that correct?

5           MR. DURHAM:  That's our position, your Honor,

6   yes.

7           THE COURT:  Correct.  You have their exhibit

8   list and transcripts of any tapes they're seeking to

9   offer?

10          MS. RANTALA:  I have to admit I've been sick all

11  of this week.  I know there was some submissions that I

12  have not had the opportunity to view, including a number

13  of CDs.  I have to take it on the government's word what's

14  in those.  I have not had the opportunity to review said

15  submission at this time.

16          THE COURT:  Let me know if you think there's

17  something missing.  They're representing to the Court they

18  initially disclosed the exhibits they intend to use.  The

19  3500 material I think another batch is going out today.

20          MR. DURHAM:  Either today or tomorrow.  Initial

21  3500 was provided for more than half of the witnesses and

22  another significant batch will go out either today or

23  tomorrow.

24          THE COURT:  You can let me know.

25          MS. RANTALA:  Yes.

4

1          MR. DURHAM:  To clarify, your Honor, we don't

2     anticipate any lengthy transcripts of recordings being

3     played during the trial.  We may play 911 calls or

4     something short like that.  I doubt there would be a

5     transcript.  It's in English.  We would play the call.

6     They are not recorded conversations involving the

7     defendants.

8          THE COURT:  In terms of the request for Brady

9     materials, the government has represent it's aware of its

10     Brady obligations and it's ongoing Brady obligations I

11     assume.

12          MR. DURHAM:  Your Honor, in preparing for 3500,

13     we have identified a couple of documents which are

14     arguably whether or not they're Brady we will be providing

15     those either tomorrow or early next week.

16          THE COURT:  They should be provided at the

17     latest on Tuesday.

18          The next motion was for the identity of the

19     government's cooperating witnesses and confidential

20     informants, the ones that are going to testify.  Is that

21     moot now or will be moot in the next day or two?

22          MR. DURHAM:  It will be moot in the next day or

23     two.  We had ongoing plea negotiations so we held back

24     disclosing the confidential informant and cooperating

25     witnesses.  If that does not come to fruition, we will

5

1    turn that material over.

2         THE COURT:  So I'll say again by the latest on

3    Tuesday unless there's an agreement, because of plea

4    negotiations, counsel agree to withhold it further that's

5    okay.

6         MR. DURHAM:  Yes, your Honor.

7         THE COURT:  With respect to that I think there's

8    a sub-motion to the extent the government is not going to

9    call a particular cooperating witness or confidential

10   informant, they want access to that.  Do you want to

11   address that Mr. Durham?  What's your response to that?

12        MR. DURHAM:  Your Honor, to the extent we're not

13   going to call a cooperating witness, we don't intend on

14   turning 3500 material or Giglio material.  To the extent

15   that cooperating witness provided Brady material, that

16   will be turned over in accordance with our obligation.

17        THE COURT:  Okay.  I think that's sufficient in

18   this situation under the law.  I don't think, unless

19   there's Brady material, the government choses not to call

20   a particular informant, I don't think a showing has been

21   made by the defense that they should be entitled to the

22   name of that informant.  I don't believe there's any case

23   law that requires that and as a matter of discretion I

24   don't believe it's a situation that would warrant such a

25   disclosure.

6

1      Any other aspects to the motion?

2      MS. RANTALA:  I believe your Honor has covered

3  the other motion other than the actual motion to suppress.

4      THE COURT:  Before the government calls its

5  witnesses, is there anything we need to discuss before we

6  get started?

7      MR. DURHAM:  Not from the government, your

8  Honor.

9      MS. RANTALA:  Nothing at the moment from the

10  defense.

11      THE COURT:  They note in their papers there's a

12  direct challenge to the search I guess, but does the

13  government intend to put on any proof with respect to the

14  intent to search as well?

15      MR. DURHAM:  Yes, your Honor.  It's interrelated

16  with the arrest.  We intend to put on proof of that out of

17  an abundance of caution.

18      THE COURT:  Do you want to orally challenge that

19  as well?

20      MS. RANTALA:  It's actually in the affidavit.

21  It was challenged and we would orally challenge both the

22  search to the extent it has not been argued in the papers.

23      THE COURT:  Okay.  Go ahead, Mr. Durham.

24      MR. DURHAM:  May I have one moment with counsel,

25  your Honor?

7

1        THE COURT:  Sure.

2        (Pause in proceedings.)

3        MR. LONDON:  Judge, before we begin, I would

4   like to make a motion in limine.

5        If the defendant Carlos Ortega is called as a

6   witness, I would like to know whether the Court will

7   permit any cross-examination beyond the scope of this

8   examination?  To clarify that, would you allow the

9   government to go into offense conduct in their

10  cross-examination?

11       THE COURT:  Do you know to know that now before

12  I hear their evidence?  I want to hear their evidence

13  first before you make a decision on whether or not he

14  should take the stand.

15       Go ahead.

16       MR. DURHAM:  Your Honor, the government calls

17  Special Agent Reynaldo Tariche, T-A-R-I-C-H-E.

18

19  REYNALDO TARICHE,

20            called as a witness, having been first

21            duly sworn, was examined and testified

22            as follows:

23

24       THE CLERK:  Please state your name and spell it

25  for the record.

**Tariche  -  Direct/Durham**

8

1     THE WITNESS: Reynaldo Tariche, R-E-Y-N-A-L-D-O,

2  T-A-R-I-C-H-E.

3     MR. DURHAM:  Your Honor, may I approach?

4     THE COURT:  Yes.

5

6  DIRECT EXAMINATION

7  BY MR. DURHAM:

8  Q.   Good afternoon.

9  A.   Good afternoon.

10  Q.   What do you do for a living?

11  A.   I'm an FBI agent.

12  Q.   How long have you been doing that?

13  A.   Approximately 23 years.

14  Q.   Where are you currently assigned with the FBI?

15  A.   I'm currently assigned to the New York Division at

16  the Long Island Resident Agency here in Melville, New

17  York.

18  Q.   How long have you been assigned there?

19  A.   I've been assigned there for approximately 10 years.

20  Q.   And do you have any particular specialty at the Long

21  Island Resident Agency?

22  A.   Yes.

23     I'm assigned to the Long Island Gang Task Force

24  working MS-13 matters predominantly.

25  Q.   Just briefly, could you explain to the Court what's

Tariche  -  Direct/Durham

9

1  the mission of the Long Island Gang Task Force?

2  A.    The mission of the Long Island Gang Task Force is to

3  identify and dismantle violent gangs that perpetrate

4  crimes here on Long Island.

5  Q.    What languages do you speech?

6  A.    I speak English and Spanish.

7  Q.    What language or languages did you learn first?

8  A.    I learned Spanish first.  I grew up in a bilingual

9  home.  My parents are true immigrants.

10  Q.    In addition to speaking Spanish at home, did you ever

11  take any formal education classes in the Spanish language?

12  A.    I took Spanish both in high school and college.

13  Q.    During your career with the FBI, have you ever been

14  tested and certified in Spanish?

15  A.    Yes.

16  Q.    What is your certification?

17  A.    It's three plus.

18  Q.    Could you explain to the Court what is a three plus

19  certification?

20  A.    Three plus is fluent conversational Spanish as well

21  as being able to read and write at a certain level.

22  Q.    During your career with the FBI, have you conducted

23  interviews in Spanish?

24  A.    Yes.

25  Q.    Approximately how many?

Tariche  -  Direct/Durham

10

1   A.   Hundreds.

2   Q.   You have had the opportunity to advise defendants of

3   their Miranda rights in Spanish?

4   A.   Yes.

5   Q.   How many times?

6   A.   Hundreds of times.

7   Q.   Now I want to ask you, were you involved in the

8   investigation of the murders of David Sandler and Mario

9   Quijada?

10  A.   Yes.

11  Q.   At some point during your investigation, was an

12  individual by the name of Carlos Ortega also known as

13  Silencio or Silent identified as a suspect in those

14  murders?

15  A.   Yes.

16  Q.   I direct your attention to March 26, 2012.

17       Were you working that day?

18  A.   Yes, I was.

19  Q.   Where were you working?

20  A.   I was working out of the Long Island office in

21  Melville on that day, yes.

22  Q.   You began your day in Melville?

23  A.   Yes.

24  Q.   Did you stay in Melville all day or at some point did

25  you go somewhere else?

11

1   A.   At some point we went to have a meeting regarding the

2   arrest, finding and arresting Carlos Ortega.

3   Q.   So you were looking for Carlos Ortega?

4   A.   Yes.

5   Q.   Street name is Silencio?

6   A.   That's correct.

7   Q.   Where did you go looking for him?

8   A.   We went looking at his place of employment and at his

9   residence.

10  Q.   Do you recall where his place of employment was?

11  A.   Yes, L & K Company in Hauppauge.

12  Q.   What about his residence, where was that locate?

13  A.   I believe it was in Brentwood, 11 Leahy.

14  Q.   Now when you were looking for Mr. Ortega, were you

15  doing it by yourself or with other law enforcement

16  officers?

17  A.   I was with other members of the Long Island Gang Task

18  Force.

19  Q.   Do you recall who was there?

20  A.   Yes.

21       I recall Agent Lopez, Detective Nigro, Task

22  Force Officer Davis, as well as a couple of Suffolk County

23  probation officers, Martorell and Casalan.

24  Q.   And at some point that afternoon did you locate

25  Mr. Ortega?

12

1   A.   Yes.

2   Q.   Where was that?

3   A.   He was located at L and K, his place of employment in

4   Hauppauge.

5   Q.   And looking around the courtroom, do you see the

6   individual Mr. Ortega in the courtroom?

7   A.   Yes, I do.

8   Q.   Would you please point him out and identify what he's

9   wearing?

10  A.   Yes.

11       Mr. Ortega is seated wearing a white T-shirt at

12  the defense counsel table.

13       MR. DURHAM:  Your Honor, I would ask the record

14  reflect that the witness has identified the defendant.

15       THE COURT:  Yes.

16  BY MR. DURHAM:

17  Q.   So you located Mr. Ortega at his place of employment.

18       What happened next?

19  A.   Mr. Ortega was placed under arrest and we took him to

20  his residence in Brentwood.

21  Q.   And when he was placed under arrest, was he

22  handcuffed?

23  A.   Yes, he was.

24  Q.   Did you or anyone else tell him why he was being

25  taken into custody?

13

1    A.    He was told he was taken into custody as part of an

2    MS-13 murder investigation that we were involved with.

3    Q.    So you took him into custody then you brought him to

4    his residence?

5    A.    Yes.

6    Q.    What was the reason of taking him to his residence?

7    A.    We were still looking for a firearm that was used in

8    that murder and we were going to ask his permission to

9    search his apartment for that firearm.

10   Q.    Is that the firearm that was used in the David

11   Sandler murder?

12   A.    Yes, as well as other evidence regarding that

13   homicide.

14   Q.    Can you describe for the Court what happened once you

15   got to the defendant's residence?

16   A.    When we got to his residence, I asked him for his

17   permission to search what amounted to a rented room at 11

18   Leahy and he agreed to us looking through his room.

19   Q.    And when you asked for his permission, did you do so

20   in English or Spanish?

21   A.    I did so in Spanish.

22   Q.    And when you asked the defendant, what did he say?

23   A.    He said it was okay if we looked through his room.

24   Q.    And you did this orally?

25   A.    Yes.

Tariche  -  Direct/Durham

14

1    Q.    In addition to seeking his permission orally, did you

2    do anything else with respect to the defendant?

3    A.    Yes.

4          I provided him with an FBI consent to search

5    form marked FD-26, which was in Spanish, which basically

6    he signed allowing us to search through his room.

7    Q.    So you explained that form to him in Spanish?

8    A.    Yes.

9    Q.    You signed it?

10   A.    Yes, that's correct.

11   Q.    And he signed it?

12   A.    Yes.

13   Q.    As I ask to you look at the binder I placed in front

14   of you.

15         Do you see a document labeled as Government's

16   Exhibit 1?

17   A.    Yes.

18   Q.    Do you recognize that document?

19   A.    I do recognize the document.

20   Q.    What is it?

21   A.    That is the FBI form, consent to search form FD-26,

22   Spanish version.

23   Q.    That's the form.

24         And this form is filled out?

25   A.    Yes.

15

1    Q.    Whose handwriting is on the form?

2    A.    My handwriting is in the middle which is his address,

3    11 Leahy, Brentwood, New York, rented room, second floor.

4    Q.    That's your handwriting?

5    A.    That is my handwriting, yes.

6    Q.    Is there other handwriting on this document?

7    A.    Yes, there's other handwriting.

8          On the bottom left is the date, that's my

9    handwriting, which is March 26, 2012, and then there's a

10   series of signatures there.  My signature is directly

11   below Mr. Ortega's signature.

12   Q.    So who else signed the document?

13   A.    Detective Michael Nigro, Special Agent James Lopez

14   and the illegible signature is Casalan.

15   Q.    And the defendant signed it?

16   A.    Yes.

17   Q.    And you personally saw all these signatures?

18   A.    Yes.

19          MR. DURHAM:  Your Honor, the Government offers

20   exhibit 1 for purposes of this hearing.

21          MR. LONDON:  No objection.

22          THE COURT:  Government's Exhibit 1 is admitted.

23          (Government's Exhibit 1 in evidence.)

24   BY MR. DURHAM:

25   Q.    Looking at exhibit 1, would you please read into the

1   record item number one from the notification.

2   A.   From the top?

3   Q.   Yes, please.

4   A.   Traduccion del ingles.

5        Do you want to have him repeating what I'm

6   saying?

7   Q.   What I would ask you to do, the document is in

8   evidence which is in Spanish, correct?

9   A.   Yes.

10  Q.   I would ask you to read it into the record in English

11  so the Court is aware of what advice was given to the

12  defendant.

13  A.   Department of Justice, Federal Bureau Investigation,

14  consent to search.

15       1.   Agents of the FBI have asked me if it's okay

16  to do a complete search of the below described person,

17  location.  Things to search, 11 Leahy Avenue, Brentwood,

18  New York, rented room, second floor.

19       2.   They have informed me that I have a right to

20  refuse this search.

21       3.   I voluntarily give this permission.

22       4.   Giving this authorization to this agents, I

23  give them permission to take any things that are related

24  to this investigation.

25       Date signed, witnesses.

17

1    Q.    So you orally read this form to the defendant?

2    A.    Yes.

3    Q.    And then you allowed him to read it?

4    A.    Yes.

5    Q.    And he signed it?

6    A.    Yes.

7    Q.    And after he signed it, what did you guys do next?

8          THE COURT:  You orally read it in Spanish or

9    English?

10          THE WITNESS:  I read it in Spanish.

11   BY MR. DURHAM:

12   Q.    Just so we're clear, as we're talking today, your

13   interactions with the defendant on March 26, 2012, were

14   they in English or Spanish?

15   A.    Spanish.

16   Q.    I'll try to clarify to the extent did you have any

17   English conversations with him?

18   A.    No, always in Spanish.

19   Q.    After you advised him of his right and he signed the

20   search form, what did you do?

21   A.    We searched his room.

22   Q.    What, if anything, did you recover?

23   A.    We recovered a knife, baseball bat, some MS-13

24   paraphernalia including a belt, his passport, his El

25   Salvador passport, and two fake I.D.'s, green card and

1    social security card, among other items.

2    Q.    No gun?

3    A.    No gun.

4    Q.    And after searching the defendant's residence, what

5    did you do next?

6    A.    We transported him to the Melville FBI office.

7    Q.    Once he got to the FBI office, what happened?

8    A.    We offered him a chance to use the bathroom, gave him

9    some water and I believe a snack, some pretzels.

10   Q.    You said we.

11           At this point who else was present other than

12   yourself and the defendant?

13   A.    Present was Agent Lopez and Detective Nigro.

14   Q.    Who conducted the interview?

15   A.    I conducted the interview.

16   Q.    Why was that?

17   A.    Because I was the only one that spoke Spanish of the

18   three of us.

19   Q.    Where was the interview conducted within the Melville

20   office?

21   A.    It was conducted in the interview room in the area of

22   our squad bay.

23   Q.    And could you explain to the Court how you began the

24   interview?

25   A.    Yes.  I began the interview by reading him his

19

1    Miranda rights and showing him another FBI form, form

2    FD-395.

3    Q.    How would you describe the defendant's demeanor at

4    the beginning of the interview?

5    A.    I would describe it as concern, but calm.

6    Q.    You testified you advised him of his Miranda rights?

7    A.    Yes.

8    Q.    Could you explain to the Court how you did that?

9    A.    I produced the FBI Miranda form also in Spanish.  I

10   read it to him and then I had him read aloud a couple of

11   lines so that I could see that he could actually read in

12   Spanish as well.

13   Q.    You read the entire form to him out loud?

14   A.    Yes.

15   Q.    And then you gave him an opportunity to read it?

16   A.    Yes.

17   Q.    And you had him read a portion of it aloud so you

18   would be sure he could read?

19   A.    Yes.

20   Q.    After reading him the form, what did you ask him?

21   A.    I asked him if he was willing to speak to us.  He

22   said yes and signed the form, and then I also had him

23   initial next to each one of the Miranda warnings.

24   Q.    Did the defendant sign the form?

25   A.    Yes.

Tariche  -  Direct/Durham

20

1   Q.   Did anybody else sign the form?

2   A.   Yes, Agent Lopez and Detective Nigro.

3   Q.   As you were reviewing the form with the defendant,

4   did he appear to have any trouble understanding you?

5   A.   No.

6   Q.   Did you have any trouble understanding him?

7   A.   No.

8   Q.   If you look at the binder in front of you, I would

9   ask you to turn to the exhibit that's been marked

10  Government's Exhibit 2.

11          Do you recognize that document?

12  A.   Yes.

13  Q.   What is it?

14  A.   This is the Spanish version of FBI form 395 which is

15  advise of rights.

16  Q.   How do you recognize it?

17  A.   I recognize it based upon my signature and my

18  handwriting.

19  Q.   Is the defendant's signature on that form?

20  A.   Yes.

21          MR. DURHAM:  Your Honor, the Government offers

22  exhibit 2.

23          MR. LONDON:  No objection, your Honor.

24          THE COURT:  Government's Exhibit 2 is admitted.

25          (Government's Exhibit 2 in evidence.)

21

1  BY MR. DURHAM:

2  Q.   Similarly with what we did with the last form, would

3  you please, starting with the actual warnings, read what

4  this says in English into the record?

5  A.   Before asking you any questions, you should know your

6  rights.

7            You have the right to remain silent.

8            Anything you say can be used against you in

9  Court.

10           You have the right to consult with an attorney

11 so he could advise you before we ask you questions, and

12 you have the right to have an attorney present during the

13 interrogation.

14           If you cannot afford an attorney, there will be

15 one assigned to you for the interrogation if you desire.

16           If you decide to answer questions now without

17 the presence of an attorney, you still hold the right to

18 stop speaking at any moment.  You also reserve the right

19 to stop speaking at any moment as well.

20           I have read this statement of my rights and I

21 understand what they are.

22           I am willing to give a declaration and answer

23 questions without the presence of an attorney.

24           Signed, witnesses, time.

25 Q.   Looking at the top right-hand corner of that

Tariche  -  Direct/Durham

22

1    document, what is the time in that location?

2    A.    The time is four p.m..

3    Q.    What does that signify?

4    A.    That indicates when we began the notification of the

5    advice of rights.

6    Q.    Now turning to the bottom left-hand corner of that

7    document, is there also a time?

8    A.    Yes.

9    Q.    What time is that?

10   Q.    That is 4:15?

11   Q.    What does that signify?

12   A.    That signifies the time that Mr. Ortega and myself,

13   Agent Lopez and Detective Nigro signed the form.

14   Q.    It took you about 15 minutes to explain this to the

15   defendant?

16   A.    Yes.

17   Q.    You read it orally to him and then you allowed him to

18   read it?

19   A.    Yes.

20   Q.    And then looking along the left side of that

21   document, there are a number of places where it says C.O.

22   A.    Yes, that's Mr. Ortega's initials.

23   Q.    He placed those initials on the document?

24   A.    Yes.

25   Q.    Next to each of the rights that you advised him of?

Tariche  -  Direct/Durham

23

1   A.   Yes.

2   Q.   On the bottom right-hand side of the document there's

3   a signature Carlos Ortega.

4            Who placed that on there?

5   A.   Mr. Ortega.

6   Q.   Now after you read the defendant his rights and he

7   signed the form, what did you do next?

8   A.   We asked him questions and spoke to Mr. Ortega.

9   Q.   Did you ask questions about the David Sandler murder

10  and the Quijada murder?

11  A.   Yes, questions about both murders.

12  Q.   Did he answer your questions?

13  A.   Yes.

14  Q.   During the course of the interview, did he admit

15  participating in those murders?

16  A.   Yes.

17  Q.   In connection with the Sandler murder, did he also

18  admit that he shot a second individual who was referred to

19  in the indictment as John Doe?

20  A.   Yes.

21  Q.   Did you take notes during the interview?

22  A.   No.

23  Q.   Did anyone?

24  A.   Yes, Agent Lopez took notes during the interview.

25  Q.   Could you explain to the Court why you didn't take

24

1   notes, why Agent Lopez did?

2   A.   I was conducting the interview in Spanish and because

3   of the fact that Agent Lopez and Detective Nigro did not

4   speak Spanish, I would stop and advise them of what he was

5   saying.

6          And it's normal practice that whoever is asking

7   questions would not take the notes.  And in this case with

8   the Spanish being added on top of that, Agent Lopez took

9   notes.

10  Q.   Turning back to the binder that's in front of you, I

11  would ask you to look at Government's Exhibit 3.

12         Do you recognize that item?

13  A.   Yes.

14  Q.   What is it?

15  A.   Those are the handwritten notes of Agent Lopez.

16  Q.   How do you recognize his handwriting?

17  A.   We were working for a long time and I see his

18  handwriting quite often.

19  Q.   Have you reviewed those notes both at the time of the

20  interview and before coming to court today?

21  A.   Yes.

22  Q.   Are they a fair and accurate summary of statements

23  made by the defendant during that interview?

24  A.   Yes.

25         MR. DURHAM:  Your Honor, at this time, the

1   Government offers exhibit 3.

2           MR. LONDON:  I just have a brief voir dire.

3           THE COURT:  Sure.

4

5   VOIR DIRE EXAMINATION

6   BY MR. LONDON:

7   Q.   Agent Tariche, as I understand it, this is the

8   handwriting of the other agent; is that correct?

9   A.   Yes, that's correct.

10  Q.   And what he was writing is what you were translating

11  into English?

12  A.   Yes.

13  Q.   So it's your version of what you claim Carlos Ortega

14  was telling you in Spanish?

15  A.   It's what Carlos Ortega was telling me in Spanish,

16  yes.

17          MR. LONDON:  That's all I need, Judge.

18          THE COURT:  Okay.  Any objection?

19          MR. LONDON:  No, no objection.

20          THE COURT:  Government's Exhibit 3 is admitted.

21          (Government's Exhibit 3 in evidence.)

22          MR. DURHAM:  Thank you, your Honor.

23  BY MR. DURHAM:

24  Q.   So Special Agent Lopez took those notes?

25  A.   Yes.

26

1    Q.    And at the end of the interview did you ask the

2    defendant to sign a written statement?

3    A.    Yes.

4    Q.    Did you ask him to do that in English or Spanish?

5    A.    Spanish.

6    Q.    And did you prepare a written statement?

7    A.    I did.

8    Q.    What language was that in?

9    A.    Spanish.

10   Q.    Could you explain to the Court what your process was

11   to prepare that statement?

12   A.    Yes.

13         I left the interview room, went to another quiet

14   location and wrote down in Spanish a statement based upon

15   what Mr. Ortega had told us.

16   Q.    So you wrote it out in another room?

17   A.    Yes.

18   Q.    What did you do next?

19   A.    I brought the statement back into the interview room,

20   once again read it to Mr. Ortega, and then he signed it.

21   Q.    You read it to him out loud?

22   A.    Yes.

23   Q.    When you read it to him, was that in Spanish?

24   A.    Yes.

25   Q.    Did you give him an opportunity to read it himself?

27

1   A.    Yes.

2   Q.    And did you have him sign it?

3   A.    Yes.

4   Q.    Where did you have him sign it?

5   A.    I believe it's on the third page.

6   Q.    Did you have him make any other markings on the

7   document other than his signature on the third page?

8   A.    Yes.

9           I had him initial both the first and second page

10  of the statement as well and the third page.  He initialed

11  all three pages and signed it in the middle of the third

12  page.

13  Q.    I'll ask you to look at Government's Exhibit 4.

14          Do you recognize that document?

15  A.    Yes.

16  Q.    What is it?

17  A.    This is the statement which I wrote out in Spanish

18  for Mr. Ortega.

19  Q.    That's your handwriting?

20  A.    Yes.

21          MR. DURHAM:  Your Honor, we offer Government's

22  Exhibit 4.

23          MR. LONDON:  No objection.

24          THE COURT:  Government's Exhibit 4 is admitted.

25          (Government's Exhibit 4 in evidence.)

28

BY MR. DURHAM:

Q.   Agent, looking at the first page at the very top of the document in the center there are initials C.O., do you see that?

A.   Yes.

Q.   Who made that notation?

A.   Mr. Ortega.

Q.   Then on the second page again at the top in the middle there's a C.O., who wrote that?

A.   Mr. Ortega's initials.

Q.   On the third page at the top in the middle there's another C.O., who made that?

A.   Mr. Ortega.

Q.   Below that there's a line that says F-I-R-M-A. There's a signature on that line.  Whose signature is that?

A.   That's Mr. Ortega's signature as well.

Q.   This statement is in Spanish?

A.   Yes.

Q.   At any time afterwards, did the FBI prepare an English translation of that?

A.   Yes.

Q.   Who prepared that?

A.   A translator for the FBI.

Q.   After it was prepared, did you review the statement?

29

1    A.    Yes.

2    Q.    Is it fair and accurate?

3    A.    Yes, it is.

4    Q.    I would ask you to look at Government's Exhibit 5.

5          Do you recognize that?

6    A.    Yes.

7    Q.    What is it?

8    A.    This is the translated into English report of the

9    statement that Mr. Ortega signed.

10   Q.    To be clear, has this document been finalized yet?

11   A.    This is a draft version, but it has been finalized.

12   Q.    Is that awaiting finalization for trial?

13   A.    Yes.

14         MR. DURHAM:  Your Honor, we offer Government's

15   Exhibit 5 for purposes of the hearing.

16         THE COURT:  Any objection?

17         MR. LONDON:  Well, I don't know what unfinalized

18   means.  I would like a clarification of that.

19         THE COURT:  I guess for purpose of the hearing

20   the question is whether or not he believes whether the

21   interpreter has finalized it or not.  I think the question

22   is whether he believed it's accurate based upon his

23   knowledge.  He wrote the statement out.  He obviously

24   knows both Spanish and English.

25         Do you believe that that's accurate?

1           THE WITNESS:  Yes.

2           MR. LONDON:  If that's the representation I have

3    no objection.

4           THE COURT:  Okay.

5           MR. DURHAM:  To be clear, your Honor, in

6    accordance with the Court's prior rulings, we had

7    submitted a proposed Brutonized version of the statement.

8    Once that's approved we will finalize it.  That's

9    essentially what is waiting to be finished.

10          THE COURT:  Okay.  So Government's Exhibit 5 is

11   admitted.

12          (Government's Exhibit 5 in evidence.)

13   BY MR. DURHAM:

14   Q.   You testified before that when you arrested the

15   defendant he had a cellular telephone?

16   A.   Yes.

17   Q.   During the course of your interview, did you request

18   permission to search his cell phone?

19   A.   Yes.

20   Q.   Did you ask him to do so in English or Spanish?

21   A.   In Spanish.

22   Q.   When you asked the defendant, what did he say?

23   A.   He agreed for us to look through his cell phone.

24   Q.   Again, could you go through step-by-step how you

25   obtained his consent?

31

1    A.    Yes.

2          I asked him in Spanish if it was okay if we look

3    through his cell phone.  He said yes.

4          And then, once again, I produced the Spanish

5    version of form FD-26 which is a consent to search form

6    used by the FBI.

7    Q.    I show you Government's Exhibit 6.

8          Do you recognize that?

9    A.    Yes.

10   Q.    What is that?

11   A.    That is the form FD-26, the Spanish version, the

12   Department of Justice FBI consent to search form.

13   Q.    This is the form you used to advise the defendant?

14   A.    Yes.

15   Q.    You read it to him orally?

16   A.    Yes.

17   Q.    Did you give him an opportunity to read it?

18   A.    Yes.

19   Q.    And then there's signatures at the bottom.

20          Do you recognize those signatures?

21   A.    Yes.

22   Q.    Is one of them your own?

23   A.    Yes.

24   Q.    Did you see the other people sign it?

25   A.    Yes.

Tariche  -  Direct/Durham

32

1    MR. DURHAM:  Your Honor, the Government offers

2    exhibit 6.

3    MR. LONDON:  No objection.

4    THE COURT:  Government's Exhibit 6 is admitted.

5    (Government's Exhibit 6 in evidence.)

6    BY MR. DURHAM:

7    Q.   As you've done before, would you please read this

8    into the record in English.

9    A.   Consent to search.  Agents of the FBI have asked me

10   permission to search my person, a place, a thing that is

11   mine, and then I wrote my cellular telephone area code

12   (631) 575-5129.

13           I have been informed of my right to refuse this

14   search.  I give this permission voluntarily.  I give

15   permission to the agents to take whatever articles are

16   related to their investigation.

17   Q.   And then the defendant signed that form?

18   A.   Yes.

19   Q.   How long did your interview of the defendant last in

20   total?

21   A.   Approximately two to three hours.

22   Q.   And you testified before you offered him food and

23   something to drink?

24   A.   Yes.

25   Q.   Did you allow him to use the bathroom?

33

1    A.    Yes.

2    Q.    At any point during the interview did you or any of

3    the other law enforcement officers that were present tell

4    the defendant that he was your friend?

5    A.    No.

6    Q.    Did you ever tell the defendant that you would tell

7    the prosecutor or judge to go easy on you if he answered

8    your questions?

9    A.    No.

10   Q.    At any point during the interview did you have

11   problems communicating with the defendant?

12   A.    No.

13   Q.    Did you have problems understanding him?

14   A.    No.

15   Q.    Did he appear to have any trouble understanding you?

16   A.    Nope.

17   Q.    What was the overall tone of the interview?

18   A.    Again, he was obviously concerned but it was calm.

19   Q.    At any point during the interview did he say he

20   didn't understand his rights?

21   A.    No.

22   Q.    Did he ever ask to speak to a lawyer?

23   A.    No.

24   Q.    Did he ever ask that you stop asking him questions?

25   A.    No.

Tariche  -  Cross/London

34

1    Q.    Did he ever say I want to remain silent?

2    A.    No.

3            MR. DURHAM:  One moment, your Honor.

4            (Pause in proceedings.)

5            MR. DURHAM:  No further questions.

6            THE COURT:  Let's take a short break.

7            Do you have any other witnesses?

8            MR. DURHAM:  That's our only witness, your

9    Honor.

10           THE COURT:  Let's take a short break.

11           (Recess taken.)

12           (After recess.)

13           THE COURT:  Cross-examination.

14           MR. LONDON:  Thank you, Judge.

15

16   CROSS-EXAMINATION

17   BY MR. LONDON:

18   Q.    Agent Tariche, if I understand your direct testimony,

19   you said that you have engaged in hundreds of Miranda

20   warnings; is that correct?

21   A.    Yes.

22           THE COURT:  The record should reflect the

23   defendant was not seated.  He was coming out of the

24   holding cell.  Just start that over.

25

**Tariche  -  Cross/London**

35

```
1   BY MR. LONDON:

2   Q.   In your direct testimony you said you were engaged in

3   hundreds --

4            THE COURT:  Mr. Ortega, we're just beginning the

5   cross-examination.

6            Go ahead, Mr. London.

7   BY MR. LONDON:

8   Q.   For the third time I understand your testimony to be

9   that you engaged in hundreds of Miranda waivers; is that

10  correct?

11  A.   Yes.

12  Q.   And in doing so, do you understand the standard for a

13  Miranda waiver?

14  A.   Do I understand the standard?  Yes.

15  Q.   Yes, the standard.

16           What do you understand it to be?

17           MR. DURHAM:  Your Honor, objection.  The witness

18  is not a lawyer.

19           THE COURT:  I'll allow his general

20  understanding.

21           What's your general understanding of what the

22  standard is?

23           MR. LONDON:  Well, could I follow that up.

24  BY MR. LONDON:

25  Q.   Are you a lawyer?
```

36

1   A.   I am not a lawyer, no.

2   Q.   I just want to establish that because many agents

3   are.

4   A.   No, I'm not a lawyer.

5        Could you just explain further what you mean by

6   standard.

7   Q.   Well, let me put it this way.

8        Have you ever testified at a suppression hearing

9   of a post-arrest statement?

10   A.   I believe I have, yes.

11   Q.   On how many occasions?

12   A.   A couple.

13   Q.   That mean one or two?

14   A.   Yeah.

15   Q.   Okay, so you may not know the standard.

16        Have you heard the terms voluntary and knowing?

17   A.   Voluntary, knowing, yes.

18   Q.   What do you understand them to mean in relation to a

19   waiver of the Miranda rights?

20   A.   Generally or legally?  As a layman or as a lawyer?

21   Q.   Your understanding of it.

22   A.   Voluntary would be not against his will.  Knowingly

23   would mean that he understands what I'm reading to him.

24   Q.   So voluntary would mean to you that he's not coerced?

25   A.   Yes.

Tariche   -   Cross/London

37

1    Q.    In any way into signing or waiving orally his

2    statement.

3          Is that right, sir?

4    A.    Yes.

5    Q.    Knowing, what is your understanding of that term?

6    A.    That he has an understanding of what I'm reading to

7    him and understands what his rights are.

8    Q.    And his right to decline?

9    A.    Yes.  That would be one of them, yes.

10   Q.    Now when you began this process, you said I placed

11   him under arrest at his place of work; is that correct?

12   A.    I didn't, members of the Task Force did.

13   Q.    I thought you said you did?

14   A.    No, I did not.

15   Q.    Who placed him under arrest?

16   A.    I believe it was Agent Lopez with either Nigro or

17   Casalan.

18   Q.    So if it were any of them, they would not be able to

19   communicate to him in his native tongue; is that correct?

20   A.    Yes.

21   Q.    So nothing was said to him by being placed under

22   arrest, I take it.  You mean he was handcuffed?

23   A.    No, because I arrived in front of the place of

24   business, L and K, as they were bringing him out.

25         So I told him at that point that he was under

**Tariche  -  Cross/London**

38

1   arrest, we were conducting an MS-13 murder investigation.

2   Q.   At the point he was handcuffed, you were not there?

3   A.   Yes, I was, because he was brought out of his L and K

4   workplace by I believe it was his boss, Agent Lopez and

5   Casalan, and he wasn't placed in handcuffs until he was in

6   front of the business being searched and being put into a

7   car, so I was present then.

8   Q.   Do you know whether anything was said to him in

9   English or Spanish before he came into your presence?

10   A.   I do not know because I was not there. I was not

11   there.

12   Q.   You had the ability to communicate with them, so did

13   they tell you that he said anything to them?

14   A.   No.

15   Q.   Okay.

16        When he was brought outside and placed in

17   handcuffs, were you present?

18   A.   Yes.

19   Q.   And what, if anything, did you say to him?

20   A.   I told him that he was under arrest, we were with the

21   FBI conducting an MS-13 murder investigations.

22   Q.   Did you say anything else?

23   A.   No.

24   Q.   What was the next thing that was done with respect to

25   Carlos Ortega?

39

1   A.    He was driven to his residence 11 Leahy.

2   Q.    Did anyone tell him he was going to be driven there,

3   did you or anyone?

4   A.    Yes.

5   Q.    What did you say?

6   A.    I said, we're going to be going to your residence.

7   Q.    So you didn't ask him whether it was okay to go, you

8   said we're taking you to your residence?

9   A.    I said we're going to be going to his residence and

10  then to the FBI office afterwards, yes.

11  Q.    And when you got to his residence what, if anything,

12  did you say to him?

13  A.    I asked him would it be okay if we looked in his

14  room.

15  Q.    Did you tell him he had a right to decline that

16  invitation?

17  A.    Yes, I told him that, and I also read that to him in

18  the form.

19  Q.    You read the form?

20  A.    Yes.

21  Q.    And was anything else said to him when you read the

22  form?

23  A.    I read the form directly as it's written.

24  Q.    Was anything outside of the form said to him?

25  A.    The only thing that was said was would it be okay if

Tariche  -  Cross/London

40

1    we look in your room.  He said yes.

2    Q.    And after you searched his room -- excuse me.

3          While you were searching his room, was he

4    present?

5    A.    Yes.

6    Q.    Where was he?

7    A.    In the room with us.  It was a small rented room

8    within the house.

9    Q.    So you were there with the other officers?

10   A.    Yes.

11   Q.    There were five of you in the room?

12   A.    I believe so, yes.

13   Q.    A little crowded, wasn't it?

14   A.    Single room rental apartment, yes.

15   Q.    Was there any conversation with him while you were

16   searching?

17   A.    No.

18   Q.    And you did not recover any handguns or weapons of

19   any kind other than the knife that you mentioned?

20   A.    The knife and baseball bat, yes.

21   Q.    Well, a baseball bat is not intrinsically a weapon.

22   A.    It isn't, but it's used in many MS-13 assaults.

23   Q.    Intrinsically it's not a weapon.

24   A.    It's not a weapon.  It's originally meant for

25   baseball, but it's been used by MS-13 members in many

41

1  assaults.

2  Q.   Did you have any evidence that he ever used a

3  baseball bat in an assault?

4  A.   No.

5  Q.   Did you have any evidence -- what was the knife,

6  describe that for us?

7  A.   It was a hunting knife.

8  Q.   Size?

9  A.   I don't recall the exact size.

10  Q.   Did you have any evidence that he had ever used a

11  knife in a criminal assault?

12  A.   No, but knives are used in many MS-13 --

13  Q.   That's not my question.

14         MR. LONDON: I move to strike the unresponsive

15  part.

16         THE COURT:  I won't strike it.  Try to answer

17  his question.  Mr. Durham will ask you questions on

18  redirect.

19  A.   The crimes he was involved with, actually there was a

20  knife used on the beach in the Quijada murder.

21  Q.   The question was:  Was he involved in any criminal

22  assault using a knife?

23  A.   Yes, he was, on the beach in Rockaway.

24         One of the crimes he's charged with was the

25  Quijada murder, which a knife was placed through the

1   eyeball of the victim.

2   Q.   Was he alleged to have placed the knife?

3   A.   He was present when that occurred.

4   Q.   That's not my question.  Answer my question.

5        Was he alleged to have used a knife?

6   A.   There were several knives present there at that crime

7   scene, including one that was in the eyeball of the

8   victim.

9   Q.   Was he holding the knife that was placed in the

10  eyeball of the victim?

11  A.   I don't believe he was.  I don't know the answer to

12  that.

13  Q.   Why is that, sir?

14  A.   I was not present when they assaulted Mr. Quijada.

15  Q.   But you had witnesses describe the incident to you,

16  haven't you?

17  A.   Yes.

18  Q.   Okay.

19        MR. DURHAM:  I object.  Beyond the scope.

20        MR. LONDON:  I'll move to something else. It was

21  just the connection to the knife that I was exploring.

22  BY MR. LONDON:

23  Q.   So my initial question, Agent Tariche, did you have

24  any knowledge that Carlos Ortega had used a hunting knife

25  in a criminal assault?

Tariche  -  Cross/London

43

1   A.   No.

2   Q.   So after you searched his room, you put him back in

3   the car and he was still in handcuffs, correct?

4   A.   Yes.

5   Q.   Was he handcuffed in front or in back?

6   A.   Handcuffed in the rear.

7   Q.   Behind his back?

8   A.   Yes.

9   Q.   You took him to Melville station; is that it?

10  A.   No, it's an office building in Melville.

11  Q.   That's an FBI division, headquarters?

12  A.   No, it's an FBI resident agency which is a satellite

13  office out of our main division in New York.

14  Q.   And what is meant by satellite office?

15  A.   Resident agencies are smaller offices that operate

16  outside of the main division which in New York's case is

17  in Manhattan.

18  Q.   At some point at the Melville office you began to

19  question him; is that correct?

20  A.   Yes.

21  Q.   Before doing that, did you have any background as to

22  his education or his level of being able to read or write?

23  A.   No.

24  Q.   You had no knowledge about that?

25  A.   No, I didn't know his educational history, no.

44

1   Q.   Did you attempt to determine whether he could read or

2   write?

3   A.   Yes.

4   Q.   How did you do that?

5   A.   By having him read aloud the form in Spanish that I

6   had provided.

7   Q.   Which form of the forms that are in evidence, which

8   did you do that with?

9   A.   The Miranda form, the FD-395.

10   Q.   Are you referring to Government's Exhibit 2?

11   A.   Yes.

12   Q.   And you claim that he was able to read that to you in

13   Spanish as it was written?

14   A.   He read several lines in the beginning to me, yes.

15   Q.   Which lines did he read?

16   A.   I believe the first three.

17   Q.   And did he appear to have any difficulty reading it?

18   A.   No.

19   Q.   Are you aware that he never got passed the second

20   grade in school?

21   A.   I'm not aware of that.

22   Q.   Now, did you attempt in any way to memorialize the

23   interrogation process that you engaged in?

24   A.   The notes of Agent Lopez was memorialization of the

25   interrogation.

Tariche  -  Cross/London

45

1    Q.    That's subjective, isn't it?

2    A.    I don't think so, no.

3    Q.    Well, an objective memorialization would be a

4    videotape, wouldn't it?

5    A.    Yes.

6    Q.    That would show it exactly as it occurred?

7    A.    Yes.

8          Video and recording interviews in interrogation

9    is against FBI policy, so we don't do that.

10   Q.    Well, that doesn't mean that it's right, wouldn't you

11   agree?

12         MR. DURHAM:  Objection.

13         THE COURT:  Sustained.

14   BY MR. LONDON:

15   Q.    In any event, you did not have an objective

16   memorialization of the interrogation process?

17   A.    It was memorialized.

18         MR. DURHAM:  Objection.

19         THE COURT:  Sustained as to form.

20   BY MR. LONDON:

21   Q.    So the record you have of the interrogation is

22   Agent -- is he a detective, Gomez?

23   A.    Agent Lopez.

24   Q.    Lopez.  Sorry.

25   A.    Yes.

46

1  Q.   Agent Lopez' version of what you're telling him?

2  A.   It's Agent Lopez writing down what I told him, yes.

3  Q.   Well, he's not taking dictation, right?

4  A.   He's not taking dictation, no.

5  Q.   He's writing down as best he can what you're saying

6  to him that you claim my client is saying to you?

7  A.   He's writing down what your client said to me, that's

8  correct.

9  Q.   And your interpretation of it?

10  A.   He's writing down what your client has said to me.

11  Yes, you're correct.

12  Q.   Now I notice on exhibit 2 -- do you want to turn to

13  exhibit 2 in your book.

14  A.   Yes.

15  Q.   On the line where you have the writing Carlos Ortega,

16  you have an X before it.

17  A.   Yes.

18  Q.   And did you tell him to sign his name next to the X?

19  A.   I indicated where he should sign by placing an X,

20  yes.

21  Q.   And you did that on the other forms as well; is that

22  correct, you placed an X to help him?

23  A.   I did not on the consent to search form, no.

24  Q.   Now if we go to Exhibit 4, that is a statement in

25  Spanish.  Is that in your handwriting?

47

1   A.   Yes.

2   Q.   And these are your words written on the page?

3   A.   These are the words that were told to me by your

4   client, Mr. Ortega.

5   Q.   Is it your claim that this is verbatim or your

6   version of what he's saying?

7   A.   This is what he told me.  I read to him and he signed

8   it and initialed each page, yes.

9   Q.   And these are words that he used in talking to you;

10   is that correct?

11   A.   Yes.

12   Q.   And the word decision or in Spanish decision on page

13   one is his word?

14   A.   Could you tell me where that word is?

15   Q.   Right in the middle of the thing about 12 lines down

16   from the top on page 1 beginning with trabajo, tribajo y

17   entonces la decision.

18   A.   Yes.

19   Q.   That's his word?

20   A.   Yes.

21   Q.   It's a word he used?

22   A.   Yes.

23   Q.   At the end of that statement that you wrote out for

24   him, you placed an X and he signed his name next to it?

25   A.   Yes.  That's his signature, yes.

48

1   Q.   Isn't it a fact, Agent Tariche, that you handed him

2   this statement and told him he had to sign it?

3   A.   That is not a fact.

4   Q.   And you didn't tell him that you would help him if he

5   signed it?

6   A.   That's not true.

7   Q.   And you said this process took two to three hours?

8   A.   Yes.

9   Q.   Is it closer to three hours or closer to two hours,

10  which is it?

11  A.   Somewhere between two and three hours.

12  Q.   Did you indicate the time it began and the time it

13  ended?

14  A.   It began at 4:00 is when he signed the Miranda form

15  and I recall it ended somewhere between six and seven p.m.

16  that night.

17  Q.   And after he signed the statement, did anything else

18  take place?

19  A.   Yes.

20        He signed the consent to search his cell phone.

21  Q.   And following that what took place?

22  A.   I think there was a little bit of time went by and

23  then he was eventually transported to be housed at a

24  Suffolk County precinct.

25        MR. LONDON:  May I have a moment, your Honor?

49

```
1            THE COURT:  Sure.
2            (Pause in proceedings.)
3            MR. LONDON:  Nothing further, your Honor.
4            THE COURT:  Redirect.
5            MR. DURHAM:  One moment.
6
7    REDIRECT EXAMINATION
8    BY MR. DURHAM:
9    Q.   Agent, during your career with the FBI, you had
10   defendants decline or refuse to sign Miranda forms?
11   A.   Yes.
12   Q.   Have you had defendants refuse or decline to sign
13   consent to search forms?
14   A.   Yes.
15   Q.   They exercise their right not to sign it?
16   A.   Yes.
17   Q.   And with respect to the Quijada murder which the
18   defendant is charged with --
19   A.   Yes.
20   Q.   -- are you aware whether one knife or multiple knives
21   were used in connection with that murder?
22   A.   Multiple knives.
23   Q.   You were also asked some questions about the
24   defendant's ability to read and write.
25   A.   Yes.
```

50

1  Q.   You had him read the forms out loud to you?

2  A.   Yes.

3  Q.   That was with respect to each of the consent forms?

4  A.   Yes.

5  Q.   And the Miranda forms?

6  A.   Yes.

7  Q.   And he was able to write his name?

8  A.   Yes.

9  Q.   He was able to write his initials?

10 A.   Yes.

11 Q.   At any point did he say he didn't understand what he

12 was signing?

13 A.   No.

14 Q.   Did he ever ask any questions what this meant?

15 A.   No.

16         MR. DURHAM:  No further questions.

17         THE COURT:  Anything further, Mr. London?

18         MR. LONDON:  Not on the Government's case,

19 judge.

20         THE COURT:  Okay.  You can step down.  Thank

21 you.

22         THE WITNESS:  Thank you, your Honor.

23         (The witness steps down.)

24         THE COURT:  Does the government rest?

25         MR. DURHAM:  Your Honor, the government rests.

51

1              THE COURT:  Okay.

2              In terms of the defense case you want a ruling

3      with respect to the scope of the cross of your client, is

4      that what you want?

5              MR. LONDON:  Not yet, Judge.  We may decline to

6      produce any testimony.

7              THE COURT:  Do you want a moment to discuss

8      that?

9              MR. LONDON:  Yes.

10             THE COURT:  Okay.  Let me know when you're

11     ready.

12             (Recess taken.)

13             (After recess.)

14             THE COURT:  Please be seated.

15             Mr. London.

16             MR. LONDON:  Defense rests, your Honor.

17             THE COURT:  So I'm going to reserve decision.

18     I'll issue a ruling on Wednesday at the start of the

19     conference on Wednesday.

20             Is there anything else we need to address today?

21             MR. DURHAM:  Your Honor, if we could, because of

22     the statement made earlier on the record, if the Court

23     would inquire to confirm the defendant understands he has

24     the rights to testify and he's electing not to do so.

25             THE COURT:  Sure.

1          Mr. Ortega, I want to make sure that you

2    understand that you have the right to testify at the

3    suppression hearing if you wish to and Mr. London has

4    advised me that you do not wish to testify; is that

5    correct?  Is that your decision?

6          THE DEFENDANT:  Yes.

7          THE COURT:  Okay, is there anything else?

8          MR. DURHAM:  No, your Honor, thank you.

9          THE COURT:  Mr. London, anything else for today?

10         MR. LONDON:  Nothing that I can think of.

11         THE COURT:  I'll see you Wednesday at one.

12         Thank you.

13         (Proceedings in this matter are concluded.)

14

15

16

17

18

19

20

21

22

23

24

25

53

```
 1                    WITNESSES

 2

 3     REYNALDO TARICHE                        7

 4     DIRECT EXAMINATION                      8

 5     BY MR. DURHAM

 6     VOIR DIRE EXAMINATION                   25

 7     BY MR. LONDON

 8     CROSS-EXAMINATION                       34

 9     BY MR. LONDON

10     REDIRECT EXAMINATION                    49

11     BY MR. DURHAM

12

13                     EXHIBITS

14     Government's Exhibit 1 in evidence      15

15     Government's Exhibit 2 in evidence      20

16     Government's Exhibit 3 in evidence      25

17     Government's Exhibit 4 in evidence      27

18     Government's Exhibit 5 in evidence      30

19     Government's Exhibit 6 in evidence      32

20

21

22

23

24

25
```

## $

**$150** [1] - 2:17

## 1

**1** [8] - 14:16, 15:20, 15:22, 15:23, 15:25, 16:15, 47:16, 53:14
**10** [1] - 8:19
**100** [2] - 1:14, 1:22
**11** [5] - 11:13, 13:17, 15:3, 16:17, 39:1
**11722** [2] - 1:14, 1:23
**12** [1] - 47:15
**15** [2] - 22:14, 53:14
**17** [1] - 1:8

## 2

**2** [9] - 16:19, 20:10, 20:22, 20:24, 20:25, 44:10, 46:12, 46:13, 53:15
**20** [1] - 53:15
**2012** [3] - 10:16, 15:9, 17:13
**2013** [1] - 1:8
**23** [1] - 8:13
**25** [2] - 53:6, 53:16
**26** [3] - 10:16, 15:9, 17:13
**27** [1] - 53:17
**2:15** [1] - 1:9

## 3

**3** [6] - 16:21, 24:11, 25:1, 25:20, 25:21, 53:16
**30** [1] - 53:18
**32** [1] - 53:19
**34** [1] - 53:8
**3500** [4] - 3:19, 3:21, 4:12, 5:14
**395** [1] - 20:14

## 4

**4** [7] - 16:22, 27:13, 27:22, 27:24, 27:25, 46:24, 53:17
**49** [1] - 53:10
**4:00** [1] - 48:14
**4:15** [1] - 22:10

## 5

**5** [5] - 29:4, 29:15, 30:10, 30:12, 53:18

**575-5129** [1] - 32:12

## 6

**6** [5] - 31:7, 32:2, 32:4, 32:5, 53:19
**631** [2] - 1:23, 32:12

## 7

**7** [1] - 53:3
**712-6101** [1] - 1:23

## 8

**8** [1] - 53:4

## 9

**911** [1] - 4:3

## A

**ability** [3] - 2:13, 38:12, 49:24
**able** [6] - 9:21, 37:18, 43:22, 44:12, 50:7, 50:9
**abundance** [1] - 6:17
**access** [1] - 5:10
**accordance** [2] - 5:16, 30:6
**accurate** [4] - 24:22, 29:2, 29:22, 29:25
**actual** [2] - 6:3, 21:3
**add** [1] - 2:24
**added** [1] - 24:8
**addition** [2] - 9:10, 14:1
**additional** [1] - 2:23
**address** [3] - 5:11, 15:2, 51:20
**admit** [3] - 3:10, 23:14, 23:18
**admitted** [6] - 15:22, 20:24, 25:20, 27:24, 30:11, 32:4
**advice** [2] - 16:11, 22:5
**advise** [5] - 10:2, 20:15, 21:11, 24:4, 31:13
**advised** [4] - 17:19, 19:6, 22:25, 52:4
**affidavit** [1] - 6:20
**afford** [1] - 21:14
**afternoon** [3] - 8:8, 8:9, 11:24
**afterwards** [2] - 28:20, 39:10
**agencies** [1] - 43:15
**Agency** [2] - 8:16, 8:21

**agency** [1] - 43:12
**Agent** [23] - 7:17, 11:21, 15:13, 18:13, 20:2, 22:13, 23:24, 24:1, 24:3, 24:8, 24:15, 25:7, 25:24, 34:18, 37:16, 38:4, 42:23, 44:24, 45:22, 45:23, 46:1, 46:2, 48:1
**agent** [4] - 8:11, 25:8, 28:2, 49:9
**agents** [5] - 16:15, 16:22, 32:9, 32:15, 36:2
**agree** [2] - 5:4, 45:11
**agreed** [2] - 13:18, 30:23
**agreement** [1] - 5:3
**ahead** [3] - 6:23, 7:15, 35:6
**alert** [1] - 2:12
**alleged** [2] - 42:2, 42:5
**allow** [3] - 7:8, 32:25, 35:19
**allowed** [2] - 17:3, 22:17
**allowing** [1] - 14:6
**aloud** [3] - 19:10, 19:17, 44:5
**AMERICA** [1] - 1:3
**amounted** [1] - 13:17
**Ann** [1] - 1:22
**answer** [6] - 21:16, 21:22, 23:12, 41:16, 42:4, 42:11
**answered** [1] - 33:7
**anticipate** [1] - 4:2
**apartment** [2] - 13:9, 40:14
**appear** [3] - 20:4, 33:15, 44:17
**APPEARANCES** [1] - 1:12
**approach** [1] - 8:3
**approved** [1] - 30:8
**area** [2] - 18:21, 32:11
**arguably** [1] - 4:14
**argued** [1] - 6:22
**argument** [1] - 2:24
**arrest** [6] - 6:16, 11:2, 12:19, 12:21, 36:9, 37:11, 37:15, 37:22, 38:1, 38:20
**arrested** [1] - 30:14
**arresting** [1] - 11:2
**arrived** [1] - 37:23
**articles** [1] - 32:15
**aspects** [1] - 6:1
**assault** [4] - 41:3, 41:11, 41:22, 42:25
**assaulted** [1] - 42:14
**assaults** [2] - 40:22, 41:1
**assigned** [6] - 8:14, 8:15, 8:18, 8:19, 8:23, 21:15
**Assistant** [1] - 1:16
**assume** [1] - 4:11
**attempt** [2] - 44:1, 44:22
**attention** [1] - 10:16
**attorney** [5] - 21:10, 21:12,

21:14, 21:17, 21:23
**Attorney** [2] - 1:13, 1:16
**authorization** [2] - 2:12, 16:22
**Avenue** [1] - 16:17
**awaiting** [1] - 29:12
**aware** [5] - 4:9, 16:11, 44:19, 44:21, 49:20

## B

**background** [1] - 43:21
**baseball** [5] - 17:23, 40:20, 40:21, 40:25, 41:3
**based** [4] - 3:3, 20:17, 26:14, 29:22
**bat** [4] - 17:23, 40:20, 40:21, 41:3
**batch** [2] - 3:19, 3:22
**bathroom** [2] - 18:8, 32:25
**bay** [1] - 18:22
**beach** [2] - 41:20, 41:23
**BEFORE** [1] - 1:10
**began** [8] - 10:22, 18:23, 18:25, 22:4, 37:10, 43:18, 48:12, 48:14
**begin** [1] - 7:3
**beginning** [4] - 19:4, 35:4, 44:14, 47:16
**behind** [1] - 43:7
**believes** [1] - 29:20
**below** [3] - 15:11, 16:16, 28:14
**belt** [1] - 17:24
**best** [1] - 46:5
**between** [2] - 48:11, 48:15
**beyond** [2] - 7:7, 42:19
**BIANCO** [1] - 1:10
**bilingual** [1] - 9:8
**binder** [3] - 14:13, 20:8, 24:10
**bit** [1] - 48:22
**book** [1] - 46:13
**boss** [1] - 38:4
**bottom** [4] - 15:8, 22:6, 23:2, 31:19
**Brady** [6] - 4:8, 4:10, 4:14, 5:15, 5:19
**break** [2] - 34:6, 34:10
**Brentwood** [4] - 11:13, 12:20, 15:3, 16:17
**brief** [1] - 25:2
**briefly** [1] - 8:25
**bringing** [1] - 37:24
**brought** [4] - 13:3, 26:19, 38:3, 38:16
**Brutonized** [1] - 30:7
**building** [1] - 43:10
**Bureau** [1] - 16:13

2

**business** [2] - 37:24, 38:6
**BY** [23] - 1:15, 8:7, 12:16, 15:24, 17:11, 21:1, 25:6, 25:23, 28:1, 30:13, 32:6, 34:17, 35:1, 35:7, 35:24, 42:22, 45:14, 45:20, 49:8, 53:5, 53:7, 53:9, 53:11

**C**

**C.O** [4] - 22:21, 28:3, 28:9, 28:12
**calm** [2] - 19:5, 33:18
**cannot** [1] - 21:14
**CAPWELL** [1] - 1:16
**car** [2] - 38:7, 43:3
**card** [2] - 17:25, 18:1
**career** [3] - 9:13, 9:22, 49:9
**Carlos** [10] - 7:5, 10:12, 11:2, 11:3, 23:3, 25:13, 25:15, 38:25, 42:24, 46:15
**CARLOS** [1] - 1:7
**CARRIE** [1] - 1:16
**Casalan** [4] - 11:23, 15:14, 37:17, 38:5
**case** [5] - 5:22, 24:7, 43:16, 50:18, 51:2
**caution** [1] - 6:17
**CDs** [1] - 3:13
**cell** [5] - 30:18, 30:23, 31:3, 34:24, 48:20
**cellular** [2] - 30:15, 32:11
**center** [1] - 28:3
**Central** [3] - 1:6, 1:14, 1:23
**certain** [1] - 9:21
**certification** [2] - 9:16, 9:19
**certified** [1] - 9:14
**challenge** [3] - 6:12, 6:18, 6:21
**challenged** [1] - 6:21
**chance** [1] - 18:8
**charged** [2] - 41:24, 49:18
**choses** [1] - 5:19
**CJA** [1] - 2:2
**claim** [4] - 25:13, 44:12, 46:6, 47:5
**clarification** [1] - 29:18
**clarify** [3] - 4:1, 7:8, 17:16
**classes** [1] - 9:11
**clear** [3] - 17:12, 29:10, 30:5
**CLERK** [1] - 7:24
**client** [6] - 22:12, 46:6, 46:7, 46:10, 47:4, 51:3
**closer** [1] - 48:9
**clothing** [2] - 2:13, 2:14
**code** [1] - 32:11
**coerced** [1] - 36:24

**college** [1] - 9:12
**coming** [2] - 24:20, 34:23
**communicate** [2] - 37:19, 38:12
**communicating** [1] - 33:11
**Company** [1] - 11:11
**complete** [1] - 16:16
**computer** [1] - 1:25
**concern** [1] - 19:5
**concerned** [1] - 33:18
**concluded** [1] - 52:13
**conduct** [1] - 7:9
**conducted** [5] - 9:22, 18:14, 18:15, 18:19, 18:21
**conducting** [3] - 24:2, 38:1, 38:21
**conference** [1] - 51:19
**confidential** [3] - 4:19, 4:24, 5:9
**confirm** [1] - 51:23
**connection** [2] - 23:17, 42:21, 49:21
**consent** [11] - 14:4, 14:21, 16:14, 30:25, 31:5, 31:12, 32:9, 46:23, 48:20, 49:13, 50:3
**consult** [1] - 21:10
**conversation** [1] - 40:15
**conversational** [1] - 9:20
**conversations** [3] - 3:2, 4:6, 17:17
**cooperating** [5] - 4:19, 4:24, 5:9, 5:13, 5:15
**corner** [2] - 21:25, 22:6
**correct** [18] - 3:4, 3:7, 11:6, 14:10, 16:8, 25:8, 25:9, 34:20, 35:10, 37:11, 37:19, 43:3, 43:19, 46:8, 46:11, 46:22, 47:10, 52:5
**counsel** [3] - 5:4, 6:24, 12:12
**County** [2] - 11:22, 48:24
**couple** [4] - 4:13, 11:22, 19:10, 36:12
**course** [2] - 23:14, 30:17
**COURT** [58] - 1:1, 2:5, 2:8, 2:10, 2:16, 2:18, 2:20, 3:7, 3:16, 3:24, 4:8, 4:16, 5:2, 5:7, 5:17, 6:4, 6:11, 6:18, 6:23, 7:1, 7:11, 8:4, 12:15, 15:22, 17:8, 20:24, 25:3, 25:18, 25:20, 27:24, 29:16, 29:19, 30:4, 30:10, 32:4, 34:6, 34:10, 34:13, 34:22, 35:4, 35:19, 41:16, 45:13, 45:19, 49:1, 49:4, 50:17, 50:20, 50:24, 51:1, 51:7, 51:10, 51:14, 51:17, 51:25, 52:7, 52:9, 52:11
**court** [1] - 24:20

**Court** [14] - 1:22, 2:12, 3:17, 7:6, 8:25, 9:18, 13:14, 16:11, 18:23, 19:8, 21:9, 23:25, 26:10, 51:22
**Court's** [1] - 30:6
**Courthouse** [1] - 1:16
**courtroom** [4] - 2:13, 2:15, 12:5, 12:6
**covered** [1] - 6:2
**CR-10-0074** [1] - 1:4
**crime** [1] - 42:6
**crimes** [3] - 9:4, 41:19, 41:24
**criminal** [3] - 41:11, 41:21, 42:25
**cross** [5] - 7:7, 7:10, 34:13, 35:5, 51:3
**CROSS** [2] - 34:16, 53:8
**cross-examination** [4] - 7:7, 7:10, 34:13, 35:5
**CROSS-EXAMINATION** [2] - 34:16, 53:8
**crowded** [1] - 40:13
**custody** [3] - 12:25, 13:1, 13:3

**D**

**date** [2] - 15:8, 16:25
**David** [3] - 10:8, 13:10, 23:9
**Davis** [1] - 11:22
**decide** [1] - 21:16
**decision** [6] - 7:13, 47:12, 47:17, 51:17, 52:5
**declaration** [1] - 21:22
**decline** [5] - 37:8, 39:15, 49:10, 49:12, 51:5
**DEFENDANT** [1] - 52:6
**Defendant** [2] - 1:8, 1:18
**defendant** [26] - 7:5, 12:14, 13:22, 14:2, 15:15, 16:12, 17:1, 17:13, 18:12, 19:24, 20:3, 22:15, 23:6, 24:23, 26:2, 30:15, 30:22, 31:13, 32:17, 32:19, 33:4, 33:6, 33:11, 34:23, 49:18, 51:23
**defendant's** [5] - 13:15, 18:4, 19:3, 20:19, 49:24
**defendants** [4] - 4:7, 10:2, 49:10, 49:12
**defense** [5] - 5:21, 6:10, 12:12, 51:2, 51:16
**del** [1] - 16:4
**demeanor** [1] - 19:3
**Department** [2] - 16:13, 31:12
**describe** [5] - 13:14, 19:3, 19:5, 41:6, 42:15

**described** [1] - 16:16
**desire** [1] - 21:15
**Detective** [5] - 11:21, 18:13, 20:2, 22:13, 24:3
**detective** [2] - 15:13, 45:22
**determine** [1] - 44:1
**dictation** [2] - 46:3, 46:4
**difficulty** [1] - 44:17
**dire** [1] - 25:2
**DIRE** [2] - 25:5, 53:6
**DIRECT** [2] - 8:6, 53:4
**direct** [4] - 6:12, 10:16, 34:18, 35:2
**directly** [2] - 15:10, 39:23
**disclosed** [1] - 3:18
**disclosing** [1] - 4:24
**disclosure** [1] - 5:25
**discretion** [1] - 5:23
**discuss** [2] - 6:5, 51:7
**dismantle** [1] - 9:3
**DISTRICT** [3] - 1:1, 1:1, 1:11
**Division** [1] - 8:15
**division** [3] - 43:11, 43:13, 43:16
**document** [16] - 14:15, 14:18, 14:19, 15:6, 15:12, 16:7, 20:11, 22:1, 22:7, 22:21, 22:23, 23:2, 27:7, 27:14, 28:3, 29:10
**documents** [1] - 4:13
**Doe** [1] - 23:19
**done** [2] - 32:7, 38:24
**doubt** [1] - 4:4
**down** [8] - 26:14, 46:2, 46:5, 46:7, 46:10, 47:15, 50:20, 50:23
**draft** [1] - 29:11
**drink** [1] - 32:23
**driven** [2] - 39:1, 39:2
**duly** [1] - 7:21
**DURHAM** [46] - 1:15, 3:5, 3:20, 4:1, 4:12, 4:22, 5:6, 5:12, 6:7, 6:15, 6:24, 7:16, 8:3, 8:7, 12:13, 12:16, 15:19, 15:24, 17:11, 20:21, 21:1, 24:25, 25:22, 25:23, 27:21, 28:1, 29:14, 30:5, 30:13, 32:1, 32:6, 34:3, 34:5, 34:8, 35:17, 42:19, 45:12, 45:18, 49:5, 49:8, 50:16, 50:25, 51:21, 52:8, 53:5, 53:11
**Durham** [5] - 5:11, 6:23, 41:17
**during** [14] - 4:3, 9:13, 9:22, 10:11, 21:12, 23:14, 23:21, 23:24, 24:23, 30:17, 33:2, 33:10, 33:19, 49:9

## E

**early** [1] - 4:15
**EASTERN** [1] - 1:1
**easy** [1] - 33:7
**economically** [1] - 2:14
**education** [2] - 9:11, 43:22
**educational** [1] - 43:25
**either** [4] - 3:20, 3:22, 4:15, 37:16
**El** [1] - 17:24
**electing** [1] - 51:24
**employment** [4] - 11:8, 11:10, 12:3, 12:17
**end** [2] - 26:1, 47:23
**ended** [2] - 48:13, 48:15
**enforcement** [2] - 11:15, 33:3
**engaged** [4] - 34:19, 35:2, 35:9, 44:23
**English** [16] - 4:5, 9:6, 13:20, 16:10, 17:9, 17:14, 17:17, 21:4, 25:11, 26:4, 28:21, 29:8, 29:24, 30:20, 32:8, 38:9
**entire** [1] - 19:13
**entitled** [1] - 5:21
**entonces** [1] - 47:17
**ESQ** [5] - 1:15, 1:15, 1:16, 1:18, 1:19
**essentially** [1] - 30:9
**establish** [1] - 36:2
**event** [1] - 45:15
**eventually** [1] - 48:23
**evidence** [20] - 7:12, 13:12, 15:23, 16:8, 20:25, 25:21, 27:25, 30:12, 32:5, 41:2, 41:5, 41:10, 44:7, 53:14, 53:15, 53:16, 53:17, 53:18, 53:19
**exact** [1] - 41:9
**exactly** [1] - 45:6
**examination** [5] - 7:7, 7:8, 7:10, 34:13, 35:5
**EXAMINATION** [8] - 8:6, 25:5, 34:16, 49:7, 53:4, 53:6, 53:8, 53:10
**examined** [1] - 7:21
**exceed** [1] - 2:17
**excuse** [1] - 40:2
**exercise** [1] - 49:15
**Exhibit** [28] - 14:16, 15:22, 15:23, 20:10, 20:24, 20:25, 24:11, 25:20, 25:21, 27:13, 27:22, 27:24, 27:25, 29:4, 29:15, 30:10, 30:12, 31:7, 32:4, 32:5, 44:10, 46:24, 53:14, 53:15, 53:16, 53:17, 53:18, 53:19

## F

**exhibit** [9] - 3:7, 15:20, 15:25, 20:9, 20:22, 25:1, 32:2, 46:12, 46:13
**EXHIBITS** [1] - 53:13
**exhibits** [2] - 3:1, 3:18
**explain** [8] - 8:25, 9:18, 18:23, 19:8, 22:14, 23:25, 26:10, 36:5
**explained** [1] - 14:7
**exploring** [1] - 42:21
**extent** [2] - 2:24, 5:8, 5:12, 5:14, 6:22, 17:16
**eyeball** [3] - 42:1, 42:7, 42:10

## F

**F-I-R-M-A** [1] - 28:14
**fact** [3] - 24:3, 48:1, 48:3
**fair** [2] - 24:22, 29:2
**fake** [1] - 17:25
**FBI** [23] - 8:11, 8:14, 9:13, 9:22, 14:4, 14:21, 16:15, 18:6, 18:7, 19:1, 19:9, 20:14, 28:20, 28:24, 31:6, 31:12, 32:9, 38:21, 39:10, 43:11, 43:12, 45:9, 49:9
**FD-26** [4] - 14:5, 14:21, 31:5, 31:11
**FD-395** [2] - 19:2, 44:9
**Federal** [3] - 1:14, 1:22, 16:13
**filled** [1] - 14:24
**finalization** [1] - 29:12
**finalize** [1] - 30:8
**finalized** [3] - 29:10, 29:11, 29:21
**fine** [2] - 2:16, 2:18
**finished** [1] - 30:9
**firearm** [3] - 13:7, 13:9, 13:10
**first** [8] - 2:25, 7:13, 7:20, 9:7, 9:8, 27:9, 28:2, 44:16
**firstly** [1] - 2:3
**five** [1] - 40:11
**floor** [2] - 15:3, 16:18
**fluent** [1] - 9:20
**follow** [1] - 35:23
**following** [1] - 48:21
**follows** [1] - 7:22
**food** [1] - 32:22
**Force** [6] - 8:23, 9:1, 9:2, 11:18, 11:22, 37:12
**form** [40] - 14:5, 14:7, 14:21, 14:23, 14:24, 15:1, 17:1, 17:20, 19:1, 19:9, 19:13, 19:20, 19:22, 19:24, 20:1, 20:3, 20:14, 20:19, 21:2, 22:13, 23:7, 31:5,

31:11, 31:12, 31:13, 32:17, 39:18, 39:19, 39:22, 39:23, 39:24, 44:5, 44:7, 44:9, 45:19, 46:23, 48:14
**formal** [1] - 9:11
**forms** [7] - 44:7, 46:21, 49:10, 49:13, 50:1, 50:3, 50:5
**four** [1] - 22:2
**friend** [1] - 33:4
**front** [6] - 14:13, 20:8, 24:10, 37:23, 38:6, 43:5
**fruition** [1] - 4:25

## G

**Gang** [4] - 8:23, 9:1, 9:2, 11:17
**gangs** [1] - 9:3
**general** [2] - 35:19, 35:21
**generally** [1] - 36:20
**Giglio** [1] - 5:14
**given** [1] - 16:11
**Gomez** [1] - 45:22
**Government** [5] - 1:13, 15:19, 20:21, 25:1, 32:1
**government** [11] - 3:2, 4:9, 5:8, 5:19, 6:4, 6:7, 6:13, 7:9, 7:16, 50:24, 50:25
**Government's** [27] - 14:15, 15:22, 15:23, 20:10, 20:25, 24:11, 25:20, 25:21, 27:13, 27:21, 27:24, 27:25, 29:4, 29:14, 30:10, 30:12, 31:7, 32:4, 32:5, 44:10, 50:18, 53:14, 53:15, 53:16, 53:17, 53:18, 53:19
**government's** [4] - 3:3, 3:13, 4:19, 20:24
**grade** [1] - 44:20
**green** [1] - 17:25
**grew** [1] - 9:8
**guess** [2] - 6:12, 29:19
**gun** [2] - 18:2, 18:3
**guys** [1] - 17:7

## H

**half** [1] - 3:21
**hand** [3] - 21:25, 22:6, 23:2
**handcuffed** [5] - 12:22, 37:22, 38:2, 43:5, 43:6
**handcuffs** [3] - 38:5, 38:17, 43:3
**handed** [1] - 48:1
**handguns** [1] - 40:18
**handwriting** [13] - 15:1, 15:2, 15:4, 15:5, 15:6,

15:7, 15:9, 20:18, 24:16, 24:18, 25:8, 27:19, 46:25
**handwritten** [1] - 24:15
**Hauppauge** [2] - 11:11, 12:4
**headquarters** [1] - 43:11
**hear** [3] - 2:23, 7:12
**heard** [1] - 36:16
**hearing** [5] - 15:20, 29:15, 29:19, 36:8, 52:3
**held** [1] - 4:23
**help** [2] - 46:22, 48:4
**high** [1] - 9:12
**himself** [1] - 26:25
**history** [1] - 43:25
**hold** [1] - 21:17
**holding** [2] - 34:24, 42:9
**home** [2] - 9:9, 9:10
**homicide** [1] - 13:13
**Honor** [31] - 3:5, 4:1, 4:12, 5:6, 5:12, 6:2, 6:8, 6:15, 6:25, 7:16, 8:3, 12:13, 15:19, 20:21, 20:23, 24:25, 25:22, 27:21, 29:14, 30:5, 32:1, 34:3, 34:9, 35:17, 48:25, 49:3, 50:22, 50:25, 51:16, 51:21, 52:8
**HONORABLE** [1] - 1:10
**hours** [5] - 32:21, 48:7, 48:9, 48:11
**house** [1] - 40:8
**housed** [1] - 48:23
**hundreds** [5] - 10:1, 10:6, 34:19, 35:3, 35:9
**hunting** [2] - 41:7, 42:24

## I

**I.D.'s** [1] - 17:25
**identified** [3] - 4:13, 10:13, 12:14
**identify** [2] - 9:3, 12:8
**identity** [1] - 4:18
**illegible** [1] - 15:14
**immigrants** [1] - 9:9
**incident** [1] - 42:15
**including** [3] - 3:12, 17:24, 42:7
**indicate** [1] - 48:12
**indicated** [1] - 46:19
**indicates** [1] - 22:4
**indictment** [1] - 23:19
**individual** [3] - 10:12, 12:6, 23:18
**informant** [4] - 4:24, 5:10, 5:20, 5:22
**informants** [1] - 4:20
**informed** [2] - 16:19, 32:13
**ingles** [1] - 16:4

4

## K

**kind** [1] - 40:19
**knife** [15] - 17:23, 40:19, 40:20, 41:5, 41:7, 41:11, 41:20, 41:22, 41:25, 42:2, 42:5, 42:9, 42:21, 42:24, 49:20
**knives** [4] - 41:12, 42:6, 49:20, 49:22
**knowing** [3] - 36:16, 36:17, 37:5
**knowingly** [1] - 36:22
**knowledge** [3] - 29:23, 42:24, 43:24
**known** [1] - 10:12
**knows** [1] - 29:24

## L

**labeled** [1] - 14:15
**language** [3] - 9:7, 9:11, 26:8
**languages** [2] - 9:5, 9:7
**last** [2] - 21:2, 32:19
**latest** [2] - 4:17, 5:2
**law** [4] - 5:18, 5:23, 11:15, 33:3
**lawyer** [6] - 33:22, 35:18, 35:25, 36:1, 36:4, 36:20
**layman** [1] - 36:20
**Leahy** [5] - 11:13, 13:18, 15:3, 16:17, 39:1
**learn** [1] - 9:7
**learned** [1] - 9:8
**left** [4] - 15:8, 22:6, 22:20, 26:13
**left-hand** [1] - 22:6
**legally** [1] - 36:20
**lengthy** [1] - 4:2
**level** [2] - 9:21, 43:22
**limine** [1] - 7:4
**line** [3] - 28:14, 28:15, 46:15
**lines** [4] - 19:11, 44:14, 44:15, 47:15
**list** [2] - 3:1, 3:8
**living** [1] - 8:10
**locate** [2] - 11:12, 11:24
**located** [2] - 12:3, 12:17
**location** [3] - 16:17, 22:1, 26:14
**London** [5] - 35:6, 50:17, 51:15, 52:3, 52:9
**LONDON** [38] - 1:18, 2:1, 2:6, 2:9, 2:11, 2:17, 2:19, 7:3, 15:21, 20:23, 25:2, 25:6, 25:17, 25:19, 27:23,

---

**initial** [4] - 3:20, 19:23, 27:9, 42:23
**initialed** [2] - 27:10, 47:8
**initials** [5] - 22:22, 22:23, 28:3, 28:10, 50:9
**inquire** [1] - 51:23
**intend** [5] - 3:3, 3:18, 5:13, 6:13, 6:16
**intent** [1] - 6:14
**interactions** [1] - 17:13
**interpretation** [1] - 46:9
**interpreter** [1] - 29:21
**interrelated** [1] - 6:15
**interrogation** [7] - 21:13, 21:15, 44:23, 44:25, 45:8, 45:16, 45:21
**interview** [22] - 18:14, 18:15, 18:19, 18:21, 18:24, 18:25, 19:4, 23:14, 23:21, 23:24, 24:2, 24:20, 24:23, 26:1, 26:13, 26:19, 30:17, 32:19, 33:2, 33:10, 33:17, 33:19
**interviews** [2] - 9:23, 45:8
**intrinsically** [2] - 40:21, 40:23
**Investigation** [1] - 16:13
**investigation** [6] - 10:8, 10:11, 13:2, 16:24, 32:16, 38:1
**investigations** [1] - 38:21
**invitation** [1] - 39:16
**involved** [4] - 10:7, 13:2, 41:19, 41:21
**involving** [1] - 4:6
**IRA** [1] - 1:18
**Island** [8] - 8:16, 8:21, 8:23, 9:1, 9:2, 9:4, 10:20, 11:17
**Islip** [3] - 1:6, 1:14, 1:23
**issue** [1] - 51:18
**item** [2] - 16:1, 24:12
**items** [1] - 18:1

## J

**James** [1] - 15:13
**January** [1] - 1:8
**John** [1] - 23:19
**JOHN** [1] - 1:15
**JOSEPH** [1] - 1:10
**judge** [4] - 2:1, 7:3, 33:7, 50:19
**Judge** [3] - 25:17, 34:14, 51:5
**JUDGE** [1] - 1:11
**Justice** [2] - 16:13, 31:12

---

29:17, 30:2, 32:3, 34:14, 34:17, 35:1, 35:7, 35:23, 35:24, 41:14, 42:20, 42:22, 45:14, 45:20, 48:25, 49:3, 50:18, 51:5, 51:9, 51:16, 52:10, 53:7, 53:9
**look** [8] - 14:13, 20:8, 24:11, 27:13, 29:4, 30:23, 31:2, 40:1
**looked** [2] - 13:23, 39:13
**looking** [11] - 3:3, 11:7, 11:8, 11:14, 12:5, 13:7, 13:18, 15:25, 21:25, 22:20, 28:2
**Lopez** [17] - 11:21, 15:13, 18:13, 20:2, 22:13, 23:24, 24:1, 24:3, 24:8, 24:15, 25:24, 37:16, 38:4, 44:24, 45:23, 45:24, 46:2
**Lopez'** [1] - 46:1
**LORETTA** [1] - 1:13
**loud** [3] - 19:13, 26:21, 50:1
**LYNCH** [1] - 1:13

## M

**main** [2] - 43:13, 43:16
**Manhattan** [1] - 43:17
**March** [3] - 10:16, 15:9, 17:13
**MARIANNE** [1] - 1:19
**Mario** [1] - 10:8
**marked** [2] - 14:5, 20:9
**markings** [1] - 27:6
**Martorell** [1] - 11:23
**Mary** [1] - 1:22
**material** [6] - 3:19, 5:1, 5:14, 5:15, 5:19
**materials** [1] - 4:9
**matter** [2] - 5:23, 52:13
**matters** [1] - 8:24
**mean** [7] - 36:5, 36:13, 36:18, 36:23, 36:24, 37:22, 45:10
**means** [1] - 29:18
**meant** [3] - 40:24, 43:14, 50:14
**mechanical** [1] - 1:25
**meeting** [1] - 11:1
**Melville** [9] - 8:16, 10:21, 10:22, 10:24, 18:6, 18:19, 43:9, 43:10, 43:18
**members** [3] - 11:17, 37:12, 40:25
**memorialization** [3] - 44:24, 45:3, 45:16
**memorialize** [1] - 44:22
**memorialized** [1] - 45:17

---

**mentioned** [1] - 40:19
**Michael** [1] - 15:13
**middle** [5] - 15:2, 27:11, 28:9, 28:11, 47:15
**mind** [1] - 2:2
**mine** [1] - 32:11
**minutes** [1] - 22:14
**Miranda** [13] - 10:3, 19:1, 19:6, 19:9, 19:23, 34:19, 35:9, 35:13, 36:19, 44:9, 48:14, 49:10, 50:5
**missing** [1] - 3:17
**mission** [2] - 9:1, 9:2
**moment** [7] - 2:23, 6:9, 6:24, 21:18, 21:19, 34:3, 48:25, 49:5, 51:7
**moot** [4] - 3:4, 4:21, 4:22
**motion** [8] - 2:21, 3:1, 4:18, 5:8, 6:1, 6:3, 7:4
**motions** [2] - 2:22, 2:25
**move** [2] - 41:14, 42:20
**MR** [82] - 2:1, 2:6, 2:9, 2:11, 2:17, 2:19, 3:5, 3:20, 4:1, 4:12, 4:22, 5:6, 5:12, 6:7, 6:15, 6:24, 7:3, 7:16, 8:3, 8:7, 12:13, 12:16, 15:19, 15:21, 15:24, 17:11, 20:21, 20:23, 21:1, 24:25, 25:2, 25:6, 25:17, 25:19, 25:22, 25:23, 27:21, 27:23, 28:1, 29:14, 29:17, 30:2, 30:5, 30:13, 32:1, 32:3, 32:6, 34:3, 34:5, 34:8, 34:14, 34:17, 35:1, 35:7, 35:17, 35:23, 35:24, 41:14, 42:19, 42:20, 42:22, 45:12, 45:14, 45:18, 45:20, 48:25, 49:3, 49:5, 49:8, 50:16, 50:18, 50:25, 51:5, 51:9, 51:16, 51:21, 52:8, 52:10, 53:5, 53:7, 53:9, 53:11
**MS** [5] - 3:10, 3:25, 6:2, 6:9, 6:20
**MS-13** [8] - 8:24, 13:2, 17:23, 38:1, 38:21, 40:22, 40:25, 41:12
**multiple** [2] - 49:20, 49:22
**murder** [12] - 13:2, 13:8, 13:11, 23:9, 23:10, 23:17, 38:1, 38:21, 41:20, 41:25, 49:17, 49:21
**murders** [4] - 10:8, 10:14, 23:11, 23:15

## N

**name** [7] - 5:22, 7:24, 10:12, 11:5, 46:18, 47:24, 50:7

5

**native** [1] - 37:19
**need** [4] - 2:11, 6:5, 25:17, 51:20
**negotiations** [2] - 4:23, 5:4
**never** [1] - 44:19
**NEW** [1] - 1:1
**New** [9] - 1:6, 1:14, 1:23, 8:15, 8:16, 15:3, 16:18, 43:13, 43:16
**next** [14] - 4:15, 4:18, 4:21, 4:22, 12:18, 17:7, 18:5, 19:23, 22:25, 23:7, 26:18, 38:24, 46:18, 47:24
**night** [1] - 48:16
**Nigro** [7] - 11:21, 15:13, 18:13, 20:2, 22:13, 24:3, 37:16
**non** [1] - 2:22
**non-suppression** [1] - 2:22
**normal** [1] - 24:6
**notation** [1] - 28:6
**note** [1] - 6:11
**notes** [9] - 23:21, 23:24, 24:1, 24:7, 24:9, 24:15, 24:19, 25:24, 44:24
**nothing** [4] - 6:9, 37:21, 49:3, 52:10
**notice** [1] - 46:12
**notification** [2] - 16:1, 22:4
**number** [3] - 3:12, 16:1, 22:21

## O

**object** [1] - 42:19
**objection** [11] - 15:21, 20:23, 25:18, 25:19, 27:23, 29:16, 30:3, 32:3, 35:17, 45:12, 45:18
**objective** [2] - 45:3, 45:15
**obligation** [1] - 5:16
**obligations** [2] - 4:10
**obtained** [1] - 30:25
**obviously** [2] - 29:23, 33:18
**occasions** [1] - 36:11
**occurred** [2] - 42:3, 45:6
**OF** [3] - 1:1, 1:3, 1:10
**offense** [1] - 7:9
**offer** [3] - 3:9, 27:21, 29:14
**offered** [2] - 18:8, 32:22
**offers** [4] - 15:19, 20:21, 25:1, 32:1
**office** [9] - 10:20, 18:6, 18:7, 18:20, 39:10, 43:10, 43:13, 43:14, 43:18
**Officer** [1] - 11:22
**officers** [4] - 11:16, 11:23,

**offices** [1] - 43:15
**often** [1] - 24:18
**once** [5] - 13:14, 18:7, 26:20, 30:8, 31:4
**one** [15] - 6:24, 16:1, 18:17, 19:23, 21:15, 31:22, 34:3, 36:13, 37:9, 41:24, 42:7, 47:13, 49:5, 49:20, 52:11
**ones** [1] - 4:20
**ongoing** [2] - 4:10, 4:23
**operate** [1] - 43:15
**opportunity** [6] - 3:12, 3:14, 10:2, 19:15, 26:25, 31:17
**orally** [9] - 6:18, 6:21, 13:24, 14:1, 17:1, 17:8, 22:17, 31:15, 37:1
**originally** [1] - 40:24
**ORTEGA** [1] - 1:7
**Ortega** [22] - 2:20, 7:5, 10:12, 11:2, 11:3, 11:14, 11:25, 12:6, 12:11, 12:17, 12:19, 22:12, 23:3, 23:5, 23:8, 25:13, 25:15, 26:15, 26:20, 27:18, 28:7, 28:13, 29:9, 35:4, 38:25, 42:24, 46:15, 47:4, 52:1
**Ortega's** [4] - 15:11, 22:22, 28:10, 28:17
**outside** [3] - 38:16, 39:24, 43:16
**overall** [1] - 33:17
**own** [1] - 31:22

## P

**p.m** [2] - 1:9, 48:15
**p.m.** [1] - 22:2
**page** [12] - 27:5, 27:7, 27:9, 27:10, 27:12, 28:2, 28:8, 28:11, 47:2, 47:8, 47:12, 47:16
**pages** [1] - 27:11
**papers** [2] - 6:11, 6:22
**paraphernalia** [1] - 17:24
**parents** [1] - 9:9
**part** [2] - 13:1, 41:15
**participating** [1] - 23:15
**particular** [3] - 5:9, 5:20, 8:20
**passed** [1] - 44:19
**passport** [2] - 17:24, 17:25
**pause** [1] - 34:4, 49:2
**Pause** [1] - 7:2
**people** [1] - 31:24
**permission** [11] - 2:3, 13:8, 13:17, 13:19, 14:1, 16:21, 16:23, 30:18, 32:10, 32:14,

32:15
**permit** [1] - 7:7
**perpetrate** [1] - 9:3
**person** [2] - 16:16, 32:10
**personally** [1] - 15:17
**phone** [4] - 30:18, 30:23, 31:3, 48:20
**place** [9] - 11:8, 11:10, 12:3, 12:17, 32:10, 37:11, 37:23, 48:18, 48:21
**placed** [12] - 12:19, 12:21, 14:13, 22:23, 23:4, 37:10, 37:15, 37:21, 38:5, 38:16, 41:25, 42:2, 42:9, 46:22, 47:24
**places** [1] - 22:21
**placing** [1] - 46:19
**play** [2] - 4:3, 4:5
**played** [1] - 4:3
**Plaza** [2] - 1:14, 1:22
**plea** [2] - 4:23, 5:3
**plus** [3] - 9:17, 9:18, 9:20
**point** [13] - 10:11, 10:24, 11:1, 11:24, 12:8, 18:11, 33:2, 33:10, 33:19, 37:25, 38:2, 43:18, 50:11
**policy** [1] - 45:9
**portion** [1] - 19:17
**position** [1] - 3:5
**possible** [1] - 2:14
**post** [1] - 36:9
**post-arrest** [1] - 36:9
**practice** [1] - 24:6
**precinct** [1] - 48:24
**predominantly** [1] - 8:24
**prepare** [2] - 26:6, 26:11, 28:20
**prepared** [2] - 28:23, 28:25
**preparing** [1] - 4:12
**presence** [3] - 21:17, 21:23, 38:9
**present** [10] - 18:11, 18:13, 21:12, 33:3, 38:7, 38:17, 40:4, 42:3, 42:6, 42:14
**pretzels** [1] - 18:9
**probation** [1] - 11:23
**problems** [2] - 33:11, 33:13
**proceed** [1] - 2:20
**proceeding** [1] - 2:4
**PROCEEDINGS** [1] - 1:10
**proceedings** [4] - 7:2, 34:4, 49:2, 52:13
**Proceedings** [1] - 1:25
**process** [5] - 26:10, 37:10, 44:23, 45:16, 48:7
**produce** [1] - 51:6
**produced** [3] - 1:25, 19:9, 31:4

**proof** [2] - 6:13, 6:16
**proposed** [1] - 30:7
**prosecutor** [1] - 33:7
**provided** [5] - 3:21, 4:16, 5:15, 14:4, 44:6
**providing** [1] - 4:14
**purchase** [1] - 2:14
**purpose** [1] - 29:19
**purposes** [2] - 15:20, 29:15
**put** [5] - 6:13, 6:16, 36:7, 38:6, 43:2

## Q

**questions** [16] - 21:5, 21:11, 21:16, 21:23, 23:8, 23:9, 23:11, 23:12, 24:7, 33:8, 33:24, 34:5, 41:17, 49:23, 50:14, 50:16
**quiet** [1] - 26:13
**Quijada** [6] - 10:9, 23:10, 41:20, 41:25, 42:14, 49:17
**quite** [1] - 24:18

## R

**RANTALA** [6] - 1:19, 3:10, 3:25, 6:2, 6:9, 6:20
**RAYMOND** [1] - 1:15
**read** [39] - 9:21, 15:25, 16:10, 17:1, 17:3, 17:8, 17:10, 19:10, 19:11, 19:13, 19:15, 19:17, 19:18, 21:3, 21:20, 22:17, 22:18, 23:6, 26:20, 26:21, 26:23, 26:25, 31:15, 31:17, 32:7, 39:17, 39:19, 39:21, 39:23, 43:22, 44:1, 44:5, 44:12, 44:14, 44:15, 47:7, 49:24, 50:1
**reading** [5] - 18:25, 19:20, 36:23, 37:6, 44:17
**ready** [1] - 51:11
**rear** [1] - 43:6
**reason** [1] - 13:6
**recess** [4] - 34:11, 34:12, 51:12, 51:13
**recognize** [11] - 14:18, 14:19, 20:11, 20:16, 20:17, 24:12, 24:16, 27:14, 29:5, 31:8, 31:20
**record** [9] - 7:25, 12:13, 16:1, 16:10, 21:4, 32:8, 34:22, 45:21, 51:22
**recorded** [3] - 1:25, 3:2, 4:6
**recording** [1] - 45:8
**recordings** [1] - 4:2
**recover** [2] - 17:22, 40:18

recovered [1] - 17:23
REDIRECT [2] - 49:7,
53:10
redirect [2] - 41:18, 49:4
referred [1] - 23:18
referring [1] - 44:10
reflect [2] - 12:14, 34:22
refuse [4] - 16:20, 32:13,
49:10, 49:12
regarding [2] - 11:1, 13:12
related [2] - 16:23, 32:16
relation [1] - 36:18
remain [2] - 21:7, 34:1
rental [1] - 40:14
rented [4] - 13:17, 15:3,
16:18, 40:7
repeating [1] - 16:5
report [1] - 29:8
Reporter [1] - 1:22
represent [1] - 4:9
representation [1] - 30:2
representing [1] - 3:17
request [3] - 2:7, 4:8, 30:17
requesting [1] - 3:1
requests [1] - 2:2
requires [1] - 5:23
reserve [2] - 21:18, 51:17
residence [13] - 11:9,
11:12, 12:20, 13:4, 13:6,
13:15, 13:16, 18:4, 39:1,
39:6, 39:8, 39:9, 39:11
resident [2] - 43:12, 43:15
Resident [2] - 8:16, 8:21
respect [7] - 5:7, 6:13,
14:2, 38:24, 49:17, 50:3,
51:3
response [2] - 3:3, 5:11
rest [1] - 50:24
rests [2] - 50:25, 51:16
review [2] - 3:14, 28:25
reviewed [1] - 24:19
reviewing [1] - 20:3
Reynaldo [2] - 7:17, 8:1
REYNALDO [3] - 7:19, 8:1,
53:3
right-hand [2] - 21:25, 23:2
rights [13] - 10:3, 19:1,
19:6, 20:15, 21:6, 21:20,
22:5, 22:25, 23:6, 33:20,
36:19, 37:7, 51:24
Rockaway [1] - 41:23
room [20] - 13:17, 13:18,
13:23, 14:6, 15:3, 16:18,
17:21, 18:21, 26:13, 26:16,
26:19, 39:14, 40:1, 40:2,
40:3, 40:7, 40:11, 40:14,
43:2
rule [1] - 2:23
ruling [2] - 51:2, 51:18

rulings [1] - 30:6

S

Salvador [1] - 17:25
Sandler [4] - 10:8, 13:11,
23:9, 23:17
satellite [2] - 43:12, 43:14
saw [1] - 15:17
scene [1] - 42:7
school [2] - 9:12, 44:20
scope [3] - 7:7, 42:19, 51:3
search [22] - 6:12, 6:14,
6:22, 13:9, 13:17, 14:4,
14:6, 14:21, 16:14, 16:16,
16:17, 16:20, 17:20, 30:18,
31:5, 31:12, 32:9, 32:10,
32:14, 46:23, 48:20, 49:13
searched [4] - 17:21, 38:6,
40:2, 43:2
searching [3] - 18:4, 40:3,
40:16
seated [3] - 12:11, 34:23,
51:14
second [6] - 15:3, 16:18,
23:18, 27:9, 28:8, 44:19
security [1] - 18:1
see [7] - 12:5, 14:15, 19:11,
24:17, 28:4, 31:24, 52:11
seeking [2] - 3:8, 14:1
series [1] - 15:10
seven [1] - 48:15
several [2] - 42:6, 44:14
shirt [1] - 12:11
short [3] - 4:4, 34:6, 34:10
shot [1] - 23:18
show [2] - 31:7, 45:6
showing [2] - 5:20, 19:1
sick [1] - 3:10
side [2] - 22:20, 23:2
sign [12] - 19:24, 20:1,
26:2, 27:2, 27:4, 31:24,
46:18, 46:19, 48:2, 49:10,
49:12, 49:15
signature [11] - 15:10,
15:11, 15:14, 20:17, 20:19,
23:3, 27:7, 28:15, 28:17,
47:25
signatures [4] - 15:10,
15:17, 31:19, 31:20
signed [24] - 2:8, 14:6,
14:9, 14:11, 15:12, 15:15,
16:25, 17:5, 17:7, 17:19,
19:22, 21:24, 22:13, 23:7,
26:20, 27:11, 29:9, 32:17,
47:7, 47:24, 48:5, 48:14,
48:17, 48:20
significant [1] - 3:22
signifies [1] - 22:12

signify [2] - 22:3, 22:11
signing [2] - 37:1, 50:12
Silencio [2] - 10:13, 11:5
silent [2] - 21:7, 34:1
Silent [1] - 10:13
similarly [1] - 21:2
single [1] - 40:14
situation [2] - 5:18, 5:24
six [1] - 48:15
size [2] - 41:8, 41:9
small [1] - 40:7
smaller [1] - 43:15
snack [1] - 18:9
social [1] - 18:1
somewhere [3] - 10:25,
48:11, 48:15
sorry [1] - 45:24
Spanish [47] - 9:6, 9:8,
9:10, 9:11, 9:12, 9:14,
9:20, 9:23, 10:3, 13:20,
13:21, 14:5, 14:7, 14:22,
16:8, 17:8, 17:10, 17:14,
17:15, 17:18, 18:17, 19:9,
19:12, 20:14, 24:2, 24:4,
24:8, 25:14, 25:15, 26:4,
26:5, 26:9, 26:14, 26:23,
27:17, 28:18, 29:24, 30:20,
30:21, 31:2, 31:4, 31:11,
38:9, 44:5, 44:13, 46:25,
47:12
speaking [3] - 9:10, 21:18,
21:19
Special [3] - 7:17, 15:13,
25:24
specialty [1] - 8:20
specific [1] - 2:11
speech [1] - 9:5
spell [1] - 7:24
squad [1] - 18:22
stand [1] - 7:14
standard [6] - 35:12,
35:14, 35:15, 35:22, 36:6,
36:15
start [2] - 34:24, 51:18
started [1] - 6:6
starting [1] - 21:3
state [1] - 7:24
statement [20] - 21:20,
26:2, 26:6, 26:11, 26:14,
26:19, 27:10, 27:17, 28:18,
28:25, 29:9, 29:23, 30:7,
36:9, 37:2, 46:24, 47:23,
48:2, 48:17, 51:22
statements [1] - 24:22
STATES [3] - 1:1, 1:3, 1:11
States [3] - 1:6, 1:13, 1:16
station [1] - 43:9
stay [1] - 10:24
Steiger [1] - 1:22
stenography [1] - 1:25

step [3] - 30:24, 50:20
step-by-step [1] - 30:24
steps [1] - 50:23
still [3] - 13:7, 21:17, 43:3
stop [4] - 21:18, 21:19,
24:4, 33:24
street [1] - 11:5
strike [2] - 41:14, 41:16
sub [1] - 5:8
sub-motion [1] - 5:8
subjective [1] - 45:1
submission [1] - 3:15
submissions [1] - 3:11
submitted [2] - 2:6, 30:7
sufficient [1] - 5:17
Suffolk [2] - 11:22, 48:24
summary [1] - 24:22
suppress [1] - 6:3
suppression [3] - 2:22,
36:8, 52:3
suspect [1] - 10:13
sustained [2] - 45:13,
45:19
sworn [1] - 7:21

T

T-A-R-I-C-H-E [2] - 7:17,
8:2
T-shirt [1] - 12:11
table [1] - 12:12
tapes [1] - 3:8
Tariche [6] - 7:17, 8:1,
25:7, 34:18, 42:23, 48:1
TARICHE [2] - 7:19, 53:3
Task [6] - 8:23, 9:1, 9:2,
11:17, 11:21, 37:12
telephone [2] - 30:15,
32:11
term [1] - 37:5
terms [3] - 4:8, 36:16, 51:2
tested [1] - 9:14
testified [5] - 7:21, 19:6,
30:14, 32:22, 36:8
testify [4] - 4:20, 51:24,
52:2, 52:4
testimony [4] - 34:18, 35:2,
35:8, 51:6
THE [64] - 1:10, 2:5, 2:8,
2:10, 2:16, 2:18, 2:20, 3:7,
3:16, 3:24, 4:8, 4:16, 5:2,
5:7, 5:17, 6:4, 6:11, 6:18,
6:23, 7:1, 7:11, 7:24, 8:1,
8:4, 12:15, 15:22, 17:8,
17:10, 20:24, 25:3, 25:18,
25:20, 27:24, 29:16, 29:19,
30:1, 30:4, 30:10, 32:4,
34:6, 34:10, 34:13, 34:22,
35:4, 35:19, 41:16, 45:13,

45:19, 49:1, 49:4, 50:17, 50:20, 50:22, 50:24, 51:1, 51:7, 51:10, 51:14, 51:17, 51:25, 52:6, 52:7, 52:9, 52:11
**third** [6] - 27:5, 27:7, 27:10, 27:11, 28:11, 35:8
**three** [10] - 9:17, 9:18, 9:20, 18:18, 27:11, 32:21, 44:16, 48:7, 48:9, 48:11
**TIERNEY** [1] - 1:15
**today** [7] - 3:19, 3:20, 3:22, 17:12, 24:20, 51:20, 52:9
**today's** [1] - 2:4
**tomorrow** [3] - 3:20, 3:23, 4:15
**tone** [1] - 33:17
**tongue** [1] - 37:19
**took** [10] - 9:12, 12:19, 13:3, 22:14, 23:24, 24:8, 25:24, 43:9, 48:7, 48:21
**top** [7] - 16:2, 21:25, 24:8, 28:2, 28:8, 28:11, 47:16
**total** [1] - 32:20
**trabajo** [1] - 47:16
**Traduccion** [1] - 16:4
**TRANSCRIPT** [1] - 1:10
**transcript** [3] - 1:25, 2:4, 4:5
**transcripts** [3] - 3:2, 3:8, 4:2
**translated** [1] - 29:8
**translating** [1] - 25:10
**translation** [1] - 28:21
**translator** [1] - 28:24
**transported** [2] - 18:6, 48:23
**trial** [3] - 3:1, 4:3, 29:12
**tribajo** [1] - 47:16
**trouble** [3] - 20:4, 20:6, 33:15
**true** [2] - 9:9, 48:6
**try** [2] - 17:16, 41:16
**Tuesday** [2] - 4:17, 5:3
**turn** [3] - 5:1, 20:9, 46:12
**turned** [1] - 5:16
**turning** [3] - 5:14, 22:6, 24:10
**two** [8] - 4:21, 4:23, 17:25, 32:21, 36:13, 48:7, 48:9, 48:11

## U

**under** [8] - 5:18, 12:19, 12:21, 37:11, 37:15, 37:21, 37:25, 38:20
**unfinalized** [1] - 29:17
**UNITED** [3] - 1:1, 1:3, 1:11

**United** [3] - 1:6, 1:13, 1:16
**unless** [2] - 5:3, 5:18
**unresponsive** [1] - 41:14
**up** [2] - 9:8, 35:23

## V

**verbatim** [1] - 47:5
**version** [9] - 14:22, 20:14, 25:13, 29:11, 30:7, 31:5, 31:11, 46:1, 47:6
**victim** [3] - 42:1, 42:8, 42:10
**video** [1] - 45:8
**videotape** [1] - 45:4
**view** [1] - 3:12
**violent** [1] - 9:3
**voir** [1] - 25:2
**VOIR** [2] - 25:5, 53:6
**voluntarily** [2] - 16:21, 32:14
**voluntary** [4] - 36:16, 36:17, 36:22, 36:24

## W

**waiting** [2] - 2:1, 30:9
**waiver** [2] - 35:13, 36:19
**waivers** [1] - 35:9
**waiving** [1] - 37:1
**warnings** [3] - 19:23, 21:3, 34:20
**warrant** [1] - 5:24
**water** [1] - 18:9
**weapon** [3] - 40:21, 40:23, 40:24
**weapons** [1] - 40:18
**wear** [1] - 2:15
**wearing** [2] - 12:9, 12:11
**Wednesday** [3] - 51:18, 51:19, 52:11
**week** [2] - 3:11, 4:15
**white** [1] - 12:11
**willing** [2] - 19:21, 21:22
**wish** [2] - 52:3, 52:4
**withhold** [1] - 5:4
**WITNESS** [4] - 8:1, 17:10, 30:1, 50:22
**witness** [9] - 5:9, 5:13, 5:15, 7:6, 7:20, 12:14, 34:8, 35:17, 50:23
**witnesses** [8] - 3:21, 4:19, 4:25, 6:5, 16:25, 21:24, 34:7, 42:15
**WITNESSES** [1] - 53:1
**word** [6] - 3:13, 47:12, 47:13, 47:14, 47:19, 47:21
**words** [3] - 47:2, 47:3, 47:9

**workplace** [1] - 38:4
**write** [6] - 9:21, 43:22, 44:2, 49:24, 50:7, 50:9
**writing** [6] - 25:10, 46:2, 46:5, 46:7, 46:10, 46:15
**written** [5] - 26:2, 26:6, 39:23, 44:13, 47:2
**wrote** [7] - 26:14, 26:16, 27:17, 28:9, 29:23, 32:11, 47:23

## Y

**years** [2] - 8:13, 8:19
**YORK** [1] - 1:1
**York** [8] - 1:6, 1:14, 1:23, 8:15, 8:17, 15:3, 16:18, 43:13
**York's** [1] - 43:16
**yourself** [2] - 11:15, 18:12