929

1          UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF NEW YORK
2
    --------------------------------X
3   UNITED STATES OF AMERICA,
                                :  10-CR-74(JFB)
4
        -against-              :   United States Court
5                                   Central Islip, NY
    HERIBERTO MARTINEZ,         :
6   CARLOS ORTEGA,
                                :  February 21, 2013
7          Defendants.             9:30 a.m.
    --------------------------------X
8
    BEFORE:
9          HONORABLE JOSEPH F. BIANCO
         UNITED STATES DISTRICT COURT JUDGE
10


11
    APPEARANCES:
12
    For the Government:     LORETTA E. LYNCH
13                          UNITED STATES ATTORNEY
                            BY:  JOHN J. DURHAM, AUSA
14                               CARRIE N. CAPWELL, AUSA
                                 RAYMOND A. TIERNEY, AUSA
15                          610 Federal Plaza
                            Central Islip, NY 11722-4454
16


17  For Defendant:          ELIZABETH E. MACEDONIO, ESQ.
    Martinez                ARNOLD J. LEVINE, ESQ.
18
    For Defendant:          IRA D. LONDON, ESQ.(not present)
19  Ortega                  MARIANNE S. RANTALA, ESQ.
20

    Court Reporters:        STEPHANIE PICOZZI
21                          OWEN WICKER
                            HARRY RAPAPORT
22                          United States District Court
                            100 Federal Plaza
23                          Central Islip, New York 11722
                            (631) 712-6104
24
        Proceedings recorded by computerized stenography.
25             Transcript produced by CAT.

Proceedings

930

1          M O R N I N G   S E S S I O N

2               (Appearances noted.)

3               THE COURT:  Mr. Levine, I signed your request

4     with regard to the hotel.  I'm sorry I didn't see it

5     sooner; otherwise, I would have taken care of that.

6               MR. LEVINE:  Thank you.

7               THE COURT:  Defendants are present.

8               I did receive a copy of the Government's

9     disclosure with regard to Ms. Santos, to the defense, and

10    I received Ms. Macedonio's letter, again making a motion

11    for a mistrial and for other relief.

12              And I assume, Ms. Rantala, you join in that

13    letter?

14              MS. RANTALA:  I would, your Honor.

15              THE COURT:  I just wanted the Government to go

16    through some of these questions that were answered by the

17    letter.  But Mr. Durham, I would like you to go through

18    the questions that are on the bottom of page 4 or the top

19    of page 5.

20              If it's a written agreement, a lot of it is

21    answered by the agreement itself.  But since this was an

22    oral promise, to the best of your ability, you should try

23    to answer those questions so she has enough information as

24    possible.

25              Obviously, she can question the witness

**Proceedings**

931

1    regarding her understanding, but she's entitled to as much

2    information as possible from the Government with respect

3    to this promise.

4              I'll let you go through that.

5              MR. DURHAM:  Yes, your Honor.

6              With respect to question one, those discussions

7    were with Special Agent James Lopez, Tariche and myself.

8              With respect to question two, the approximate

9    day, time and place that the promise was made, that is

10   very difficult to characterize.  Most significant of those

11   discussions would have been the September of 2011, after

12   we received notice from the Marshals Service that Santos

13   had been accepted in the program.

14             We had conversations with her where we relayed

15   the supplemental letter that was filed.  She had been

16   accepted into the program; however, she needed to provide

17   truthful information, be with us and, if necessary, to

18   testify.

19             Number three, that was the circumstances -- that

20   was the primary conversation.  There may have been other

21   conversations, you know, leading up to that where similar

22   representations were made.  It may not have been in the

23   exact terms or that clearly, but that was the substance of

24   the conversation.

25             The copy of the written agreement with the

**Proceedings**

932

1    Marshals Service, what happens when she's accepted in the

2    program, the marshals send the United States Attorney's

3    Office a letter saying that she has been accepted and asks

4    us to instruct her that she needs to continue to comply

5    and be available to testify, which is what we did in

6    September of 2011.

7            No other law enforcement agencies were a party

8    of this informal grant of immunity.  Suffolk County Police

9    Department or other offices, in agreement with the United

10   States attorneys, primarily with us to a lesser extent.

11           The informal range of immunity.  If she left

12   something out, and if she says something on the stand, she

13   has no protection from that.

14           With regard to question number seven, I think --

15           THE COURT:  Let me go back.  If it's something

16   that she previously disclosed to the Government and admits

17   to it on the stand, that is the scope of the

18   nonprosecution?

19           MR. DURHAM:  Correct your Honor.  If there is

20   some crime she never disclosed or of talked to us, and she

21   admits to that, she has no protection.

22           With respect to number seven, that is a

23   prosecutorial discretion.  Why we elected not to do that

24   is not relevant to this defendant.

25           THE COURT:  Okay.  I think that answers the

Proceedings

933

1    questions, Ms. Macedonio, but if there is any follow-up

2    with respect to any of those -- I'll go back to your

3    request for a mistrial in a moment.  But with respect to

4    the additional information requested, I think that

5    satisfies it.

6              MS. MACEDONIO:  It is difficult to say it

7    satisfies it.  I think Mr. Durham did the best he could,

8    because there is no written formal agreement.  I'm not

9    suggesting that he's trying to hide the ball before the

10   Court, but I'm certain there were ongoing conversations

11   with this witness wherein she was assured, if not

12   promised, that she would not be prosecuted.

13             THE COURT:  You said that.

14             MS. MACEDONIO:  I know.  I'm acknowledging that.

15             I don't have any follow-up questions.

16             THE COURT:  Okay.  Is there anything else you

17   might add then?

18             MS. MACEDONIO:  No, there is nothing else I want

19   to add to my letter, Judge.

20             THE COURT:  Thank you.

21             Ms. Rantala, anything else?

22             MS. RANTALA:  No, your Honor.

23             THE COURT:  The motion for a mistrial is again

24   denied.  The case law is clear on this.

25             Ms. Macedonio cites some of it in her letter,

Proceedings

934

1   but I also found it in some detail where Brady material or

2   impeachment material -- what the standard is.  It's U.S.

3   versus Barlow, B-A-R-L-O-W, 732 F.Supp.2d 1, Eastern

4   District of New York, August 5, 2010.

5          I adopt the standard contained in there, and I

6   will not belabor the record, especially because we have a

7   jury waiting.

8          I might write a quick decision on this, but the

9   bottom line is the following:  As I said yesterday, I

10  believe that disclosure was insufficient in terms of there

11  being an oral promise not to prosecute the witness.  I

12  don't believe it was in bad faith.  I believe the

13  prosecutors believed that, I guess, that it was apparent

14  from the circumstances, given that she was coming in --

15  and they disclosed, obviously, that she is in the program.

16         She said on direct something along the lines:

17  as long as she complies.  That was her obligation, in

18  part, to comply with the program.

19         So there wasn't an effort, in my view, to

20  conceal this from the defense.  It appears that the

21  Government thought it was obvious under the circumstances.

22         But the question under the law is whether or not

23  the defense had an effect for the use of that material or

24  if they were prejudiced in some way.  I don't believe

25  yesterday they were prejudiced in any way.

Proceedings

935

1    And I've reviewed Ms. Macedonio's letter, and

2    I've gone back to the opening statements, because one of

3    the points she made in the letter, if she had known there

4    they would have mentioned it in the opening.

5    I went back to the opening, and the opening very

6    clearly -- Mr. Lee in a broad fashion, impeaches all of

7    the cooperating witnesses.  They are working off the

8    street and so on.

9    So all the benefits conferred on them was done

10   extensively, with a very broad brush.

11   Could they have pointed to Ms. Santos

12   specifically if they had that particular piece of

13   information?  Possibly, but I don't believe that in any

14   way prejudices the defendant.

15   The issue for motives for lying was front and

16   center in the opening and was well covered.  With this

17   witness, it came out on the cross while she was still on

18   the stand.

19   They've had another night to prepare to cross

20   her.  Additionally, they have the Government's information

21   today in answer to their questions.  I believe they can

22   make full use of this information with respect to this

23   witness.

24   And in the case as a whole, I see no prejudice

25   or no inability to make effective use of the material in

Proceedings

936

1    connection with the trial.

2             So the drastic remedy of a mistrial is not

3    warranted and is denied.

4             I will say, though, with respect to -- again,

5    with respect to the rest of the witnesses in the case, I

6    don't want there to be any other issues like this with

7    respect to the witnesses.  If the notes are not legible,

8    the Government has to type them up for the defense.  And

9    certainly if there is anything else of this nature, the

10   Government has to make sure that it is disclosed in

11   advance of the witness taking the stand so we don't have

12   this witness -- so we don't have that again.

13            MR. DURHAM:  Your Honor, this witness is

14   uniquely situated.  All of the other witnesses pled guilty

15   in a formal written agreement.

16            THE COURT:  Any other issues?

17            MS. MACEDONIO:  No, your Honor.

18            MS. RANTALA:  Nothing from Mr. Ortega.

19            THE COURT:  All right.  We'll bring the witness

20   in.

21            (Witness enters.)

22            (Whereupon, the jury at this time enters the

23   courtroom.)

24            THE COURT:  Please be seated.

25            Good morning, members of the jury.  I'm happy to

937

1   have Juror 121 back.

2           We're ready to continue with the trial.

3           As you recall, when we broke yesterday

4   Ms. Santos was on cross-examination by Ms. Macedonio.

5   We'll continue with that point.

6           Ms. Santos, I again remind you, you are under

7   oath.  Do you understand?

8           THE WITNESS:  Yes.

9           THE COURT:  Again, move forward closer to the

10  mike.

11

12  **C A R L A   S A N T O S**,

13          called as a witness, having been previously

14          duly sworn, was examined and testified further

15          as follows:

16  CROSS-EXAMINATION

17  BY MS. MACEDONIO:  (Continued)

18  Q    Yesterday when we broke, I was in the middle of

19  questioning you.

20  A    Yes.

21  Q    Since that time, has anyone spoken to you about your

22  testimony?

23  A    No.

24  Q    No one from the prosecution team has spoken to you

25  about your testimony?

C. Santos - Cross/Macedonio

938

1    A    No.

2    Q    And no one from the Marshals Service?

3    A    No.

4    Q    Or the agents?

5    A    No.

6    Q    And you testified that your name was La Mania?

7    A    Yes.

8    Q    And we established that -- in the translation what

9    that means?

10   A    Yes.

11   Q    You testified that a mother would do anything for her

12   child, right?

13   A    Yes.

14   Q    Isn't it a fact, Ms. Santos, that your daughter has

15   the nickname Mania Ticita, M-A-N-I-A  T-I-C-I-T-A?

16   A    Everybody knew her by her name, Ticita.

17   Q    That was her given name?

18   A    Yes.

19   Q    She also had a nickname?

20   A    She didn't have an official nickname.

21   Q    No one called her Mania Ticita?

22   A    One or two people would call her that, because they

23   would call her by her name.

24   Q    What does that translate?

25   A    Basically, little maniac.

C. Santos - Cross/Macedonio

939

1  Q    When you talked yesterday about all those drive-bys,

2  oftentimes there was marijuana that you smoked in your car

3  when you were driving it around?

4  A    No.

5  Q    Never?

6  A    There were like a handful of times, but, no, I

7  wouldn't allow anybody to smoke in my car.

8  Q    Well, you said there were a handful of times that

9  marijuana would be smoked?

10  A    Yes.

11  Q    But you wouldn't allow anyone to smoke marijuana.

12  Which one was it?

13  A    It was a handful of times; not all the time.

14  Q    So that it was not accurate, because you did allow

15  them to smoke marijuana in the car?

16  A    Yes.

17  Q    There were times that was going on when you had your

18  daughter in the car?

19  A    No.  Never.

20  Q    No.

21        How about that -- did you post a picture of your

22  daughter on your Facebook page holding a bottle of beer?

23  A    Holding a bottle of beer?

24  Q    Yes.

25  A    Maybe I did; maybe I didn't.  I don't remember.

C. Santos - Cross/Macedonio

940

1  Q    Certainly you would have remembered if you posted it

2  on your Facebook page?

3  A    I don't remember.  I can't answer your question

4  because I can't -- I don't remember.

5  Q    But it certainly could have happened, right?

6  A    Like I said, I don't remember.

7  Q    You were a partier --

8         MR. DURHAM:  Objection.

9         THE COURT:  Sustained.

10 BY MS. MACEDONIO:

11 Q    Did you participate smoking marijuana with other

12 people?

13 A    I didn't smoke marijuana because I had probation.

14 Q    Okay.  You testified yesterday that you participated

15 in a murder, numerous drive-bys, assaults and all sorts of

16 other crimes while you were on probation.

17 A    Uh-huh.

18 Q    But you wouldn't dare to smoke marijuana when you

19 were on probation.  Is that your testimony, Ms. Santos?

20 A    Because I was getting drug-tested.

21 Q    I see.  So you weren't worried about all those other

22 crimes; you were only worried about smoking marijuana?

23 A    Yes.

24 Q    And you let people smoke marijuana in your car; is

25 that correct?

941

1   A   A few times.

2   Q   Just a few times?

3   A   Yes.

4   Q   Yesterday, you testified to some of the crimes you

5   committed while on probation, but we didn't get to the

6   robbery in the car.

7   A   Yes.

8   Q   That was a robbery that you participated in because

9   you needed money, right?

10  A   I didn't personally need the money:  Somebody else

11  needed the money.

12  Q   But you participated in that?

13  A   I was there, yes.

14  Q   Did you drive the people there?

15  A   No, I did not.

16  Q   Okay.  Was your daughter present when that happened?

17  A   No, she was not.

18  Q   She was only present when you committed some of these

19  crimes?

20  A   Yes.

21  Q   So, for example, when you testified that -- when you

22  picked up Cruzito, Gringo and Zorro -- do you remember

23  your testimony about that?

24  A   Yes.

25  Q   You testified that you were scared because you didn't

942

1    know what was going on?

2    A    Yes.

3    Q    And you were so scared that you put your daughter in

4    the car.  Do you remember that?

5    A    I brought my daughter in the car.

6    Q    Even though you were scared, right?

7         And when you found out that these three men had

8    just killed two people, you continued to put your daughter

9    in the car and drive around with them, didn't you?

10   A    Yes.

11   Q    So, for example, when you drove to the hotel, was

12   your daughter with you?

13   A    Yes, she was.

14   Q    When you drove to the Bronx to McDonalds, was your

15   daughter with you?

16   A    Yes.

17   Q    And you did that even though you testified that you

18   were scared, right?

19   A    Yes.

20   Q    Is that one of those things that a mother would do

21   anything for her child?

22            MR. DURHAM:  Objection.

23            THE COURT:  Sustained.

24   BY MS. MACEDONIO:

25   Q    During the course of you driving Cruzito, Gringo and

C. Santos - Cross/Macedonio

943

1    Zorro around after the homicide of February of 2010, was

2    there a time when you heard Cruzito speaking to his

3    girlfriend Jennifer?

4    A    Yes.

5    Q    Did you here him say, Jennifer, I did this for you?

6    A    Yes, I did.

7    Q    Was it your understanding that Cruzito had done it

8    for Jennifer because Vanessa had sent people to Cruzito's

9    house on two occasions to beat him up?

10   A    Yes.

11   Q    And did you tell the agents in this case that Zorro

12   made the plan for Cruzito to kill Vanessa?

13   A    Yes.

14   Q    And did either Zorro or Gringo tell you that they

15   participated in those homicides for Cruzito?

16   A    Yes.

17   Q    Now, you testified that after Baby Blue was killed on

18   March 17th of 2010, that you traveled to Universal,

19   correct?

20   A    Yes.

21   Q    Before that date, you participated in other clique

22   meetings, right?

23   A    For the Coronados, yes.

24   Q    Did you actually participate in those meetings?

25   A    I was there.  I was present at the meetings.

944

1    Q    You were allowed in, but you weren't speaking.  Fair

2    enough?

3    A    Yes.

4    Q    But you were listening to what was going on?

5    A    Yes.

6    Q    And if things were being planned, you heard it,

7    right?

8    A    Yes.

9    Q    And you traveled to Universal, and then they told you

10   you had to leave?

11   A    Yes.

12   Q    Has anyone ever told you what racketeering is?

13   A    I'm sorry, what was that?

14   Q    Racketeering?

15   A    I have an idea what it is.

16   Q    What is your idea what racketeering is?

17   A    Well, I know it is one or more persons contributing

18   to a crime, but I'm not sure if I'm correct or not.

19   Q    How about racketeering conspiracy?  Do you know what

20   that is?

21   A    No.

22   Q    Has anyone ever told you that your participation in

23   all of these crimes could subject you to prosecution for

24   racketeering or a racketeering conspiracy?

25   A    No.

945

1   Q    Not those crimes?

2   A    No.

3   Q    Now, in the Universal that you attended, you

4   testified that part of the issue or part of the agenda was

5   that there was going to be green lights put out because of

6   Baby Blue's murder, right?

7   A    Yes.

8   Q    That is because Baby Blue's murder wasn't sanctioned;

9   is that correct?

10  A    Yes.

11  Q    So let's switch gears now and talk about your

12  progress with the FBI.

13        You testified you started meeting with the FBI

14  in March, or on March 23, 2010, right?

15  A    Yes.

16  Q    And you said that the reason why you did that was

17  because you were either going to go to jail or stay on the

18  street, which would be problematic for you and your

19  daughter, right?

20  A    Yes.

21  Q    And you had testified yesterday that -- you

22  repeatedly testified yesterday you wanted to leave

23  sometime?

24  A    Yes.

25  Q    In fact, I think it was the day before that you said

946

1    that Vanessa and Diego's murders had really gotten to you,

2    right?

3    A    Yes.

4    Q    But their murders occurred in February of 2010,

5    right?

6    A    Yes.

7    Q    Between the time of February 5, 2010, and March 23,

8    2010, you committed a laundry list of crimes, right?

9    A    Yes.

10   Q    We don't have to go through them again because we did

11   it yesterday.

12           It's fair to say that you continued to

13   participate in MS-13 crimes with full force, right?

14   A    Yes.

15   Q    Even though you said you wanted out?

16   A    Yes.

17   Q    Right?

18   A    Yes.

19   Q    And even though you said that it was those homicides

20   that really got to you, you helped those three individuals

21   flee the country, didn't you?

22   A    Yes.

23   Q    And then you sent them money?

24   A    Yes.

25   Q    And you continued to communicate with their parents?

C. Santos - Cross/Macedonio

947

1    A    Yes.

2    Q    Calling you, giving you messages, called them back.

3    Made sure they were up to date, didn't you?

4    A    Yes.

5    Q    Even though you testified that that was a turning

6    event, that's not really what happened, was it?

7    A    That was the turning event.  If they were capable to

8    do that to Diego and Vanessa, yes.

9    Q    But even though -- when Baby Blue was killed in the

10   middle of March, you got yourself tattooed, didn't you?

11   A    Yes.

12   Q    And you were talking about becoming a full-fledged

13   member, weren't you?

14   A    Yes.

15   Q    So you didn't get out after junior high school,

16   right?

17   A    Yes.

18   Q    Didn't get out when your daughter was born?

19   A    No.

20   Q    Didn't get out when your father's daughter [sic] was

21   in jail?

22           MR. DURHAM:  Objection.

23           THE COURT:  Overruled.

24   BY MS. MACEDONIO:

25   Q    Right?

C. Santos - Cross/Macedonio

948

1    A    Yes.

2    Q    Didn't get out when Vanessa and Diego were killed?

3    A    Yes.

4    Q    Didn't get out when David Sandler was killed?

5    A    No.

6    Q    Didn't get out when Baby Blue was killed?

7    A    Yes.

8    Q    You only got out when you were threatened with jail,

9    correct?

10   A    Yes.

11   Q    Now, in September of 2011, you went into the Witness

12   Protection Program; is that correct?

13   A    Yes.

14   Q    And with your participation in the Witness Protection

15   Program, they give you, I think you said, $1430 a month,

16   right?

17   A    Yes.

18   Q    And you get that every month, and you get that for

19   two years, right?

20   A    For 18 months.

21   Q    For 18 months.

22        So roughly about $28,000 you are going to get

23   for your participation in the program?

24   A    No.

25   Q    Ever pay taxes on the money?

C. Santos - Cross/Macedonio

949

1   A    No, I don't.

2   Q    So you get that money tax-free?

3   A    Yes.

4   Q    Before your testimony in this case here today, have

5   you ever testified in any other case?

6   A    No.

7   Q    And other than talking to the Government, what else

8   have you done for the Government?

9   A    I've talked to them and I've given them whatever they

10  asked for.

11  Q    I think you testified that you may have recorded some

12  conversations with them?

13  A    Yes.

14  Q    Phone conversations?

15  A    Yes.

16  Q    Ever wear a body wire?

17  A    Yes.

18  Q    How many times did you do that?

19  A    I don't know how many times, but it was a few times,

20  couple of times.

21  Q    Two or three times?

22  A    Yes.

23  Q    You talked with the Government two or three times;

24  you had some telephone conversations?

25  A    Yes.

C. Santos - Cross/Macedonio

950

1   Q    And for that you get about $28,000 tax-free from the

2   United States government?

3   A    Yes.

4   Q    And that's just for witness protection, right?

5   A    That money is for food, rent, for stuff like that.

6   Q    But it's for you?

7   A    Yes.

8   Q    I'm not getting it; you're getting it?

9   A    I understand --

10             MR. DURHAM:  Objection.

11             THE COURT:  Sustained.

12  BY MS. MACEDONIO:

13  Q    You are getting the money, right?

14  A    Yes.

15  Q    It's being sent to you in a check or some form?

16  A    Yes.

17  Q    And you do with it whatever you want?

18  A    For the things I need, yes.

19  Q    You use it for whatever you want.  No one is telling

20  you how to spend that money, are they, Ms. Santos?

21  A    No.

22  Q    When you went into the Witness Protection Program,

23  did the Marshals Service help you get set up?

24  A    Yes.

25  Q    Found you a place to live?

C. Santos - Cross/Macedonio

951

1    A    Yes.

2    Q    Did they get you a new car?

3    A    Yes.

4    Q    They are helping you go to school?

5    A    Not at the moment.

6    Q    Help you get a job?

7    A    Yes -- no, I got a job on my own.

8    Q    But they got you a new car?

9    A    Yes.

10   Q    Fair to say it is nicer than before?

11   A    About the same.

12   Q    How about your car?  Nicer than you had before?

13   A    It's a couple years younger.

14   Q    But it's better than the one you had before?

15   A    Yes.

16   Q    Before you went into the Witness Protection Program,

17   how were you supporting yourself?

18   A    I was working.  I had two jobs.

19   Q    When you started to cooperate, when you were living

20   in the hotel --

21   A    Yes.

22   Q    -- that was the FBI that was paying for that?

23   A    Yes.

24   Q    And are you aware that between March of 2010 and

25   September of 2011, when you went into the Witness

C. Santos - Cross/Macedonio

952

1    Protection Program, that the FBI spent $97,700 putting you

2    up in a hotel, almost $100,000 for your personal expenses?

3    Are you aware of that?

4                MR. DURHAM:  Objection.

5                If I may have a moment with counsel.

6                THE COURT:  Yes.

7                (Counsel confer.)

8    BY MS. MACEDONIO:

9    Q    Let me clarify my question.

10                Are you aware that the FBI spent close to

11    $100,000 on costs that were associated with you, not just

12    the hotel but costs that were associated with you?

13    A    No, I wasn't aware of that much.

14    Q    But the FBI paid for the hotel during that whole time

15    period?

16    A    Yes.

17    Q    Paid for your groceries during that whole time

18    period?

19    A    Yes.

20    Q    Paying for gas?

21    A    No.

22    Q    How did you pay for gas?

23    A    Mom.

24    Q    How about car insurance?

25    A    Mom.

953

1    Q    Well, sitting in the hotel, paying for your

2    groceries, and you are not working anymore, right?

3    A    No.

4    Q    So you are there under their protection, right?

5    A    Yes.

6    Q    And you, because you are so afraid, decide that it

7    would be wise to start seeing an inmate at the Queens

8    jail; is that correct?

9    A    Yes.

10   Q    Who were you seeing at the Queens jail?

11   A    Leonel.

12   Q    What is his last name?

13   A    Sanchez.

14   Q    Who is Leonel Sanchez?

15   A    He was a friend back before, when I first moved to

16   Brentwood.  I first met him, and then he went to jail.

17   And then we kept contact here and there with other

18   friends.  And once I moved, we started talking again.

19   Q    He was a gang member, wasn't he?

20   A    Yes, he was.

21   Q    So even though you testified that you had to be put

22   up in a hotel for 18 months because you were so terrified

23   what was going to happen to you, you took it upon yourself

24   to start visiting another gang member who was already

25   incarcerated, didn't you?

C. Santos - Cross/Rantala

954

1   A    Yes.

2   Q    And you did that on multiple occasions, didn't you?

3   A    Yes.

4   Q    And you brought his daughter to the jail to visit

5   Leonel Sanchez?

6   A    Yes.

7   Q    And even though you testified that you were so afraid

8   someone was going to kill you, you could have very easily

9   run into other members of MS-13 outside the jail visiting

10  their loved ones, right?

11         MR. DURHAM:  Objection.

12         THE COURT:  Overruled.

13  A    Yes.

14  BY MS. MACEDONIO:

15  Q    But you went anyway?

16  A    Yes.

17  Q    And you took your daughter and exposed her to that?

18  A    Yes.

19  Q    Because you were so scared, right?

20  A    Yes.

21         MS. MACEDONIO:  I have no further questions of

22  this witness.

23         THE COURT:  Ms. Rantala?

24         MS. RANTALA:  Yes, your Honor, briefly.

25  CROSS-EXAMINATION

C. Santos - Cross/Rantala

955

1    BY MS. RANTALA:

2    Q    Good morning.

3    A    Good morning.

4    Q    Now, you had testified yesterday or the day before,

5    I'm not sure which, regarding statements that you made to

6    the Suffolk County Police Department regarding an alleged

7    robbery, right?

8    A    Yes.

9    Q    And you remember that you had signed a statement,

10   right?

11   A    Yes.

12   Q    That was Defendant's Exhibit Martinez A?

13   A    Yes.

14   Q    All right.  And that was dated March 14th of '08?

15   A    Yes.

16   Q    Now, you are aware that you actually took a plea

17   regarding making that false statement, right?

18   A    Yes.

19   Q    And also, you -- also, that was a false statement

20   misdemeanor?

21   A    Yes.

22   Q    And you pled guilty to a perjury count, right?

23   A    Yes.

24   Q    That is Public Law 21005?

25   A    I don't know.

C. Santos - Cross/Rantala

956

1    Q    But it was a perjury count in the third degree?

2    A    Yes.

3    Q    You are aware, are you not, that perjury -- a person

4    is guilty of perjury in the third degree when he or she

5    swears falsely, right?

6    A    Yes.

7    Q    You took an oath to tell the truth when you wrote

8    that statement on March 14th of '08?

9    A    Yes.

10   Q    And you wrote, basically, a statement about a false

11   robbery, right?

12   A    Yes.

13   Q    Do you remember taking an oath to tell the truth here

14   in court?

15   A    Yes.

16   Q    To tell the truth yesterday, today, and the day

17   before yesterday?

18   A    Yes.

19   Q    But you had no respect for telling the truth on

20   March 14th of 2008, did you?

21            MR. DURHAM:  Objection.

22            THE COURT:  Sustained as to form.

23   BY MS. RANTALA:

24   Q    Did you tell the truth in that statement on

25   March 14th of 2008?

C. Santos - Cross/Rantala

957

1   A    No, I did not.

2   Q    Now, going through the David Sandler murder --

3   A    Yes.

4   Q    -- you actually discussed that particular incident

5   with several members of the MS-13 afterwards?

6   A    Afterwards?

7   Q    Yes.  Including Jimmy Sosa, known as "Junior"?

8   A    Yes.

9   Q    You came to understand at some point that Junior and

10  Perdido were the shooters, did you not?

11  A    Yes.

12  Q    And you told that to the FBI agents?

13  A    Yes.

14  Q    You eventually told that more than once to the FBI

15  agents, didn't you?

16  A    Yes.

17  Q    You stated in your direct examination that Carlos

18  Ortega -- that you would talked to him afterwards, right?

19  A    Yes.

20  Q    And he had said something that he's hot with the cops

21  and scared of one of them would snitch, and cops would be

22  looking for him, something to that effect?

23  A    Yes.

24  Q    Carlos Ortega never actually specifically said he had

25  anything to do with this?

C. Santos - Cross/Rantala

958

1    A    No, he did not.

2    Q    He actually denied his involvement in that phone

3    conversation?

4    A    He didn't deny it, but he didn't say he did it

5    either.

6    Q    We don't have the benefit of that particular

7    telephone conversation being recorded, do we?

8              MR. DURHAM:  Objection.

9              THE COURT:  Sustained as to form.

10   BY MS. RANTALA:

11   Q    Is that telephone conversation recorded?

12   A    No.

13   Q    So the jury can't hear it then?

14   A    No.

15   Q    So he could have said that he denied vehemently his

16   involvement in having to do with anything like that,

17   correct?

18   A    Yes.

19   Q    You are here basically testifying to help yourself,

20   correct?

21   A    Yes.

22   Q    You got a new life from the Government?

23   A    Yes.

24   Q    You are spending time with your daughter?

25   A    Yes.

C. Santos - Cross/Rantala

959

1   Q    You have basically gotten money from the Government?

2   A    Yes.

3   Q    Protection from the Government?

4   A    Yes.

5   Q    A better car, apparently, as we just learned, from

6   the Government?

7   A    Yes.

8   Q    And an ability to take care of your daughter from the

9   Government?

10  A    I'm sorry, what was that?

11  Q    You received the ability to take care of your

12  daughter from the Government?

13  A    Yes.

14  Q    You are not in jail?

15  A    Yes.

16  Q    They told you you are not going to jail?

17  A    Yes.

18  Q    Yes?

19         And you would do anything for your child,

20  wouldn't you?

21  A    Yes.

22  Q    Including lie today, yesterday, and the day before;

23  isn't that true?

24         MR. DURHAM:  Objection.

25         THE COURT:  Overruled.

C. Santos - Redirect/Durham

960

1    You can answer.

2  A    No.

3  BY MS. MACEDONIO:

4  Q    But you admitted to the jury on numerous occasions

5  that you lied in your police statements, did you not?

6  A    Yes, I did.

7        MS. RANTALA:  I have nothing further.

8        THE COURT:  Redirect?

9  REDIRECT EXAMINATION

10  BY MR. DURHAM:

11  Q    Good morning, Ms. Santos.

12  A    Good morning.

13  Q    Yesterday, Ms. Macedonio, and again today,

14  Ms. Rantala, asked you a number of questions about your

15  employment in the mall.

16  A    Yes.

17  Q    And you were charged with crimes in connection with

18  that?

19  A    Yes.

20  Q    Did you plead guilty to those crimes?

21  A    Yes, I did.

22  Q    You were also asked questions about a drive-by

23  shooting carried out by Juan Reyes.  That was your

24  boyfriend at the time?

25  A    Yes.

961

1  Q    Who else was involved?

2  A    Guerillero, Sonic, Cura, and Pajaro Loco.

3  Q    Were all those individuals members of the MS-13?

4  A    Yes, they were.

5  Q    You were also asked some questions about January of

6  2010 when Sparky was arrested.

7  A    Yes.

8  Q    You said you paid some money for the gun because he

9  was in a bad position?

10  A    Yes.

11  Q    What was that bad position?

12  A    He was in jail.

13  Q    You also said you paid money because you didn't want

14  him to be in a worse position?

15  A    Yes.

16  Q    What was the worse position?

17  A    Either -- he would have to pay one way or the other.

18  Either he'd be hurt in jail, or they would try to get

19  money from one of his family members.

20  Q    When you say "they," who are you referring to?

21  A    The gang.

22  Q    You were also asked questions whether or not you had

23  a detailed discussion with Sparky afterwards.  Do you

24  remember that?

25  A    Yes.

C. Santos - Redirect/Durham

962

1    Q    Did you?

2    A    I didn't have a detailed discussion, because he was

3    in jail.

4    Q    Are those jail calls recorded?

5    A    Yes, they are.

6    Q    Now, you were also asked some questions about a

7    murder that happened in May of 2009.  Is that the murder

8    of Dexter Acheampong?

9    A    Yes.

10   Q    That happened in Central Islip?

11   A    Yes.

12   Q    Did that happen in Central Islip?

13   A    Yes.

14   Q    When that murder happened, were you driving the car?

15   A    I was in the car.

16   Q    Were you in the car when the people carried out the

17   murder?

18   A    No.

19   Q    Did you give the order to shoot that person?

20   A    No, I did not

21   A    Did you shoot that person?

22   A    No, I did not

23   Q    Who did?

24   A    Diablito did.

25   Q    What clique did Diablito belong to?

C. Santos - Redirect/Durham

963

1   A    The Coronados clique.

2   Q    What status did he have with the clique?

3   A    He was the main head of the clique.

4   Q    Was he arrested of that murder to your knowledge?

5   A    Yes.

6   Q    Was he convicted of that murder?

7   A    I'm not sure.

8   Q    This morning, Ms. Macedonio asked some questions

9   about a robbery of Fajita's car?

10  A    Yes.

11  Q    Were you there for that robbery?

12  A    Yes, I was.

13  Q    Who carried out the robbery?

14  A    Zorro and Boxer.

15       MS. MACEDONIO:  May we have a side bar?

16       (Whereupon, at this time the following took

17  place at the sidebar.)

18       MS. MACEDONIO:  We've been given no formal

19  404(b) letter in this case.  I understand there are other

20  crimes my client may have participated in, but the

21  Government has elected not to seek to introduce those

22  crimes.

23       When I questioned her about this particular

24  incident, I did so in a very limited fashion, simply

25  asking her if her daughter was present at the scene.  I

C. Santos - Redirect/Durham

964

1    didn't go into it in any more detail than the Government

2    did on their direct examination, in such a way to open the

3    door as to now bring in my client's involvement.

4                MR. DURHAM:  Ms. Macedonio crossed this witness

5    extensively about the fact she was not charged with

6    certain crimes she committed.

7                The defendant committed this crime, and he was

8    not charged with it.  So when everyone commits a crime,

9    the Government doesn't charge him.

10               Additionally, your Honor, robbery is one of the

11   racketeering acts alleged in the indictment.

12               THE COURT:  This is not 404(b), this is robbery,

13   which is part of the gang.  The fact they didn't charge it

14   doesn't mean they don't have to elicit it.

15               Are you suggesting that she knew he was involved

16   in that?

17               So I think apart from opening the door issue,

18   they are permitted to prove uncharged racketeering acts as

19   well as his involvement in the enterprise.

20               What is her basis for that?

21               MR. DURHAM:  She was present for the robbery,

22   was the question.  So I'm saying, who else was present?

23               THE COURT:  Are you going to move on now?

24               MR. DURHAM:  Yes.  I just can't remember if she

25   answered that question.

C. Santos - Redirect/Durham

965

1     MS. MACEDONIO:  It's in.

2          (End of sidebar conference.)

3  BY MR. DURHAM:

4  Q    To be clear, this defendant was present for this

5  robbery (indicating)?

6          MS. MACEDONIO:  Objection.

7          THE COURT:  Asked and answered.

8  BY MR. DURHAM:

9  Q    And this morning, Ms. Rantala asked you questions

10  about the David Sandler murder.  Do you remember that?

11  A    Yes.

12  Q    When you spoke to defendant Carlos Ortega, known as

13  "Silent," did he deny he was -- being involved?

14  A    He didn't deny it.

15  Q    Specifically what did he say he was worried about?

16  A    He was worried about Perdido and Junior.

17  Q    As you understood it, why was he worried about those

18  three people?

19  A    He was worried because he was scared they were going

20  to snitch on him.

21  Q    I'm sorry?

22  A    That they were going to snitch.

23  Q    What does that mean?

24  A    That they would drag him out, tell them what would

25  happen.

C. Santos - Redirect/Durham

966

1    Q    You understood those three people were also involved

2    in the David Sandler murder?

3    A    Yes.

4    Q    Now, you were also asked some questions by

5    Ms. Macedonio this morning about Leonel Sanchez.

6    A    Yes.

7    Q    Was he at one point a member of the MS-13?

8    A    Yes, at one point.

9    Q    And at the time you were visiting him in jail, was he

10   a still a member of the gang?

11   A    No, he was not.

12   Q    Why not?

13   A    He was cooperating with the police.  He was out of

14   the gang.

15   Q    He was out of the gang?

16   A    Yes.

17   Q    Why was he out of the gang?

18   A    Because he wanted to cooperate.

19   Q    To your knowledge, did he ever testify in this

20   courthouse?

21   A    Yes.

22   Q    To your knowledge, does he also have a green light?

23            MS. MACEDONIO:  Objection.

24            THE COURT:  Overruled.

25   BY MR. DURHAM:

C. Santos - Redirect/Durham

967

1    Q    And Ms. Santos, what was Mr. Sanchez prosecuted for?

2    A    A murder.

3    Q    Now, you were also asked questions that as late as

4    March of 2010, you were considering joining the MS-13.

5    A    Yes.

6    Q    Did you ever join the MS-13?

7    A    No, I did not.

8    Q    Were you ever a leader in the MS-13?

9    A    No, I was not.

10   Q    Looking around this courtroom, do you see any leaders

11   from the MS-13?

12   A    Yes, I do.

13   Q    Where?

14   A    Right there.

15   Q    Defense table?

16   A    Yes.

17   Q    Now, you were also asked question about whether or

18   not you would come into this court and lie.

19        Do you understand what would happen if you came

20   in and lied?

21   A    I would go to jail.

22        MR. DURHAM:  No further questions.

23        THE COURT:  Anything further?

24        MS. MACEDONIO:  May I have a moment, Judge?

25        (Counsel confer.)

C. Santos - Redirect/Durham

968

1          MS. RANTALA:  Your Honor, may we approach

2     sidebar?

3          (Whereupon, at this time the following took

4     place at the sidebar.)

5          MS. RANTALA:  I didn't know how else to do this.

6     My client wants to have an interpreter at this juncture.

7          THE COURT:  Before the witness is excused?

8          MS. RANTALA:  Yes.

9          THE COURT:  Why don't we -- do you want to do it

10    outside the presence of the jury or have the interpreter

11    go over with you for a moment if you want.  What do you

12    want?

13         MS. RANTALA:  Probably be better outside the

14    jury, because if somebody understands Spanish and they

15    talk loudly, so...

16         (End of sidebar conference.)

17         THE COURT:  We'll take a short break.  Don't go

18    anywhere.  Just a short break.

19         (Whereupon, a recess was taken.)

20         THE COURT:  Please be seated.

21         Please take the witness out.

22         (Witness exits the courtroom.)

23         (Ms. Rantala confers with the defendant with the

24    aid of the interpreter.)

25         MS. RANTALA:  Thank you, your Honor.

C. Santos - Redirect/Durham

969

1    THE COURT:  All right.  Do you have other

2  questions for the witness?

3    MS. MACEDONIO:  A few, your Honor.

4    THE COURT:  Who is the next witness?

5    MR. TIERNEY:  Detective Ralph Rivera.  He's

6  outside.

7    THE COURT:  Give him the warning now so we don't

8  have to take another break.

9    MR. TIERNEY:  Thank you, your Honor.

10    (Detective Rivera enters.)

11    THE COURT:  I just want to bring you in now and

12  give you a warning.  All the witnesses are testifying

13  regarding the Torres-Argueta murders.  I've made the

14  determination that the jury is not to know the age of

15  Diego Torres, and they are not to know that he's a child

16  or a boy.  They are not to know that in any fashion.

17    So on the stand, when you were testifying, when

18  you are referring to him, you are not to reveal that in

19  any manner, that he's a male, a youth, or anything like

20  that.

21    Anything else?

22    MR. DURHAM:  I intentionally didn't get into

23  Argueta-Torres murders --

24    THE COURT:  In response to Ms. Macedonio's

25  questions, she did say something to the effect -- I don't

Case 2:10-cr-00074-JFB  Document 1588  Filed 12/01/15  Page 42 of 218 PageID #: 10101

C. Santos - Redirect/Durham

1    know the exact words, but something to the effect that if

2    they can do that to them, they can do that to my son,

3    something along the lines.  But it was in direct

4    reference, given my knowledge of the whole situation, that

5    it was discussed at sidebar.

6            It was not intentional by the witness, and I

7    don't think she violated my ruling in response to a number

8    of questions with regard to that murder, those murders,

9    affecting her.  And I would prefer she not say that, but

10   it was in response to the questions.  And I don't think

11   any relief is warranted with respect to that.

12           MR. DURHAM:  I didn't go into it in my redirect

13   for that reason.  So because I didn't do that and there

14   will not be recross on that matter, if the Court deems it

15   appropriate, we'll have to rebrief the witness.  Rather be

16   safe than sorry.

17           THE COURT:  There was a whole series of

18   questions about that, and it was unfortunate, but it is

19   what it is.  But you will not ask any additional questions

20   on that?

21           MS. MACEDONIO:  No, I am not.

22           THE COURT:  Okay.  Let's bring her back in.

23           (Witness Santos resumes the stand.)

24           THE COURT:  Bring in the jury.

25           (Whereupon, the jury at this time enters the

OWEN WICKER, RPR
OFFICIAL COURT REPORTER

C. Santos - Recross/Macedonio

971

1    courtroom.)

2              THE COURT:  Please be seated.

3              Any recross?

4              MS. MACEDONIO:  Thank you, Judge.

5    RECROSS-EXAMINATION

6    BY MS. MACEDONIO:

7    Q    You testified on redirect by Mr. Durham -- he asked

8    you questions about Leonel Sanchez.  Do you remember that?

9    A    Yes.

10   Q    You testified that Leonel Sanchez, when you were

11   visiting him, was no longer a member of the gang?

12   A    Yes.

13   Q    But he was a member of the gang for quite some time,

14   was he not?

15   A    Yes.

16   Q    Just because he was cooperating with the Government

17   doesn't mean that he didn't commit crimes?

18   A    Yes.

19   Q    And he committed murders?

20   A    Yes.

21   Q    Do you know if Mr. Sanchez participated in that

22   homicide directly?

23   A    I know he was present at the time, but I don't know

24   if he participated in a murder.

25   Q    But he pled guilty to that?

C. Santos - Recross/Macedonio

972

1    A    Yes.

2    Q    So he accepted responsible for that?

3    A    Yes.

4    Q    So he was indeed guilty of murder at some point?

5    A    Yes.

6    Q    And are you aware that Mr. Sanchez was facing a

7    mandatory life sentence for that?

8    A    I don't know.

9    Q    You don't know?

10   A    No.

11   Q    Do you know what his ultimate sentence was?

12   A    No.

13   Q    Okay.

14        You testified on redirect that if you lie, that

15   you are going to go to jail, right?

16   A    Yes.

17   Q    Has anybody told you how long you would go to jail

18   for?

19   A    No.

20   Q    And you've never been charged for a crime?

21   A    No.

22   Q    So there is no way to determine if you'd go to jail

23   or for how long?

24   A    Right.

25   Q    The very people that are going to decide if you go to

C. Santos - Recross/Macedonio

973

1    jail are the same people that you lied to when you were

2    first arrested, right?

3            MR. DURHAM:  Objection.

4    BY MS. MACEDONIO:

5    Q    You lied to the FBI -- excuse me.  I'll rephrase the

6    question.

7            I'll withdraw the other question?

8            When you were first approached by the FBI in

9    March of 2010, you lied to them, right?

10   A    Yes.

11   Q    And you lied repeatedly to them for hours, right?

12   A    Yes.

13   Q    And now you are saying if you get on the stand and

14   lie, that you will go to jail, right?

15   A    Yes.

16   Q    Who decides if you lie here today?

17   A    Can you rephrase the question for me?

18   Q    Would it be the federal government that decides

19   whether or not you are lying?

20   A    Yes.

21   Q    Okay.  And it would be them to decide whether or not

22   you are going to face a charge, right?

23   A    Yes.

24           MS. MACEDONIO:  Thank you.  I have no further

25   questions.

C. Santos - Further Redirect/Durham

974

1          MS. RANTALA:  Just briefly, your Honor.

2    RECROSS-EXAMINATION

3    BY MS. RANTALA:

4    Q    Going back to this telephone conversation between

5    Carlos Ortega and yourself.

6    A    Yes.

7    Q    Perdido wasn't even in jail when you had that

8    conversation, was he?

9    A    No.

10   Q    And you never testified that Carlos Ortega was any

11   kind of a leader, did you?

12   A    No.

13   Q    So when you pointed over at the table here, you

14   weren't referring to Carlos Ortega?

15   A    No, I wasn't.

16          MS. RANTALA:  Nothing further.

17

18   FURTHER REDIRECT EXAMINATION

19   BY MR. DURHAM:

20   Q    Ms. Macedonio asked questions about the first time

21   you met with the FBI.

22   A    Yes, I did.

23   Q    You lied to them initially?

24   A    Yes, I did.

25   Q    The same night, did you tell them where Demente was?

C. Santos - Further Redirect/Durham

975

1   A      Yes, I did.

2   Q      You showed them the house where Demente was?

3   A      Yes.

4   Q      After the FBI arrested him, did you identify him?

5   A      Yes, I did.

6   Q      What was he arrested for?

7   A      He was arrested for murder.

8          MR. DURHAM:  No further questions.

9          MS. MACEDONIO:  I have no further questions.

10         MS. RANTALA:  No further questions, your Honor.

11         THE COURT:  You may step down.

12         Next witness.

13         MR. TIERNEY:  Thank you, your Honor.

14         The Government calls Detective Ralph Rivera.

15         THE COURT:  Detective Rivera, please raise your

16  right hand.

17  R A L P H   R I V E R A,

18         called as a witness, having been first

19         duly sworn, was examined and testified

20         as follows:

21         THE COURT:  Please be seated.

22         State your name, and spell your last name for

23  the record.

24         THE WITNESS:  Ralph Rivera, R-I-V-E-R-A.

25         THE COURT:  Detective Rivera, please move close

Rivera - Direct/Tierney

976

1    to the mike and keep your voice up.

2              THE WITNESS:  Yes, sir.

3              MR. TIERNEY:  May I inquire?

4              THE COURT:  Yes.

5    DIRECT EXAMINATION

6    BY MR. TIERNEY:

7    Q    By whom are you employed?

8    A    Suffolk County Police Department.

9    Q    For how long?

10   A    24 and a half years.

11   Q    Where are you currently assigned?

12   A    The homicide squad.

13   Q    How long have you been assigned to the homicide

14   squad?

15   A    For eight years, seven consecutive.  I went off for a

16   year and came back in January of 2012.

17   Q    What are your duties and responsibilities with the

18   homicide bureau?

19   A    I investigate deaths, suicides, unattended deaths.

20   Q    These homicides and other deaths, where do they

21   occur?

22   A    Suffolk County.

23   Q    Do you speak Spanish?

24   A    I do.

25   Q    How is it that you came to speak Spanish?

Rivera - Direct/Tierney

977

1    A     I learned to speak Spanish at home, from my parents,

2    who are both natives of Puerto Rico.

3    Q     Do you speak Spanish on the job?

4    A     I do.

5    Q     And during the course of your employment with the

6    Suffolk County Police Department for the last 24 years,

7    have you taken statements from Spanish-speaking witnesses?

8    A     Yes, I have.

9    Q     And have you also taken statements from

10   Spanish-speaking defendants while working for the Suffolk

11   County PD?

12   A     Yes, I have.

13   Q     Approximately how many times?

14   A     Hundreds.

15   Q     And through the course of your employment with the

16   Suffolk County Police Department, have you advised

17   Spanish-speaking defendants of their rights in Spanish?

18   A     Yes, I have.

19   Q     Again, approximately how many times?

20   A     Hundreds.

21   Q     I'm going to call your attention to March 17th of

22   2010.  Were you called into work on that day?

23   A     Yes, I was.

24   Q     When were you originally scheduled to work?

25   A     I was originally scheduled to work 5 p.m. to 1 a.m.

Rivera - Direct/Tierney

978

1    tour of duty.

2    Q    That is 5 p.m. on the 17th to the 18th?

3    A    Yes.

4    Q    What time were you called in?

5    A    10 a.m.

6    Q    For what reason?

7    A    I was called in to investigate a murder that had

8    occurred in Suffolk County, in Central Islip, on

9    February 5, 2010.

10   Q    And who -- the victims of that murder, were they

11   Diego Torres and Vanessa Argueta?

12   A    Yes.

13   Q    Were you assigned to the investigation of that case

14   prior to March 17th?

15   A    No, I was not.

16   Q    For what purpose were you called to be in on

17   March 17th?

18   A    I was called in because the NYPD had a suspect in

19   custody who may have had information relative to our case

20   in Suffolk County.

21   Q    And in addition to yourself, were any other personnel

22   in the Suffolk County Police Department called in?

23   A    Yes.   Detective Robert Chase.

24   Q    What, if any, connections did Detective Chase have

25   with regard to the Argueta and Torres murders?

979

1    A    He was the scene detective where it occurred.

2    Q    In other words, he was the detective from the

3    homicide bureau assigned to respond to the homicide scene

4    in Central Islip regarding Argueta and Torres?

5    A    Yes.

6    Q    For what reason were you called in?

7    A    Because I spoke Spanish, and they believed that the

8    suspect may have spoken Spanish.

9    Q    Why was -- Detective Chase, does he speak Spanish?

10   A    No, he does not.

11   Q    When you were called in, were you told where you were

12   going to be speaking with this suspect?

13   A    Yes.  At the 101 Precinct in Far Rockaway.

14   Q    After being called into work, what did you do?

15   A    We responded to the 101 Precinct.

16   Q    Who is "we"?

17   A    Myself and Detective Chase.

18   Q    And what time did you get there?

19   A    At 12:40 p.m.

20   Q    And that is 12:40 p.m. on March 17th?

21   A    Correct.

22   Q    What did you do upon your arrival to the 101 squad?

23   A    We met with some of the detectives from Nassau County

24   and the NYPD.

25   Q    Okay.  And for what reason were the Nassau County

Rivera - Direct/Tierney

980

1    Police Department there?

2              MS. MACEDONIO:  Objection.

3              THE COURT:  Sustained.

4    BY MR. TIERNEY:

5    Q    And in addition -- you indicated that you spoke with

6    the NYPD and personnel from the Nassau County Police

7    Department.

8    A    Yes, sir.

9    Q    In addition to that, did you speak with any

10   witnesses?

11   A    Yes.

12   Q    Who did you speak with?

13   A    Spoke to a Diego Marroquin, I believe.

14   Q    And when you and Detective Chase responded to the 101

15   Precinct, did you have any photo arrays with you?

16   A    Yes, we did.

17   Q    What is a photo array?

18   A    A photo array is a document that has six photos on

19   it, photo of the suspect and five fillers, that we use to

20   try and identify one of the individuals who we suspect was

21   involved in a crime.

22   Q    And you indicated you had two photo arrays?

23   A    Yes.

24   Q    One for each of a particular suspect?

25   A    Yes.

Rivera - Direct/Tierney

981

1   Q     Who were the suspects in each of the photo arrays you

2   had with you?

3   A     Photo arrays of Cruzito, which is Juan Garcia, and a

4   photo array of Gringo, which is Adalberto Guzman.

5   Q     And once at the 101 Precinct, did you have a third

6   photo spread made up?

7   A     Yes.

8   Q     How did you do that?

9   A     I called the Suffolk County Police Department and

10  asked them to look into the gang database for a subject

11  who was known to us as "Zero" at that time.

12          They looked through the database, and they were

13  able to retrieve a photo of Zorro, whose real name is Rene

14  Mejia.

15  Q     And once that photo spread was made up in Suffolk

16  County, were you able to retrieve it?

17  A     Yes.

18  Q     Now, did there come a time when you and Detective

19  Chase spoke with the suspect?

20  A     Yes.

21  Q     Who was the suspect?

22          MS. MACEDONIO:  May I be heard at sidebar?

23          THE COURT:  Yes.

24          (Whereupon, at this time the following took

25  place at the sidebar.)

Rivera - Direct/Tierney

                                                                    982

1            MS. MACEDONIO:  Mr. Tierney keeps referring to

2    Mr. Martinez as "the suspect," but there is nothing in the

3    record thus far that he's a suspect.

4            THE COURT:  Just use a different term.

5            MR. TIERNEY:  I believe they said they had a

6    suspect in custody.

7            THE COURT:  It's not a big deal, but just use a

8    different term.

9            MR. TIERNEY:  Okay.

10           (End of sidebar discussion.)

11   BY MR. TIERNEY:

12   Q    Detective, I believe you testified earlier your

13   purpose for going in on March 17th to work was to speak to

14   an individual who was at the 101 Precinct in Queens.

15   A    Yes.

16   Q    When you were called into work, did you know that

17   individual's name?

18   A    At that moment, no.

19   Q    Once you got to the 101 Precinct, did you then learn

20   the individual's name who you were going to speaking with?

21   A    Yes.

22   Q    Who is that individual's name?

23   A    Heriberto Martinez.

24   Q    Did there come a time on March 17th or March 18th

25   that you had the opportunity to speak with Heriberto

Rivera - Direct/Tierney

983

1    Martinez?

2    A    Yes.

3    Q    What time was that?

4    A    One minute after midnight on March 18, 2010.

5    Q    Do you see Heriberto Martinez in the courtroom today?

6    A    Yes, I do.

7    Q    Can you please point him out with an item of

8    clothing?

9    A    With a dark gray sweater on, I believe.

10   Q    What color shirt?

11   A    A light-colored shirt.

12          MR. TIERNEY:  May the record reflect that the

13   witness identified the defendant Heriberto Martinez.

14          THE COURT:  How many seats from the right to the

15   left, Mr. Rivera?

16          THE WITNESS:  The third seat.

17   BY MR. TIERNEY:

18   Q    12:01 on March 18th, you contacted him?

19   A    Yes.

20   Q    Where?

21   A    In a small interview room in the 101 Precinct.

22   Q    What happened once you came into contact with the

23   defendant?

24   A    We were told we had to leave that room, that they

25   were going to be using it, so we were taken to a larger

984

1    office area.

2    Q    When the defendant was in that room, was he there

3    with the other members of the NYPD?

4    A    Yes, he was.

5    Q    Did you actually transport the defendant from that

6    room to the second room?

7    A    Yes, we escorted him.

8    Q    Could you describe the second room you brought him

9    to?

10   A    A large office, 15 by 20 foot.  It had file cabinets

11   all around the office.  The reception, the smaller wall,

12   it had a five-foot table, three chairs around it.  That's

13   where we sat Mr. Martinez.

14   Q    How was the defendant brought from the first room to

15   the second room?

16   A    In handcuffs.

17   Q    Once he was brought from the first room to the second

18   room, what was done with the handcuffs?

19   A    We took it off.

20   Q    Did you and Detective Chase proceed to interview the

21   defendant in this room?

22   A    Yes.

23   Q    During the course of your interview, was the

24   defendant handcuffed once in that room?

25   A    No.

985

1   Q    During the entire course of the interview between you

2   and Detective Chase and the defendant, who was present?

3   A    Myself, Detective Robert Chase and the defendant.

4   Q    And once you got the defendant into the second room,

5   what is the first thing you did?

6   A    We introduced ourselves, and we told him we want to

7   speak to him about a murder that occurred in Suffolk

8   County, but before we did that, we would read him his

9   rights.

10  Q    What did you do?

11  A    Read him his rights.

12  Q    Did you recite them from memory or read them from

13  anything?

14  A    Read them off the rights card.

15  Q    Showing you what has been previously marked as

16  Government 114 for identification (handing), and I just

17  ask if you recognize that document.

18  A    Yes.  This is the rights card that I read off to the

19  defendant.

20  Q    And how do you recognize it as such?

21  A    This card has the unique case number attached to this

22  case.  Has my initials and shield number.  It has

23  Detective Chase's signature and shield number and has the

24  defendant's signature on it.

25  Q    Is that the original of that document?

986

1   A    Yes, sir.

2   Q    Is that document in the same or substantially the

3   same condition as it was after you had advised the

4   defendant of his rights on March 18th?

5   A    Yes.

6        MR. TIERNEY:  Your Honor, I would move that in

7   at this time as Government's Exhibit 114.

8        MS. MACEDONIO:  May I see it?

9        THE COURT:  Yes.

10       MS. MACEDONIO:  Thank you.  I have no objection.

11       THE COURT:  Ms. Rantala?

12       MS. RANTALA:  No objection, your Honor.

13       THE COURT:  Government's Exhibit 114 is

14  admitted.

15       (Whereupon, Government Exhibit 114 was received

16  in evidence.)

17  BY MR. TIERNEY:

18  Q    When you advised the defendant of his rights on

19  March 18th, did you recite it from memory or from the

20  card?

21  A    Off the card.

22  Q    In what language did you read him those rights?

23  A    In Spanish.

24  Q    Using Government 114, could you illustrate to the

25  jury the manner in which you read him his rights?

987

1   A    I read him the first right.

2   Q    Again, did you read him that right in English or

3   Spanish?

4   A    In Spanish.

5   Q    What did that right mean in English?

6   A    You have the right to remain silent.

7   Q    After you read him that first right, what happened

8   next?

9   A    I asked him to place his initials after that right.

10  Q    What, if anything, did the defendant do?

11  A    He placed his initials, HNM, on the card.

12  Q    After you read the defendant his first right and he

13  placed his initials, after that, what happened?

14  A    I read him the second right.

15  Q    Again, in Spanish?

16  A    Yes.

17  Q    What does that right mean in English?

18  A    Whatever you say can and will be used against you in

19  a court of law.

20  Q    After you read him that right, what happened next?

21  A    Asked him to place his initials after that.

22  Q    Did he do that?

23  A    Yes, he did.

24  Q    What did you do after that?

25  A    Read him the third right.

Rivera - Direct/Tierney

988

1   Q    Again, all these rights were in Spanish?

2   A    Yes.

3   Q    The thirds right, what does that mean in English?

4   A    You have a right to speak to a lawyer right now and

5   be present with you while you are being questioned.

6        He placed his initials after that.

7   Q    After he placed his initials after the third right,

8   what happened next?

9   A    I read him the fourth right.

10  Q    What does that mean in English, the fourth right?

11  A    If you don't have any funds to obtain a lawyer and

12  you want to have one, the Court will designates a lawyer

13  for you before any questioning.  If you choose to answer

14  the questions without a lawyer present, you will have the

15  right to stop the questioning at any time until you talk

16  to a lawyer.

17  Q    After you read that fourth right to him, what, if

18  anything, happened?

19  A    I asked him to place his initials after that.

20  Q    Did he in fact do that?

21  A    Yes.

22  Q    After you advised him of his rights, did you read him

23  the waiver of the rights?

24  A    Yes, I did.

25  Q    What is the first waiver you read to him?

989

1  A    You understand these rights as I explained to you.

2  Q    Again, you read that to him in Spanish?

3  A    Yes.

4  Q    What, if anything, was his response to that question?

5  A    He said "si."  So I asked him to place that word and

6  his initials after.

7  Q    Did you read him a second waiver?

8  A    Yes.

9  Q    What did that waiver mean in English?

10  A    Having these rights in mind, do you want to speak to

11  us now?

12  Q    After you read him that waiver, what happened?

13  A    He said "si," which is "yes," and I asked him to

14  place that word and his initials after that.

15  Q    Did he in fact do that?

16  A    Yes, he did.

17  Q    After he placed "si" and his initials, what happened

18  next?

19  A    I asked him to sign the card, date, and time.

20  Q    After the defendant signed and dated and put the time

21  on the card, what, if anything, did you and Detective

22  Chase do?

23  A    Detective Chase put his shield number and signature

24  on the card, and the complaint number, and I put my

25  initials and shield number on the card.

Rivera - Direct/Tierney

990

1   Q    Just going to show 114 -- I think I'm going to show

2   114.

3          Now, Detective, just looking at the top, is this

4   the first right you read to the defendant?

5   A    Yes.

6   Q    The initials HNM, did he put them there?

7   A    Yes.

8   Q    The second right, the initials HNM, who put those

9   initials there?

10  A    The defendant.

11  Q    With regard to the third right, the initials HNM, who

12  put those there?

13  A    The defendant.

14  Q    And the final HNM, he placed them there?

15  A    Yes.

16  Q    And he placed those initials each time you read the

17  rights to him?

18  A    Yes.

19  Q    Down below, what am I referring to?  If you can look

20  behind you, Detective.

21  A    I have it on the screen.

22  Q    Is that the first waiver?

23  A    Yes, sir.

24  Q    What is indicated after the first waiver?

25  A    The word "si" and his initials "HNM."

991

1   Q    And the defendant placed those on the card?

2   A    Yes.

3   Q    Down below, the second waiver, what is after that?

4   A    "Si" and his initials.

5   Q    The defendant placed that?

6   A    Yes.

7   Q    To the right, 12:09 and 3/18/10, who placed that?

8   A    The defendant.

9   Q    What is the 12:09?

10  A    The time we created the card.

11  Q    This signature, whose signatures is that?

12  A    The defendant.

13  Q    Who placed that there?

14  A    He did.

15  Q    In the upper right-hand corner, whose initials are

16  those?

17  A    My initials and the shield number.

18  Q    After that, the initials?

19  A    It's Detective Chase's.

20  Q    After you advised the defendant of his rights, what

21  happened next?

22  A    We told him we were investigating the murder of

23  Vanessa Argueta and Diego Torres, and we wanted to show

24  him a photo array.

25  Q    And did you in fact do that?

Rivera - Direct/Tierney

992

1    A    Yes.

2    Q    What is the first photo array you showed him?

3    A    The first photo array I showed him was of Cruzito,

4    Juan Garcia.

5    Q    So the record is clear, the "si," is that in English

6    or Spanish?

7    A    Spanish.

8    Q    What does that mean in English?

9    A    "Yes."

10   Q    I will show you what has been marked as Government's

11   Exhibit 116 for identification.  Do you recognize that?

12   A    Yes.  This is the photo array, first photo array,

13   that we showed to the defendant.

14   Q    Okay.  And who is the subject of that photo array?

15   A    This is Juan Garcia.

16   Q    Is that the original of that statement?

17   A    Yes, it is.

18   Q    How do you recognize it as such?

19   A    It has the unique case number to this case, got my

20   signature on it, got the defendant's signature on it.

21   Q    Did you show that, Government 116, to the defendant

22   on March 18th?

23   A    Yes.

24   Q    And is that document in the same or substantially the

25   same condition as it was after you showed it to the

993

1  defendant on March 18th?

2  A    Yes.

3        MR. TIERNEY:  Your Honor, at this time I would

4  move Government's Exhibit 116 in evidence.

5        MS. MACEDONIO:  I have no objection, your Honor.

6        MS. RANTALA:  No objection, your Honor.

7        THE COURT:  Okay.  116 is admitted.

8        (Whereupon, Government Exhibit 116 was received

9  in evidence.)

10  BY MR. TIERNEY:

11  Q    For the record, Detective, I've just placed

12  Government's Exhibit 116 on the overhead.

13        What is depicted in the top of this document?

14  A    Six photographs:  one of the suspect in the case and

15  five fillers.

16  Q    And where is -- the suspect is Juan Garcia?

17  A    Yes.

18  Q    Where is Juan Garcia located within that page?

19  A    The upper center photo is Juan Garcia.

20  Q    And that is photograph number two?

21  A    Correct.

22  Q    The upper center photograph, number two, okay.

23        Obviously, when you initially showed this to the

24  defendant, the handwriting portions were blank?

25  A    Yes, sir.

Rivera - Direct/Tierney

994

1    Q    How did you show this document to the defendant on

2    March 18th?

3    A    We told him that we would be showing him six photos,

4    males, of similar appearance, if he recognized any of the

5    photos we were investigating.

6    Q    After you gave him that instruction, what did you do

7    next?

8    A    Showed him the photo array.

9    Q    After you showed the defendant the photo array, what

10   happened?

11   A    Identified photo two.  Asked him to place his

12   initials and to circle number two.

13   Q    After it was circled and the initials are placed

14   there -- who did that?

15   A    The defendant.

16   Q    After he did that, what happened?

17   A    I asked him how he recognized this person, and he

18   said this was the person known as "Cruzito" who had shot

19   Vanessa.

20   Q    And thereafter did you fill out that photo spread?

21   A    I did.

22   Q    Did the defendant sign it?

23   A    Yes, he did.

24   Q    And on the bottom right-hand side, is that the

25   defendant's signature?

995

1    A    Yes, sir.

2    Q    Now, after you showed the defendant what has been

3    marked as Government's Exhibit 116, did you have a

4    conversation with him?

5    A    Yes, we did.

6    Q    What did you discuss with -- what did you and

7    Detective Chase discuss with the defendant?

8    A    We talked to the defendant and he stated that he had

9    learned for Cruzito and Gringo, that they had shot Vanessa

10   and that Zorro had shot the person that was with Vanessa,

11   Diego Torres twice.  He stated that Gringo shot Vanessa

12   first in the head, and that Cruzito shot Vanessa in the

13   chest

14   Q    And did he indicate who, if anyone, shot Diego

15   Torres?

16   A    Zorro.

17   Q    And did he tell you what the sequence of the shots

18   were?

19   A    Yes.  He said that Gringo shot Vanessa in the head

20   first, Zorro shot Diego Torres twice, and then Cruzito

21   shot Vanessa in the chest.

22   Q    And again, did he tell you how he received

23   this information?  From whom?

24   A    He said he received that information from Cruzito.

25   Q    And did you have a conversation with him at the time

996

1   with regard to why Vanessa was shot?

2   A    Yes.  He stated that Vanessa was shot because she had

3   tried to have Cruzito killed a month earlier by the 18th

4   Street Gang.

5   Q    Did you also ask him for how long he had known

6   Cruzito?

7   A    Yes.

8   Q    What did he say?

9   A    He stated he knew Cruzito for three years, and

10  Cruzito lived at 303 Milburne in Baldwin.

11  Q    And after you would this discussion with the

12  defendant with regard to Cruzito, what did you do next?

13  A    We showed him two additional photo arrays.

14  Q    What is the first photo array you showed the

15  defendant?

16  A    The first photo array was Zorro, who is Rene Mejia.

17  Q    I will show you what has been marked as Government's

18  Exhibit 117.  Do you recognize that?

19  A    Yes.  This was the photo array that was shown to the

20  defendant.

21  Q    Who was the subject of the photo array?

22  A    Rene Mejia, or Zorro.

23  Q    Is that the original of the statement?

24  A    Yes, it was.

25  Q    How do you recognize it as such?

Rivera - Direct/Tierney

997

1   A    Central complaint number that is unique in the case,

2   my signature on it and the defendant's signature on it.

3   Q    And is that document in the same or substantially the

4   same condition as it was after you showed it to the

5   defendant on March 18th?

6   A    Yes.

7   Q    I will show you what has been marked as Government's

8   Exhibit 117-A for identification, and I'm going to ask you

9   if you recognize that (handing).

10  A    Yes.

11  Q    Is 117-A, is that a redacted copy of Government's

12  Exhibit 117?

13  A    Yes.

14  Q    And other than the redaction, is it a fair and

15  accurate representation of the original, Government's

16  Exhibit 117?

17  A    Yes, sir.

18          MR. TIERNEY:  Your Honor, I would move

19  Government's Exhibit 117-A into evidence at this time.

20          MS. MACEDONIO:  No objection.

21          MS. RANTALA:  Your Honor, may I view that

22  particular exhibit?

23          MR. TIERNEY:  Certainly (handing).

24          MS. RANTALA:  No objection.

25          THE COURT:  Ms. Macedonio?

998

1          MS. MACEDONIO:  I have no objection.

2          THE COURT:  117-A is admitted.

3          (Whereupon, Government Exhibit 117-A was

4     received in evidence.)

5          THE COURT:  Let me explain to you again, the

6     redaction came up.  Redaction means that I have instructed

7     that the irrelevant information should be redacted out of

8     the exhibit.  You shouldn't speculate what was redacted

9     out.  You are not allowed to speculate on that at all.

10          Otherwise, you consider the exhibit as any other

11     piece of evidence.

12     BY MR. TIERNEY:

13     Q    I've placed on the overhead Government's

14     Exhibit 117-A.  Do you recognize the redacted version of

15     Government's Exhibit 117?

16     A    Yes.

17     Q    What is depicted in the top of the document?

18     A    The suspect and five fillers.

19     Q    Again, who is the suspect?

20     A    Zorro.  Rene Mejia.

21     Q    Where is he in the pocket?

22     A    Lower panel photo in the center.

23     Q    For the record, the photo identified as number five?

24     A    Yes.

25     Q    After you showed -- withdrawn.

999

1          What, if anything, did you say to the defendant

2    prior to showing him Government's Exhibit 117?

3    A    I told him that we would be showing him a photo array

4    of six males, similar in appearance, and wanted him to let

5    us know if he recognized anyone in the photo from our case

6    in Suffolk County.

7    Q    After you gave the defendant the instruction, did you

8    show him the photo array?

9    A    Yes.

10   Q    What, if anything, did the defendant do?

11   A    He identified photo five as Zorro.

12   Q    And after he identified Government's Exhibit -- I'm

13   sorry, photo number five, what did you ask him to do?

14   A    Asked him to circle number five and place his

15   initials on the document.

16   Q    Where the number is circled and there are initials,

17   the defendant placed that there?

18   A    Yes, sir.

19   Q    After that, yes or no, did you ask him how he knew

20   Gringo?

21   A    This is Zorro.

22   Q    I'm sorry, I mean Zorro.

23   A    Yes.

24   Q    Did he tell you that Zorro was the guy who told him

25   that he shot and killed the individual, the male who was

Rivera - Direct/Tierney

1000

1    with Vanessa?

2    A    Yes.

3    Q    I believe you showed the defendant a second photo

4    spread?

5    A    Yes.

6    Q    Who was the subject of that second photo spread or

7    photo array?

8    A    Gringo, Adalberto Guzman.

9    Q    I will show you what has previously been marked as

10   Government's Exhibit 118, and I just ask you if you

11   recognize that.

12   A    Yes.  This is the photo array of Gringo that we

13   showed to the defendant.

14   Q    And is that the original of that document?

15   A    Yes, sir.

16   Q    And how do you recognize that as such?

17   A    This has the same central complaint number attached

18   to this case, it has my signature on it, and it has the

19   defendant's signature on it.

20   Q    Is that document in the same or substantially the

21   same condition as it was after you executed it with the

22   defendant on March 18th?

23   A    Yes.

24   Q    I'm now going to show you what has previously been

25   marked as Government's Exhibit 118-A, and I ask you if you

Rivera - Direct/Tierney

1001

1    recognize that document.

2    A    Yes.

3    Q    Is that a redacted copy of Government's Exhibit 118?

4    A    Yes, sir.

5    Q    Other than the redaction, is that a fair and accurate

6    representation of the original, Government's Exhibit 118?

7    A    Yes, sir.

8              MR. TIERNEY:  Your Honor, I would move

9    Government's Exhibit 118-A in evidence.

10             Before I move that in, I'll show defense

11   counsel.

12             (Handing to counsel.)

13             MS. RANTALA:  No objection, your Honor.

14             MS. MACEDONIO:  I have no objection.

15             THE COURT:  118-A is admitted.

16             (Whereupon, Government Exhibit 118-A was

17   received in evidence.)

18             THE COURT:  It's 11:30.  Do you wish to break

19   now?

20             MR. TIERNEY:  Perhaps after I show him this

21   document.

22   BY MR. TIERNEY:

23   Q    I'm placing on the overhead Government's

24   Exhibit 118-A.  Do you recognize that, Detective?

25   A    Yes.

Rivera - Direct/Tierney

1002

1   Q    What do you recognize that -- withdrawn.

2            Do you recognize that document as the redacted

3   version of Government's Exhibit 118?

4   A    Yes, sir.

5   Q    Okay.  And again, the upper portion of the document,

6   what is depicted there?

7   A    The suspect and five fillers.

8   Q    And the suspect, again, in this case is Gringo,

9   Adalberto Guzman?

10  A    Yes, sir.

11  Q    Where is he located within the six photos?

12  A    The upper panel of the photo, all the way on the

13  right, number three.

14  Q    For the record, that is number three?

15  A    Yes.

16            (Continued on the following page.)

17

18

19

20

21

22

23

24

25

Rivera - direct/Tierney

1003

1   Q    The handwritten portion of this document was blank

2   when you showed it to the defendant, correct?

3   A    Correct.

4   Q    Did you provide the defendant instructions prior to

5   showing him this document?

6   A    Yes; I showed him a photo array of six males similar

7   in appearance, wanted him -- if he recognized anyone in

8   the group photos relative to our case, to let us know.

9   Q    After you gave him that instruction, did you show him

10  the photo spread?

11  A    Yes.

12  Q    What, if anything, did he do?

13  A    He identified photo number 3 as being Gringo, or

14  Adalberto Guzman.

15  Q    After he identified photo number 3 as Gringo, what

16  did you do?

17  A    I asked him to place a circle around number 3 and

18  place his initials there.

19  Q    Under number 3 where the circle is, he placed his

20  initials there?

21  A    Yes.

22  Q    Did the defendant tell you words to the effect this

23  is the individual he knows as Gringo, and he told you he

24  was with Cruzito and Zorro when they killed Vanessa and

25  the other guy that was with Vanessa?

Rivera - direct/Tierney

1004

1    A    Yes.

2    Q    One more thing, after he indicated that, did you fill

3    out the document?

4    A    Yes.

5    Q    On the bottom, did you have the defendant sign it?

6    A    Yes, sir.

7    Q    Is the signature on the bottom left hand, that's his

8    signature?

9    A    Yes, sir.

10   Q    Next to his signature is your signature?

11   A    Yes, sir.

12   Q    And on the bottom right hand, did you have the date

13   and time?

14   A    Yes.

15   Q    And you finished showing him these three photo

16   spreads at 12:23 in the morning?

17   A    Yes, sir.

18            THE COURT:  We will take the morning break.

19            Don't discuss the case.

20            (The jury leaves the courtroom.)

21            (A recess was taken.)

22            THE COURT:  Please be seated.

23            Let's get the witness and the jury.

24            (The jury enters the courtroom.)

25            THE COURT:  Please be seated.

1005

1       Mr. Tierney, go ahead.

2  BY MR. TIERNEY:

3  Q    I believe, Detective, when we left off you had just

4  finished showing the defendant the third of three photo

5  spreads.

6          After you showed the defendant that third photo

7  spread, what happened next?

8  A    We had a conversation with him.

9  Q    Approximately how long did this conversation last?

10 A    About an hour and 30 minutes.

11 Q    Who participated in the conversation?

12 A    Detective Chase ran the interview.  I was there in

13 case there were any communication problems.

14 Q    During the course of your interaction with the

15 defendant and the interview that you and Detective Chase

16 participated in, what language was it conducted in?

17 A    English.

18 Q    During the course of the conversation, were at times

19 you called upon to provide interpretation?

20 A    Yes.

21 Q    Did you have any problem understanding the defendant?

22 A    No, I did not.

23 Q    Did the defendant appear to have any problems

24 understanding you?

25 A    No.

1006

1    Q    And what was the defendant's demeanor during the

2    interview?

3    A    He was calm and cooperative.

4    Q    Now, the conversation that you had for an hour and a

5    half, what did you speak about?

6    A    We talked about the murder in Central Islip.

7    Q    Did you speak about any other incidents in either

8    Queens or Nassau County?

9    A    No.

10   Q    Why not?

11   A    That wasn't our case.

12   Q    Then after that hour-and-a-half statement, what

13   happened next?  Sorry, after that hour-and-a-half

14   conversation, what happened next?

15   A    We asked him if he would give a statement to us.

16   Q    What, if anything, was his response to that request?

17   A    He said he would.

18   Q    Did you, in fact, take a statement from him at that

19   time?

20   A    Yes, sir.

21   Q    I'm going to show you what has been marked as

22   Government Exhibit 115.  I just ask you if you recognize

23   that.

24   A    This is the three-page statement that we took from

25   the defendant.

Rivera - direct/Tierney

1007

1    Q    Is that the original of that statement?

2    A    Yes, sir.

3    Q    How do you recognize it as such?

4    A    The statement has the unique case number that's

5    attached to this case and has my signature on it, and it

6    has the defendant's signature on it four different times,

7    and has Detective Chase's signature on it.

8    Q    You indicated that -- where is the defendant's

9    signature on the first page of that document?

10   A    It's in the middle of the page after he writes, and

11   it's also at the bottom of the page, and each of the

12   preceding pages it's on the bottom of the page.

13   Q    That document, is it in the same or substantially the

14   same condition as it was after you and Detective Chase

15   obtained it from defendant on March 18th?

16   A    Yes.

17   Q    I'm going to show you now what's marked as Government

18   Exhibit 115A for identification.  Do you recognize that?

19        Actually, do you recognize that document as a

20   redacted version of the original statement you took from

21   the defendant, Government's Exhibit 115?

22   A    Yes.

23   Q    Other than the redaction, is it a fair and accurate

24   representation of the original statement, Government

25   Exhibit 115?

Rivera - direct/Tierney

1008

1    A    Yes.

2              MR. TIERNEY:  I would move it into evidence at

3    this time, your Honor, Government Exhibit 115A.

4              MS. MACEDONIO:  With the exception of my

5    pretrial motions, I would continue those objections, but I

6    have no others.

7              MS. RANTALA:  I would continue with the same

8    objection, and other than that, no objections.

9              THE COURT:  Okay.  Come up to the sidebar.

10             (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Sidebar**

1009

1      (Sidebar.)

2      THE COURT:  Why don't you -- maybe it's self

3   evident.  Maybe explain to the jury that the second page

4   was typed up.

5      MR. TIERNEY:  Okay.

6      THE COURT:  Lead him through it and explain

7   that.

8      MR. TIERNEY:  Very good.

9      (Sidebar concluded.)

10      (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar

1010

1    (In open court.)

2    THE COURT:  115A is admitted.

3    (Government Exhibit 115A received in evidence.)

4    MR. TIERNEY:  (Cont'd)

5    Q    For the record, Detective, 115A, page 1 of 115A, is

6    an exact copy of the first page of the original statement,

7    correct?

8    A    Yes, sir.

9    Q    And then what was done was with regard to the second

10   page of 115A, that's just a typewritten redacted version

11   of pages 2 and 3 of the original document, correct?

12   A    Yes, sir.

13   Q    Now, after the defendant agreed to give -- provide

14   you and Detective Chase with a written statement, what's

15   the first thing that you and Detective Chase did after

16   that?

17   A    We reread him his rights.

18   Q    How did you do that?

19   A    Being that this document is not in Spanish, I used

20   the rights card we had originally used, used the language

21   -- the Spanish language of that card, I asked him the

22   rights questions and asked him to place his initials after

23   each right on this document.

24   Q    Again, your custom and practice with regard to

25   advising defendants of their rights, either in Spanish or

Sidebar

1011

1    English, do you ever recite those from memory or do you

2    always read them off a card?

3    A    I always read them off the card.

4    Q    I'm going to just show you what has been marked as

5    Government Exhibit 115A.  And what's depicted in the upper

6    portion of that document, I'm going to hit the lights so

7    the jury can see it.

8         What's depicted in the top portion of that page?

9    A    The upper portion of the document is the rights and

10   the waiver of rights.

11   Q    Again, you read him those rights in Spanish off of

12   the original card, Government Exhibit 114?

13   A    Yes, sir.

14   Q    In the first right, what is that?

15   A    You have the right to remain silent.

16   Q    After you read him that right in Spanish, what

17   happened?

18   A    I asked him to place his initials.

19   Q    Next to that right, is that where the defendant

20   placed his initials?

21   A    Yes, sir.

22   Q    Did you read him the second right?

23   A    Yes.

24   Q    What does that mean in English?

25   A    Anything you say can and will be used against you in

1012

1    a court of law.

2    Q    After you read him that second right, did he place

3    his initials next to that?

4    A    Yes, sir.

5    Q    Did you then read him the third right?

6    A    Yes.

7    Q    Again, what does that mean in English?

8    A    You have a right to talk to a lawyer right now and

9    have him present when you are being questioned.

10   Q    After you read him that right, what did you ask him

11   to do?

12   A    I asked him to place his initials.

13   Q    On the document it says HNM, is that the defendant's

14   initials?

15   A    Yes.

16   Q    Then the fourth right?

17   A    Yes.

18   Q    In Spanish?

19   A    Yes.

20   Q    What does that right mean in English?

21   A    If you cannot afford a lawyer, one will be appointed

22   for you -- if you cannot afford a lawyer and want one, a

23   lawyer will be appointed for you by the Court before any

24   questioning.  If you decide to answer questions now

25   without a lawyer present, you will have the right to stop

Sidebar

1013

1    the questioning at any time until you talk to a lawyer.

2    Q    After you read him that right, did he place his

3    initials?

4    A    Yes, sir.

5    Q    And after you went through the advice of rights, did

6    you read him the two waiver of rights questions?

7    A    Yes, sir.

8    Q    Again, was that done in Spanish off the card?

9    A    Yes.

10   Q    The first waiver of rights question, what does that

11   mean in English?

12   A    Do you understand each of these rights as I have

13   explained to you.

14   Q    After you read the defendant that first waiver, what,

15   if anything, happened?

16   A    He answered "si," which means yes, and I asked him to

17   place the word and his initials after that.

18   Q    So that's the defendant's handwriting, "si," then his

19   initials?

20   A    Yes.

21   Q    Did you read him the second waiver?

22   A    Yes.

23   Q    Again in Spanish?

24   A    Yes.

25   Q    What does that second waiver mean in English?

1014

1   A    Having these rights in mind, do you wish to talk to

2   us now.

3   Q    After you read him that right, what happened?

4   A    He answered "si" and I asked him to place his answer

5   and his initials after that.

6   Q    Did he do that?

7   A    Yes, sir.

8   Q    Right here, is that "si" and his initials?

9   A    Yes.

10  Q    After you asked him to do that, what happened next?

11  A    I asked him to place his initials at the bottom of

12  the form.

13  Q    Did he do that?

14  A    Yes.

15  Q    What happened next?

16  A    Then Detective Chase and I had a conversation with

17  him.  I put the time we started, the statement and I

18  signed it.

19  Q    Whose signature is that?

20  A    That's the defendant's signature.

21  Q    For the record, that's the middle of the page on the

22  right-hand side.

23        When did defendant sign that?

24  A    Right after the rights.

25  Q    Who placed the date, the time on the document below

Sidebar

1015

1    that?

2    A     I did.

3    Q     The 2:05 reflected the time after you advised him of

4    his rights the second time?

5    A     Yes, sir.

6    Q     Then you signed it?

7    A     Yes, sir.

8    Q     After you went through the defendant's rights with

9    him the second time, what happened then?

10   A     We had a further conversation with him about the

11   events in Central Islip on February 5.

12   Q     This was for the purpose of taking a statement from

13   him?

14   A     Yes.

15   Q     So how that was statement obtained with regard to

16   this conversation?

17   A     That went line by line, we went -- Detective Chase

18   already had a lot of the information that we were going to

19   be putting on the statement, so in verifying the

20   information, we would go line by line writing it out.

21   Q     Again, during this process, were you available to

22   translate in Spanish, if needed?

23   A     Yes.

24   Q     Did there come a time when the statement was

25   concluded?

Sidebar

1016

1    A    Yes.

2    Q    Approximately how long did it take you to write out

3    the statement with the defendant?

4    A    25 to 30 minutes, I believe.

5    Q    Then after the statement was written out, what

6    happened next?

7    A    Then Detective Chase was reading it, as we went

8    through, he gave it to the defendant to read, he appeared

9    to be reading it, and I read it to him in Spanish.

10   Q    You read the entire document to him in Spanish?

11   A    Yes.

12   Q    After you read the entire document to him in Spanish,

13   then what happened?

14   A    We asked if -- I asked for clarification on the gun

15   that was used, and he wrote in on, I believe it's page 2.

16   Q    What did he write in?

17   A    "This is the gun that I had this morning."

18   Q    Did he write that in English or Spanish?

19   A    In Spanish.

20   Q    What is the Spanish phrase for:  This is the gun that

21   I had this morning?

22   A    Esta es la pistola que yo teni esta mañana.

23   Q    Did the defendant write that Spanish phrase in the

24   statement?

25   A    Yes, sir.

**Sidebar**

1017

1  Q    Could you read to the government the body of the

2  statement at this time -- sorry, could you read to the

3  jury the body of this statement at this time?

4  A    Yes.

5         THE COURT:  Read it slowly so the court reporter

6  can take it down.

7  A    I, Heriberto N. Martinez, being duly sworn, depose

8  and say I am 23 years old.  I was born on 2/17 of '87 in

9  El Salvador.  I live at 1261 Central Avenue, Apartment

10 108A, Far Rockaway.  I work as a dishwasher at the Woodrow

11 Restaurant on Peninsula Shopping Center in Hewlett.  My

12 friend Juan Garcia, who is also called Cruzito, I have

13 known for 2 or 3 years.  Cruzito lives in Baldwin.

14 Cruzito's girlfriend is Jennifer Valle.

15       About 2 months ago, Cruzito told me that a girl

16 named Vanessa was trying to have him killed by members of

17 the 18th Street gang.  Cruzito is MS-13 CLS.  CLS is

18 Coronados Locos Salvatruchas.  Cruzito told me that

19 Vanessa was going to be killed with a pistol.  He was

20 going to get a gun to kill her.

21       About one month ago, I went home and I met

22 Cruzito, Gringo and Zorro outside my apartment.  Cruzito

23 said he shot Vanessa.  Cruzito said Gringo shot Vanessa

24 first in the head, then Cruzito said he shot Vanessa in

25 the chest.  Zorro said he shot the guy that was with

Sidebar

1018

1    Vanessa twice.  Zorro said at first he shot the guy once,

2    and then Zorro said he shot him again.

3           Cruzito said he had done this the day before.  I

4    know that my friend Diego had been with Cruzito, Gringo

5    and Zorro earlier.  Later I talked to Diego and Diego told

6    me what Cruzito had said about Vanessa and the guy that

7    was with Vanessa being killed.

8           I saw the gun that was used to kill Vanessa

9    before she was killed.  The gun was a small silver

10   handgun.  Esta es la pistola que yo teni esta mañana.

11   HNM.

12   Q    Is that the defendant's initials?

13   A    Yes, sir.

14          Cruzito and Zorro told me they killed Vanessa

15   and the other guy in a wooded area in Central Islip.

16          I spoke to Cruzito on my cell phone two weeks

17   ago.  My cell phone number is 516-244-5546.  Cruzito's

18   phone number is in my cell phone under the name Cruz.

19   Cruzito said he was going to El Salvador with Zorro and

20   Gringo.

21          Cruzito said that Vanessa was killed in the

22   woods while the other guy that was with Vanessa was still

23   in the car.  Zorro got the other guy out at the car,

24   brought him into the woods and killed him.

25          I have viewed six photographs of males similar

Sidebar

1019

1    in appearance and have selected the person in position

2    number 2 as Cruzito, or Juan Garcia.

3           I have viewed six photographs of males similar

4    in appearance and have selected the person in position

5    number 5 as Zorro, who I now know as Rene Mejia.

6           I have viewed 6 photographs of males similar in

7    appearance and have selected the person in position number

8    3 as Gringo, who I now know as Adalberto Guzman.

9           I have read the above statement of 3 pages and I

10   swear it is true.  This statement has been read to me in

11   Spanish by Detective Ralph Rivera, shield number 1121.

12   Q    The redacted version isn't signed.  Is the original

13   signed by the defendant, although the redacted isn't?

14   A    Yes.

15   Q    The statement mentions the defendant indicated that

16   he:  Later I talked to Diego and Diego told me what

17   Cruzito had said about Vanessa and the guy that was with

18   Vanessa being killed.

19           When the defendant was referring to Diego in

20   that statement, do you know to which Diego he was

21   referring?

22   A    Diego Marroquin.

23   Q    That was the same individual who was in custody in

24   Queens that you had spoke to earlier?

25   A    Yes, sir.

Rivera - cross/Macedonio

1020

1   Q    Also during the statement, the defendant --

2   withdrawn.

3          Did you ask the defendant whether or not Cruzito

4   was a member of the MS-13 gang?

5   A    Yes, he said he was part of the CLS.

6   Q    And did you -- did the defendant indicate to you at

7   any time that night whether he was a member of the MS-13?

8   A    No, sir.

9   Q    No, he never indicated he was a member of the MS-13?

10  A    Correct.

11  Q    Thank you.  If I can have a moment.

12         MR. TIERNEY:  Nothing further, your Honor.

13  Thank you.

14         THE COURT:  Ms. Macedonio?

15         MS. MACEDONIO:  Thank you, Judge.

16  CROSS-EXAMINATION

17  BY MS. MACEDONIO:

18  Q    Good afternoon, Detective.  How are you?

19  A    Good afternoon.  Good.

20  Q    You testified that you were called out at 10:00 a.m.

21  on March 17 of 2010; is that correct?

22  A    Yes.

23  Q    Tell us or explain to us how it was you got called

24  out.

25  A    I was called at home by Detective Robert Chase, who

1021

1    stated that he had gotten word there was an individual in

2    the NYPD under arrest that may have information pertaining

3    to our murder in Suffolk County.

4    Q    So what did Detective Chase ask you to do?

5    A    He asked me to go into the city with him in case the

6    person didn't speak any English.

7    Q    So there had been some indication from NYPD they had

8    a person in custody, correct?

9    A    Yes.

10   Q    And NYPD had communicated to Suffolk County Police

11   Department that the person would need the assistance of a

12   Spanish interpreter, correct?

13   A    No, not that I'm aware of.  I wasn't part of that

14   conversation.

15   Q    You weren't the detective on this case, right?

16   A    Correct.

17   Q    And it was your understanding that the reason why you

18   were being called in was because you speak Spanish,

19   correct?

20   A    Yes.

21   Q    So would it be fair to say that your understanding

22   was that you were going in to translate whatever

23   conversation might ensue?

24   A    I was going in case the person didn't speak any Span

25   -- any English.

Rivera - cross/Macedonio

1022

1   Q    Because in case the person didn't speak English,

2   because you speak Spanish?

3   A    Yes.

4   Q    You weren't going in because the person spoke

5   Chinese?

6   A    Correct.

7   Q    This wasn't your case?

8   A    Correct.

9   Q    Other than speaking to Mr. Martinez on March 18 of

10  2010, have you had any other involvement in this case?

11  A    No.

12  Q    So you are called from some location at 10 a.m. on

13  March 17, and when you arrive at -- in the city?

14  A    12:40 p.m.

15  Q    Correct me if I'm wrong, I think you went to the

16  101st Precinct in Far Rockaway?

17  A    Correct.

18  Q    When you get to the 101st Precinct in Far Rockaway,

19  are you told anything about the person that you intend to

20  speak to?

21  A    Yes.  At that time we learned his name and we learned

22  that he was under arrest by the NYPD.

23  Q    Did you learn that Mr. Martinez had been in custody

24  from the NYPD from the early morning hours of March 17?

25  A    I was not aware of what time they had placed him into

Rivera - cross/Macedonio

1023

1    custody.

2    Q    Did you ever learn that?

3    A    No.

4    Q    So you clearly knew when you were called at 10 a.m.

5    they had someone already in custody?

6    A    Yes.

7    Q    As you are leaving Suffolk County, you understand the

8    person you want to speak to is already in the 101st

9    Precinct?

10   A    Yes.

11   Q    You are not going on a lark, you know there is

12   someone you want to speak to?

13   A    Yes, sir -- ma'am.

14   Q    You arrive at the 101st Precinct at 12:40 in the

15   afternoon, right?

16   A    Correct.

17   Q    And what happens then?

18   A    We get to the precinct, get some information from the

19   Nassau and NYPD detectives, and we wait to speak to the

20   defendant.

21   Q    So essentially you and Detective Chase have to wait

22   around from 12:40 in the afternoon until 12 the next day;

23   is that fair to say?

24   A    Yes, ma'am.

25   Q    Did you understand that the reason why you were

1024

1   waiting around is because other people were wanting to

2   speak to Mr. Martinez?

3   A    Yes, ma'am.

4   Q    So when you speak to Mr. Martinez, you are certainly

5   not the first person, in your understanding, who spoke to

6   Mr. Martinez that day?

7   A    Correct.

8   Q    Now, do you have any idea how many individuals spoke

9   to Mr. Martinez before you did?

10  A    I'm sure the NYPD and Nassau had spoken to him before

11  we were able to speak to him.

12  Q    So he is in the prison under arrest?

13  A    Correct.

14  Q    There are officers that would have effectuated that

15  arrest, correct?

16  A    Correct.

17  Q    And so would it be fair to say they would have had

18  some communication with Mr. Martinez during that process?

19  A    Yes.

20  Q    And then when he is in the precinct, it's your

21  understanding that NYPD speaks to him, correct?

22  A    Yes.

23  Q    And do you know how many officers from NYPD spoke to

24  him?

25  A    No.

Rivera - cross/Macedonio

1025

1    Q    Are you aware of the length of period of time that

2    NYPD spoke to him?

3    A    No.

4    Q    And you are also aware that officers from Nassau

5    County were present?

6    A    Yes.

7    Q    Because they were present waiting with you, right?

8    A    Yes.

9    Q    So you are sitting around the 101st Precinct with

10   both NYPD and Nassau County officers waiting to speak to

11   Mr. Martinez, right?

12   A    I'm waiting there, yes.

13   Q    And when you entered the room to speak to

14   Mr. Martinez, there were NYPD officers with him, right?

15   A    Yes.

16   Q    Is it fair to say that there was a whole range of

17   individuals who had spoken to Mr. Martinez before you

18   actually met with him?

19   A    I would say that there were other people that were

20   speaking to him, yes.

21   Q    But there were people from NYPD, right?

22   A    Yes.

23   Q    Officers -- those were detectives who were speaking

24   to him?

25   A    Yes.

Rivera - cross/Macedonio

1026

1  Q    Would have been regular patrol officers who

2  effectuated the arrest, right?

3  A    Yes.  I don't know what time he was placed under

4  arrest, so I mean, there could have been a whole

5  investigative process before he was placed under arrest.

6  I don't know anything about that particular case, so I

7  can't speculate on that.

8  Q    Understood.

9        My question is, before you got to speak to him,

10  there was a whole range of other law enforcement personnel

11  who had spoken to him?

12  A    There were other people, yes.

13  Q    And there was a range --

14  A    It was to my -- no.  Two other people, not a whole

15  range.  It's two other police people.

16  Q    I will withdraw the question.

17        There were police officers who were arresting

18  him, NYPD?

19  A    Yes.

20  Q    Detectives who were interviewing him from NYPD?

21  A    Yes.

22  Q    Nassau County detectives who were interviewing him,

23  correct?

24  A    Yes.

25  Q    And that is going on, to the best you know, because

1027

1   he is in custody at 10 a.m.   Then you don't speak to him

2   until the next day, until early morning the next day,

3   correct?

4   A    Correct.

5   Q    During that period of time, you have absolutely no

6   idea what any of these individuals have said to Mr.

7   Martinez, right?

8   A    Correct.

9   Q    You don't know if they have threatened him, right?

10  A    Correct.

11  Q    You don't know if anyone has put a hand on him,

12  right?

13  A    Correct.

14  Q    Because you weren't present for any of this?

15  A    Correct.

16  Q    You don't know whether he was given anything to eat,

17  right?

18  A    Correct.

19  Q    You don't know if when he was brought in, if he was

20  under the influence of alcohol or narcotics?

21  A    Correct.

22  Q    So by the time you get to him, which is at least 14

23  hours later, right, from 10 a.m. until just after

24  midnight?

25  A    Correct.

Rivera - cross/Macedonio

1028

1    Q    There is a whole group -- there are several law

2    enforcement personnel who have spoken to him, you don't

3    know what transpired during those 14 hours, at least 14

4    hours?

5    A    Right.

6    Q    Now, the statement that Mr. Martinez purportedly made

7    to you, did you audiotape that?

8    A    No.

9    Q    Did you videotape that?

10   A    No.

11   Q    Did you use even your cell phone to memorialize what

12   he was saying to you?

13   A    No.

14   Q    So in the 14-hour period that you were at the 1 -- in

15   the 14-hour period you knew you were going to conduct this

16   interview, or you were hopeful you were going to conduct

17   this interview, neither you nor Detective Chase said:

18   Maybe we should memorialize this?

19   A    We memorialized it in writing.

20   Q    You didn't -- neither one of you said:  We should

21   audiotape this or videotape this, right?

22   A    Correct.

23   Q    And after you spoke to Mr. Martinez, and you believed

24   he was being cooperative, at that point neither one of you

25   said:  Gee, maybe we should audio record this?

Rivera - cross/Macedonio

1029

1    A    Right.

2    Q    Neither one of you said:  Maybe we should make a

3    video of this?

4    A    Correct.

5    Q    You said Mr. Martinez's attitude was that he was calm

6    and cooperative, right?

7    A    Yes, ma'am.

8    Q    So it wouldn't have been that you felt he was lying

9    to you, and you didn't want to memorialize the

10   conversation, you just chose not to do it, right?

11   A    It's not the Suffolk County policy to audio or

12   videotape confessions or statements.

13   Q    Well, putting aside what the policy is, you chose not

14   to do it?

15   A    We go by policy.

16   Q    Okay.  There is never a time in Suffolk County where

17   there is a video or audio of a statement from a man who is

18   confessing to a double homicide in Suffolk County?

19   A    There is now, yes.

20   Q    There is now?

21   A    There wasn't at that time.

22   Q    Not in 2010?

23   A    Correct.

24   Q    Okay.  My question to you was, or it was your

25   statement it was never done?

Rivera - cross/Macedonio

1030

1   A    It was never done.

2   Q    Never?

3   A    It was done as recap in Suffolk County when we had

4   the facilities to do that.

5   Q    You spoke to Mr. Martinez before you took the

6   statement in writing?

7   A    Yes.

8   Q    So then you recapped it when you took it in writing?

9   A    Yes.

10  Q    There is no video or audio, fair to say?

11  A    Correct.

12  Q    Now, you first come into contact with Mr. Martinez, I

13  think at 12:01 a.m.; is that right?

14  A    Yes.

15  Q    Then, I think the Miranda card indicates a time of

16  12:09, correct?

17  A    Correct.

18  Q    In that eight-minute period, it's your testimony that

19  you advised Mr. Martinez of his Miranda rights, correct?

20  A    That eight-minute period we took him from the first

21  room we met him to the second room, and advised him of his

22  Miranda warnings, yes.

23  Q    And after you did that, it's your testimony that a

24  conversation ensued, right?

25  A    Yes.

Rivera - cross/Macedonio

1031

1    Q    Government Exhibit 115A, which is the redacted

2    statement that you looked at before, that has a time on it

3    as well; does it not?

4    A    Yes.

5    Q    What is the time that's on that, do you have it

6    there?

7    A    On the statement form it's 2:05.

8    Q    So it's two hours later that you decide you are going

9    to memorialize the statement in writing, right?

10   A    Yes.

11   Q    Now, it's your testimony you decided to once again

12   advise Mr. Martinez of his Miranda warnings, correct?

13   A    Yes.

14   Q    And once again, you did that in Spanish; did you not?

15   A    Yes.

16   Q    But the form, 115A, this form is in English?

17   A    Correct.

18   Q    Now, you testified that most of the conversation with

19   Mr. Martinez was conducted in English?

20   A    That's correct.

21   Q    But you felt the need, when you were advising him of

22   his Miranda warnings, to do it in Spanish?

23   A    Yes.

24   Q    Do you see the part where it says:  Waiver of rights?

25   A    Yes.

Rivera - cross/Macedonio

1032

1   Q    One, do you understand each of these rights I have

2   explained to you?

3        Answer:   And he writes "si."

4   A    Yes.

5   Q    "Si" in Spanish means yes?

6   A    Correct.

7   Q    It's your testimony that Mr. Martinez was having no

8   trouble understanding English?

9   A    Yes.

10  Q    But yet, for the simplest word in the English

11  language, he doesn't write yes, Y.E.S., he writes "si" and

12  his initials, right?

13  A    Yes.

14  Q    Now, the statement -- this is your handwriting,

15  right?

16  A    No.

17  Q    Whose handwriting is this?

18  A    Detective Chase.

19  Q    It's not Mr. Martinez's handwriting?

20  A    Correct.

21  Q    And the second page of it, which has been redacted

22  and is typed, all of this was written by Detective Chase,

23  correct?

24  A    Correct.

25  Q    Now, do you see the part I have highlighted, the

Rivera - cross/Macedonio

1033

1    first part?

2    A    Yes.

3    Q    You testified that you wanted to clarify something

4    with Mr. Martinez because you were unsure of something?

5    A    I wanted clarification on it.

6    Q    And so his response to your question, or to your

7    inquiry that you needed to clarify, again he writes that

8    in Spanish, correct?

9    A    Yes.

10   Q    Now, the statement that you are taking down, or that

11   was being taken down by Detective Chase, this is

12   purportedly Mr. Martinez's statement?

13   A    Right.

14   Q    His words?

15   A    Right.

16   Q    No one is putting words in his mouth?

17   A    Correct.

18   Q    You get to the bottom part of this, it says:  I have

19   viewed six photographs of males similar in appearance and

20   have selected the person in position number 2 as Cruzito

21   or Juan Garcia.

22         That was -- those weren't Mr. Martinez's words,

23   are they?

24   A    No.

25   Q    It says:  I have viewed 6 photographs of males

Rivera - cross/Macedonio

1034

1  similar in appearance and have selected the person in

2  position number 5 as Zorro, who I know as Rene Mejia.

3          Those aren't Mr. Martinez's words, are they?

4  A    No, those are standard sentences we use.

5  Q    Either you or Detective Chase are putting your spin

6  on this, right?

7  A    No, that's what was done.

8  Q    Right.  Well, but those aren't his words, he didn't

9  say:  I looked at something and it looks like -- you are

10  telling him what is going to be put on this form?

11  A    We are memorializing what occurred in the room.

12  Q    These aren't words he picked out?

13  A    No.

14  Q    These are words that Detective Chase put down on the

15  page, right?

16  A    Yes.

17  Q    You knew that Mr. Martinez had been in the 101st

18  Precinct since at least 10:00?

19  A    Yes.

20  Q    Is it your testimony that he appeared in no way to be

21  sleepy?

22  A    Correct.

23  Q    Did he appear to be impaired in any fashion?

24  A    No, ma'am.

25  Q    Did you learn, Detective, that Mr. Martinez worked at

Rivera - cross/Macedonio

1035

1    a restaurant as a dishwasher?

2    A    Yes.

3    Q    Did you also learn that on March 17 that he had

4    worked a full shift that day?

5    A    No.

6    Q    You didn't learn that?

7    A    No, ma'am.

8    Q    So you had no idea as to what he had done on March

9    17?

10   A    Correct.

11   Q    You testified at an earlier proceeding with regard to

12   this statement; is that correct?

13   A    Yes.

14   Q    Did you testify in that proceeding that you're not

15   proficient in Spanish?

16   A    Yes.

17   Q    In fact, didn't you testify in that proceeding that

18   you essentially have a third-grade level of Spanish?

19   A    I have no proficiency in writing Spanish.  That's

20   what I testified to.

21   Q    Right.

22   A    You said Spanish.

23   Q    I apologize.  While it's your testimony that you can

24   converse in Spanish?

25   A    Yes.

Rivera - redirect/Tierney

1036

1   Q    You can't write in Spanish; is that fair to say?

2   A    Not a proficient level.

3   Q    For example, if you had to take this statement in

4   Spanish, 115A, you couldn't write out all those words,

5   right?

6   A    Correct.

7   Q    And that's despite the fact you grew up in a house

8   where Spanish was spoken, right?

9   A    Yes.

10  Q    Both of your parents spoke Spanish to you all the

11  time?

12  A    Yes.

13          MS. MACEDONIO:  Judge, may I have one moment?

14          THE COURT:  Sure.

15          (Pause)

16          MS. MACEDONIO:  Judge, no further questions.

17  Thank you.

18          MS. RANTALA:  No questions, your Honor.

19          THE COURT:  Redirect?

20          MR. TIERNEY:  Briefly, your Honor.

21  REDIRECT EXAMINATION

22  BY MR. TIERNEY:

23  Q    Detective Rivera, does the Suffolk County Police

24  Department have a policy with regard to videotaping or

25  audiotaping confessions taken offsite; in other words,

Rivera - redirect/Tierney

1037

1   outside of Suffolk County Police building?

2   A    No.

3   Q    Do you have any training with regard to setting up

4   audio or video equipment?

5   A    No, sir.

6   Q    Did you have any audio or video equipment with you on

7   March 17?

8   A    No, sir.

9   Q    Now, you were asked questions with regard to your

10  Spanish.

11           Do you remember those questions?

12  A    Yes.

13  Q    I believe you indicated on direct examination that

14  you grew up in a Spanish-speaking household; is that

15  correct?

16  A    Yes.

17  Q    Now, when you grew up in that -- when you were born,

18  what language did your parents teach you to speak?

19  A    Spanish.

20  Q    How was it that you learned to speak English?

21  A    Through school and the neighborhood.

22  Q    So as you got older, you went to school, you learned

23  to speak English?

24  A    Yes.

25  Q    Did there come a time when your parents learned to

Rivera - redirect/Tierney

1038

1    speak English?

2    A    Yes.

3    Q    How did your parents learn how to speak English?

4    A    They learned from us.

5    Q    "Us," meaning you and your siblings?

6    A    Yes.

7    Q    You never studied writing Spanish in school; is that

8    fair to say?

9    A    That's correct.

10   Q    Now, during the time that you were with the

11   defendant, did either you or Detective Chase threaten him

12   in any way?

13   A    No, sir.

14   Q    Did either you or Detective Chase physically assault

15   him?

16   A    No, sir.

17   Q    At any time while you were with the defendant, did he

18   appear in any manner to be intoxicated?

19   A    No, sir.

20   Q    Did he appear to have any trouble understanding

21   either you or Detective Chase?

22   A    No, sir.

23   Q    And during the course of the interview, were there

24   times when you translated certain phrases or words into

25   the Spanish language?

Rivera - redirect/Tierney

1039

1    A    Yes.

2    Q    If need be, would you have been available to

3    translate the entire interview in Spanish?

4    A    Yes.

5         MR. TIERNEY:  I have nothing further, your

6    Honor.

7         THE COURT:  Ms. Macedonio?

8         MS. MACEDONIO:  May I have one second?

9         THE COURT:  Sure.

10        (Pause)

11        MS. MACEDONIO:  I have no further questions.

12   Thank you, Judge.

13        THE COURT:  You can step down.

14        Can I speak to the lawyers at sidebar?

15        (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

1040

1          (Sidebar.)

2          THE COURT:  Who is the next witness?

3          MR. TIERNEY:  Detective Haslon.  I don't know

4     where he is exactly.

5          THE COURT:  You want to take the lunch break?

6          MR. TIERNEY:  Perhaps.

7          THE COURT:  Okay.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1041

1    (Sidebar concluded.)

2    (Continued on the next page.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1042

1       (In open court.)

2       THE COURT:  We are going to take the lunch break

3   a little earlier today rather than start the next witness.

4   Why don't we reconvene at ten to 2:00.  Don't discuss the

5   case.  Have a good lunch.

6       (The jury leaves the courtroom.)

7       MS. MACEDONIO:  Judge, may I make an

8   observation?

9       THE COURT:  Sure.

10      MS. MACEDONIO:  When Detective Rivera left the

11  stand and while the jury was still present, there were

12  several agents in the courtroom, they shook his hand,

13  patted him on the back and told him:  Good job.  I ask

14  they refrain from doing that with other law enforcements

15  that take the stand.

16      THE COURT:  There shouldn't be any exchanges

17  like that in the courtroom.  I didn't see that.  You

18  shouldn't have those exchanges in the courtroom.

19      MS. MACEDONIO:  Thank you.

20      (A luncheon recess was taken.)

21      (Continued on the next page.)

22

23

24

25

1043

1           A F T E R N O O N   S E S S I O N

2

3

4           THE COURT:  Mr. Durham, is this witness in the

5   courtroom?

6           MR. TIERNEY:  He is outside.  I will get him.

7           THE COURT:  Sir, if you would state your name

8   for the record.

9           THE PROSPECTIVE WITNESS HESLIN:  Edward Heslin,

10  H-E-S-L-I-N.

11          THE COURT:  Before we bring the jury in, I need

12  to give you a warning as I gave all witnesses.  You are

13  testifying about the murders, and I'm sure the prosecutors

14  mentioned this to you as well.

15          I have made the determination that the jury is

16  not to know the age of Diego Torres, or even the fact that

17  he was a child.

18          So in your testimony, if you make any reference

19  to him, you have to use the term that doesn't make

20  reference to his age in any way.  You can refer to him by

21  his name or a male victim, whatever usual term you want to

22  use.  Understand that?

23          THE WITNESS:  Yes.

24          THE COURT:  You can sit down and we will bring

25  in the jury.

1044

1    (Whereupon, the jury at this time entered the

2  courtroom.)

3    THE COURT:  Please be seated.

4    The government, please call your next witness.

5    MR. TIERNEY:  Certainly, your Honor.

6    The government calls Special Agent Edward

7  Heslin.

8    THE COURT:  Mr. Heslin, please stand while the

9  oath is being administered.

10

11  E D W A R D    H E S L I N,

12    called as a witness, having been first

13    duly sworn, was examined and testified

14    as follows:

15    THE CLERK:  Please state your name and spell it

16  for the record.

17    THE WITNESS:  Edward Heslin, H-E-S-L-I-N.

18    THE CLERK:  Please be seated.

19    THE COURT:  Pull your chair close to the

20  microphone and keep your voice up.

21

22  DIRECT EXAMINATION

23  BY MR. TIERNEY:

24  Q    Sir, by whom are you employed?

25  A    The FBI.

1045

1    Q    And do you speak Spanish?

2    A    I do.

3    Q    How did you learn how to speak Spanish?

4    A    I studied the language for five years in school, and

5    took some advanced college courses.  And I worked and have

6    grown up in the Spanish speaking environment my whole life

7    here in New York City and elsewhere.

8    Q    How long were you employed by the FBI?

9    A    16 years.

10   Q    And what was your first assignment within the FBI?

11   A    I was assigned to a violent gang task force in New

12   York City.

13   Q    For what year to what year?

14   A    From 1997 to the middle of 2002.

15   Q    And the violent gang task force that you were

16   assigned to, were you working with any other agencies?

17   A    I was.

18         I was working with the New York City Police

19   Department and our assignment specifically was Latino

20   gangs, Latin Kings, with Dominican drug connection.

21   Q    Did you have an opportunity to speak Spanish during

22   this assignment?

23   A    Yes.  I was operating Spanish language wires, and

24   operating and recruiting informants in Spanish, monitoring

25   Spanish language wires.  Operating informants in Spanish.

1046

1   I was speaking Spanish on a daily basis to witnesses and

2   taking statements from witnesses in Spanish.

3   Q    And after your assignment there ended, where were you

4   assigned?

5   A    In 2002 I was assigned to the joint terrorism task

6   force, which is a couple of months after the 9/11 attacks.

7   Q    And how long did you stay with the joint terrorism

8   task force?

9   A    I was there for about two and a half years.

10   Q    Until about June of '04?

11   A    Yes.

12   Q    And what was your assignment with the joint terrorism

13   task force?

14   A    At that time I worked anti Al-Qaeda matters,

15   domestically, as well as in Afghanistan, Europe and other

16   parts of this country.

17   Q    And during that approximate two and a half year

18   period you were with the joint terrorism task force, and

19   did you have occasion to speak Spanish while working as an

20   FBI agent?

21   A    From time to time, not nearly as often as when I was

22   assigned to the gang task force.

23   Q    After your assignment with the joint terrorism task

24   force ended, where were you assigned after that?

25   A    After that assignment ended I was transferred to the

1047

1    San Juan, Puerto Rico office.

2    Q    For how long were you assigned to the San Juan,

3    Puerto Rico office, you mean the FBI office?

4    A    Yes.

5    Q    How long were you assigned to that office?

6    A    June 2004 until September of 2007.

7    Q    And what were your duties and responsibilities with

8    the San Juan office during this approximate three year

9    period?

10    A    In that assignment I was a gang investigator and I

11    also conducted domestic terrorism investigations.

12    Q    And while working on this -- in the San Juan office,

13    did you have occasion to speak Spanish?

14    A    Every day, both work and socially.  It is the

15    language spoken on the Island.

16    Q    And once your assignment in Puerto Rico ended in

17    September of 2007, where were you assigned?

18    A    I returned to New York City and I was once again

19    assigned to the joint terrorism task force.

20    Q    And what was your assignment with the joint terrorism

21    task force this time?

22    A    When I returned back to New York, I was assigned the

23    investigation of Puerto Rican extremist groups, such as

24    the Macheteros, M-A-C-H-E-T-E-R-O-S and the FALN.  And I

25    also did some work on extremist groups out of South

1048

1    America.

2    Q    And did you have occasion while assigned to the joint

3    terrorism task force during this time to speak Spanish?

4    A    Fairly frequently.

5    Q    Did there come a time when your assignment with the

6    joint terrorism task force ended during this time as well?

7    A    Yes.

8    Q    And when was that?

9    A    In June of 2010 I was transferred to Long Island to

10   work in the Melville, Long Island office because they

11   required an additional Spanish speaker.

12   Q    And what were your duties and responsibilities with

13   the Long Island office?

14   A    Primarily the investigation of MS-13 gang matters.

15   Q    And while working -- when did you go to the Long

16   Island gang task force?

17   A    It was June of 2010 when I was assigned.

18   Q    Are you presently assigned there as well?

19   A    Yes, I am.

20   Q    And while working with the Long Island gang task

21   force, did you have occasion to speak Spanish?

22   A    All the time.

23   Q    Now, prior to the FBI where were you employed?

24   A    I was an attorney with the United States Department

25   of Justice.

1049

1    Q    For how long?

2    A    About three years.

3    Q    And what were your duties and responsibilities within

4    the Department of Justice for that three-year period?

5    A    I primarily worked on cases involving human rights

6    issues, political asylum, some other immigration matters.

7    Q    And the immigration and asylum matters that you dealt

8    with, where did these refugees, what country were they

9    from?

10   A    They were from all over the world.  But the bulk of

11   them, I would say half the cases were from Guatemala,

12   El Salvador, some from Honduras.

13   Q    While working for the Department of Justice for that

14   three-year period, did you have the opportunity to speak

15   Spanish while working?

16   A    For the first two years I was there, I would say for

17   about -- I conducted between three and four interviews

18   every day of people who were primarily from Central

19   America.  Most of the time those interviews were conducted

20   without an interpreter.  And then my last year was spent

21   almost entirely in court doing administrative proceedings,

22   sometimes I spoke Spanish, sometimes not.

23   Q    And during the course of your career with both the

24   FBI and the Department of Justice, were you certified as a

25   Spanish language speaker?

Heslin-Direct/Tierney

1050

1    A     Three times.

2    Q     And when were -- when were these three times?

3    A     In either late 1994, early 1995.  I had to sit for a

4    verbal expression and oral comprehension exam within the

5    Department of Justice to qualify me to interview and

6    process Latin American immigrants, which I did qualify

7    for.

8          Prior to entering on duty as an FBI agent, I had

9    to sit for a fairly comprehensive exam, written ability,

10   oral comprehension, verbal expression.  And that was

11   administered in three parts over two days.

12         And then upon my assignment to Puerto Rico, in

13   order to qualify for that assignment I had to pass another

14   verbal expression and comprehension exam.

15   Q     And during all three occasions when you took these

16   tests, were you found qualified to speak the Spanish

17   language?

18   A     I was.

19   Q     And during the course of your career with both the

20   FBI and the Department of Justice, have you had the

21   opportunity to interview Spanish speaking witnesses?

22   A     Yes.  Maybe hundreds and hundreds of times.

23   Q     During the course of your career with both the FBI

24   and the Department of Justice, did you have the

25   opportunity to take a written statement from Spanish

1051

1    speaking witnesses?

2    A    Yes.

3    Q    Approximately how many times?

4    A    Maybe a dozen statements over the last ten or fifteen

5    years.

6    Q    And during the course of your career with the FBI,

7    have you had the opportunity to advise Spanish speaking

8    defendants of their rights in the Spanish language?

9    A    Very frequently.

10   Q    Approximately how many times?

11   A    Probably several hundred.

12   Q    Now, I will call your attention to April 23, 2010.

13            Were you assigned to the Long Island gang task

14   force on April 23, 2010?

15   A    No, I was not.

16   Q    Where were you assigned?

17   A    I was still assigned to the joint terrorism task

18   force in Manhattan.

19   Q    However, on April 23, 2010, were you working with

20   members of the Long Island gang task force?

21   A    Yes, I was.

22   Q    Who were you working with?

23   A    I was working with George Davis from the Nassau

24   County Corrections Department, and Jim Lopez, an FBI agent

25   assigned to Long Island on the gang task force.

Heslin-Direct/Tierney

1052

1   Q    Why were you working with the Long Island gang task

2   force on April 24th, 2010?

3   A    Most of the members of the C-41 gang task force team

4   had a court appearance that day, including the only

5   Spanish speaker on that team.  And in addition to the

6   court appearance, they had a prisoner that had to be

7   picked up in Rikers Island and transferred to Long Island

8   for FBI processing and presented in federal court for

9   arraignment.

10  Q    And were you asked to participate in that job?

11  A    Yes, I was.

12  Q    And the individual from Rikers Island that you were

13  asked to pick up, what was his name?

14  A    Heriberto Martinez.

15  Q    And did you have any involvement with the FBI's

16  investigation of Heriberto Martinez prior to April 23,

17  2010?

18  A    Never, no.

19  Q    What occurred on April 23, 2010?

20  A    I drove to the FBI's Melville, Long Island office and

21  I met Deputy Davis probably around 9:30, sometime after

22  rush hour.

23           We then got into his vehicle and drove to Rikers

24  Island.  And at that point Deputy Davis entered a sally

25  port, basically he entered the jail.  And a few minutes

Heslin-Direct/Tierney

1053

1    later he exited the jail with Mr. Martinez in handcuffs.

2    Q    Do you see Mr. Martinez in the courtroom today?

3    A    Yes.

4    Q    And would you please point him out and identify an

5    article of his clothing?

6    A    Mr. Martinez is sitting third from the end of the

7    table, white colored shirt and a gray sweatshirt, staring

8    back at me.

9         MR. TIERNEY:  May the record reflect the witness

10   identified the defendant Heriberto Martinez?

11        THE COURT:  Yes.

12   Q    Now, once the defendant emerged from Rikers Island,

13   what happened?

14   A    George Davis walked him over to the vehicle and he

15   placed and handcuffed him in the back seat of the car on

16   the passenger side.

17   Q    And where was everyone situated within the car?

18   A    I was also in the back seat on the driver's side, and

19   Deputy Davis was in the front seat driving.

20   Q    And where were you going from Rikers Island?

21   A    We were leaving Rikers Island and driving to the

22   Melville, Long Island FBI office.

23   Q    For what reason?

24   A    Umm, Mr. Martinez was under FBI arrest, and all the

25   FBI arrests have to be processed in our office, we take

1054

1   their fingerprints, photographs, voucher their property

2   and we advise them of their rights and take a statement if

3   they want to give a statement.

4   Q    How long did it take for you to get from Rikers

5   Island to the FBI office in Melville?

6   A    Maybe half an hour.

7   Q    What if anything occurred during the car ride?

8   A    Initially not much happened.  We were all kind of

9   quiet.  At some point Mr. Martinez asked where we were

10  going, what was going on.  And I explained he was being

11  processed as an arrest.  And he expressed surprise at

12  that, because he indicated he was already under arrest and

13  he had given the police a statement about a murder and

14  provided details about that murder and its participants.

15  Q    Did you explain to him who you work for?

16  A    I did.  I told him I was an FBI agent.  And he was

17  being arraigned federally on a new charge.

18  Q    Did there come a time when you in fact arrived with

19  the defendant at the FBI office in Melville?

20  A    Yes.

21  Q    What happened once you and Deputy Davis arrived with

22  the defendant at the Long Island FBI office?

23  A    Deputy Davis and I escorted Mr. Martinez upstairs and

24  we began processing.

25  Q    And did there come a time that you advised the

1055

1  defendant of his rights?

2  A    Yes.

3  Q    When did that occur in relation to when you arrived

4  at the location?

5  A    Shortly thereafter.  We only had been -- had a very

6  short amount of time.  We had to transport him to Central

7  Islip for processing by pretrial and the marshal's office

8  and subsequently for arraignment.  Probably within 10 or

9  15 minutes from arriving.

10  Q    Did you question him prior to reading him his rights?

11  A    No, we did not question him.

12  Q    When you read him his rights -- did you advise him of

13  his rights that day?

14  A    Yes.

15  Q    And how did you read him his rights, did you recite

16  them from memory our did you read it off a particular

17  document?

18  A    We have an advice of rights form and a Spanish

19  translation of the form.  I read him the rights from that

20  form in Spanish.

21  Q    I will show you what is previously marked as

22  Government's Exhibit 128 for identification.

23           (Handed to the witness.)

24           I will ask you if you recognize that document.

25  A    Yes, I do.

1056

1  Q    And what do you recognize the document to be?

2  A    It is the advice of rights form in Spanish that we

3  executed that day.

4  Q    And is that the original of the advice of rights

5  document that you used to advise the defendant of his

6  rights on April 23?

7  A    Yes, it is.

8  Q    And is it -- how do you recognize it as such?

9  A    Well, it says notification of rights in Spanish.  It

10  has my signature and Mr. Martinez' signature and James

11  Lopez' signature on the bottom.

12  Q    That document, is that the original of that document?

13  A    Yes.

14  Q    And is that document the same or substantially the

15  same condition it was in after you executed it with the

16  defendant on April 23?

17  A    Yes, it is.

18          MR. TIERNEY:  Your Honor, I move

19  Government's Exhibit 128 in evidence at this time.

20          MS. MACEDONIO:  No objection.

21          MS. RANTALA:  No objection.

22          THE COURT:  128 is admitted.

23          (Whereupon, Government's Exhibit 128 was

24  received in evidence.)

25  Q    Can you see that on the screen?

**Heslin-Direct/Tierney**

1057

1    A    Yes.

2    Q    What is at the top of Government's Exhibit 128?

3    A    It is notification of rights.

4    Q    To the right of that, what does it say?

5    A    There are three lines, place, date and hour.

6    Q    And did you place -- what does it say?

7    A    It says LIRA, which is Long Island Resident Agency.

8    Q    And what is next underneath that?

9    A    The date.

10   Q    What is the date?

11   A    The date on the form is 4/22/10.  April 22, 2010.

12   Q    Is that a mistake?

13   A    Yes, a mistake.

14   Q    And underneath that, is that the hour?

15   A    The time.

16   Q    And what time is that?

17   A    11:00 a.m.

18   Q    Who placed that there?

19   A    I did.

20   Q    And that 11:00 a.m., what does it reflect?

21   A    That is the point where I basically take the form out

22   and begun the notification process.

23   Q    How did you advise the defendant of his rights on

24   April 23?

25   A    I asked him if he understood Spanish well enough to

1058

```
1   read it.  And he indicated he did so.  I then read him the
2   form.  And I then had him read the form.  I then went
3   through the form paragraph by paragraph and had him
4   initial each one of the rights.
5   Q    After you read the form to him and you gave -- when
6   you gave the defendant the form, did he read it out loud?
7   A    No.  I think he read it to himself.
8   Q    Did he appear to be reading it?
9   A    Yes.
10  Q    After those two things happened, you indicated you
11  went through the document line by line?
12  A    Yes.
13  Q    And at the top it says S-U-S, D-E-R-E-C-H-O-S.
14            What does that mean in English?
15  A    Your rights.
16  Q    And did you begun reading it line by line?
17  A    Yes.
18  Q    The first line at the top of the document up here,
19  does that begin with the word A-N-T-E-S; what does that
20  mean in English?
21  A    It means before.
22  Q    And what does that entire statement mean?
23  A    Before formulating any question, you must understand
24  your rights.
25  Q    And then what did you read next?
```

1059

1   A    And then we went through each right.  The first one

2   being, you have the right to maintain silence.

3   Q    And after you read that right to the defendant, what

4   did you ask him to do?

5   A    I asked him if he understood it, and I asked him to

6   initial it.  And he did.

7   Q    And the HM, who placed that on the document?

8   A    Boxer, the defendant, Mr. Martinez.

9   Q    And after that right was read to him, did you read a

10  second right?

11  A    Yes, I did.

12  Q    And that second right on the document, what does that

13  mean in English?

14  A    It says anything that you say can be used against you

15  in a court.

16  Q    And after you read him that right, what did you do?

17  A    I asked him again to initial afterwards.

18  Q    And the second from the top, the HM, is that the

19  defendant who initialed that?

20  A    Yes.

21  Q    And after he initialed the documents the second time,

22  did you read him the third right below it?

23  A    Yes.

24  Q    What does that right mean in English?

25  A    It means you have the right to consult with an

1060

1    attorney.  And he can counsel you prior to us asking you

2    any questions.  You also have a right for an attorney

3    present during the questioning.

4    Q    After that right what did you do next?

5    A    Had him initial it.

6    Q    The HM, the defendant put it there?

7    A    Yes.

8    Q    And after you read that sentence to him, what did you

9    do next?

10   A    We moved on to the next right.

11   Q    The one just beneath it?

12   A    Yes.

13   Q    What does that mean in English?

14   A    If you are not able to pay the cost for an attorney,

15   one will be assigned to you before beginning any

16   questioning if you so desire.

17   Q    After you read that right to him, what did you do?

18   A    Had him initial it.

19   Q    After you read that sentence to him, what happened

20   next?

21   A    We moved on then to the next right.

22   Q    The one below it?

23   A    Yes.

24   Q    What does that right mean in English?

25   A    If you decide to answer questions now without the

1061

1   presence of an attorney, you still have the right to stop

2   answering questions at any moment.

3            The next sentence is a redundancy.  You also

4   have the right to stop questioning at any time.

5   Q    And after you read that right to him, what did you

6   have the defendant to?

7   A    I had him initial it again.

8   Q    And then after you read him that right, what happened

9   next?

10  A    I read the bottom paragraph.  And he signed.  And

11  then Agent Lopez and I signed.

12  Q    That bottom paragraph which begins with H-E.  What

13  does that -- what does that paragraph mean in English?

14  A    I have read this statement of my rights and I

15  understand it.  I am disposed to make a statement and to

16  answer questions without the presence of an attorney.

17  Q    After you read that sentence to the defendant, what

18  did you have him do?

19  A    I had him sign next to where it says F-I-R-M-A, which

20  means signature.

21  Q    And that writing next to that is the defendant's

22  signature?

23  A    That was the signature he made on that day, yes.

24  Q    And then directly underneath that, is that your

25  signature?

Heslin-Direct/Tierney

1062

1    A    Yes, it is.

2    Q    And directly underneath your signature, is that Agent

3    Lopez' signature?

4    A    Yes, it is.

5    Q    And then 11:12 a.m., what is that?

6    A    I looked at the clock when we were done.  11:12, that

7    is the time.

8    Q    And did you write that 11:12 there?

9    A    Yes, I did.

10   Q    All right.

11            Now, once the defendant was apprised of his

12   rights and waived them, did you have a conversation with

13   him?

14   A    We did.

15   Q    What was the defendant's demeanor like during your

16   conversation with him?

17   A    He was very pleasant.  He was articulate.  Again, he

18   indicated he already gave a statement about a murder to

19   the police.  I asked him if he knew about any other

20   murders, is he willing to talk about that.

21   Q    During the conversation did he tell you what his

22   nickname was?

23   A    Yes.

24   Q    What did he tell you?

25   A    They call him Boxer in the MS-13 gang.

Heslin-Direct/Tierney

1063

1  Q     And did he discuss with you whether or not he was a

2  member of a particular street gang?

3  A     He indicated he was part of a Clique or subset of the

4  MS-13 gang known as the Coronados.

5  Q     And during the course of your conversation with the

6  defendant, did you talk to him with regard to the

7  commission of a murder of a bouncer in Nassau County?

8  A     Yes, I did.

9  Q     And what did the defendant tell you with regard to

10  the commission of that murder?

11  A     Boxer indicated that he and a group of other MS-13

12  gang members went to a club in Hempstead, and while they

13  were at the club one of the other MS-13 gang members ended

14  up in an altercation with the bouncer.  As a result of

15  this altercation, the bouncer went to expel the MS-13 gang

16  member outside of the club.  During this process the gang

17  member threatened the bouncer, identified himself as an

18  MS-13 gang member verbally and through the use of hand

19  signs, and also told the bouncer that nobody touches an

20  MS-13 gang member.

21  Q     And did there come a time -- withdrawn.

22        Did the defendant indicate as to whether he ever

23  returned to that bar?

24  A     Yes, he did.

25  Q     What did he say with regard to that?

Heslin-Direct/Tierney

1064

1    A    He explained that on a later date he and a group of

2    other MS-13 members drove back to the area of Hempstead

3    where this occurred.  He then identified both the club and

4    the bouncer to an individual member, a gang member in the

5    car that had a gun.  And this person then went, shot the

6    bouncer in the head, killing him, basically in retaliation

7    for the prior removal of the MS-13 gang member from the

8    bar.

9    Q    And when the defendant said -- you used the word he

10   identified both the club and the bouncer, who is he?

11   A    Boxer identified both the club and the bouncer to the

12   MS-13 member in the car that had the gun.

13   Q    That is what he told you?

14   A    Yes.  That is what he told me.

15   Q    Now, did you also have a conversation with the

16   defendant with regard to a double homicide that occurred

17   in Suffolk County?

18   A    Yes, I did.

19   Q    And what, if anything, did the defendant tell you

20   about the commission of that homicide?

21   A    Boxer told me that he received a call prior to the

22   homicide from a fellow MS-13 gang member.  This gang

23   member called him looking to acquire a gun that the MS-13

24   gang had used in several other homicides.

25   Q    And did this particular MS-13 gang member, did he

1065

1  tell Boxer why he wanted to use the gun?

2  A    He did.

3        He indicated that he was involved in a

4  relationship with a woman who he believed was setting him

5  up for an assault by a rival gang.  And because of that he

6  wanted to kill the woman.

7  Q    And did he -- according to Boxer did this MS-13

8  member ever tell him whether or not this individual was

9  ever killed?

10  A    He did.

11        First, prior to that Boxer indicated he didn't

12  actually have possession of the weapon.  But he did direct

13  the person, the other MS-13 gang member, how to contact

14  the person who did have the gun.

15        Subsequent to that, this person did in fact

16  commit a double homicide and then later contacted Boxer

17  and two other people.

18  Q    And did Boxer indicate whether or not he had any

19  involvement with any of the murderers subsequent to the

20  murder?

21  A    Yes, subsequent to the murder Boxer harbored the

22  three assailants involved in the homicide and hid them in

23  his house while they were arranging to flee the country.

24  Q    What if anything happened with regard to those three

25  individuals who committed the double homicide?

1066

1   A    They did in fact successfully manage to flee the

2   country.

3   Q    Where did they go?

4   A    They went to El Salvador.

5   Q    Now, approximately how long did this conversation

6   last?

7   A    It was short, maybe 30 minutes.

8   Q    And did there come a time when the conversation was

9   terminated?

10  A    Yes.

11  Q    And why was that?

12  A    Because Agent Lopez had to get the defendant over

13  here to Central Islip so he can be processed by the

14  marshals and by pretrial and presented for arraignment,

15  and we were running short on time.

16  Q    Now, with regard to your conversation with the

17  defendant, did you take notes of that conversation?

18  A    Yes, I did.

19  Q    What happened to those notes?

20  A    Those notes have been lost.

21  Q    Now, did you also reduce the sum and substance of

22  your conversation with the defendant to a report?

23  A    It was done that very day.

24  Q    And the notes that -- did you use the notes to make

25  the report?

Heslin-Direct/Tierney

1067

1    A    Yes, I did.

2         What I did was subsequent to Boxer being

3    transported to Central Islip by Agent Lopez, I went

4    immediately to a computer and began typing out the report.

5         I wasn't assigned out here at that time.  And it

6    wasn't clear when -- if I would ever be back, and I needed

7    to get it done that day.

8         What I did was, and what I always do with my

9    reports and what I have done with all of them for the last

10   16 years, is take my notes, I take statements from the

11   notes and I type them into the report.  As that occurs, I

12   cross it out.  As all the statements on the notepad are

13   crossed out, the report is done.  And that is what was

14   done in this case.

15   Q    I will show you -- would you recognize what is marked

16   as Government's Exhibit 3500-EH-2 for identification?

17        (Handed to the witness.)

18   Q    Do you recognize that?

19   A    Yes, I do.

20   Q    What do you recognize that to be?

21   A    It is the 302 report that I prepared to memorialize

22   the interview of Boxer the date we arrested him.

23   Q    Are there mistakes in that report?

24   A    There are two typographical errors.

25   Q    And what are they, the typographical errors?

Heslin-Direct/Tierney

1068

1    A    I identified the date of the identification and the

2    date of the interview as having occurred on April 22, when

3    in fact they occurred on April 23.

4    Q    And when did you make that report?  When did you

5    begin to write that report?

6    A    I mean that very day, immediately after the

7    interview.

8    Q    Is there a date of transcription on that report?

9    A    The final date of transcription is July 13, 2010.

10   Q    And why is the date of the transcription that July

11   date?

12   A    Because that is the date that the report was

13   finalized.  I came back out to Long Island to basically

14   reconcile the dates.  Unfortunately I reconciled it back

15   to the wrong date, April 22 instead of April 23.

16            MR. TIERNEY:  Thank you, no further questions of

17   the witness.

18            THE COURT:  Thank you.

19            Cross-examination.

20

21

22

23

24

25

Heslin-Cross/Macedonio

1069

1   CROSS-EXAMINATION

2   BY MS. MACEDONIO:

3   Q    Good afternoon, Agent Heslin.

4   A    Good afternoon.

5   Q    You were not assigned to the gang task force in April

6   of 2010; is that correct?

7   A    That's correct.

8   Q    Okay.

9        So you were called in primarily because not only

10  were you an FBI agent but you were fluent in Spanish; is

11  that correct?

12  A    Yes.

13  Q    And you needed to go to Rikers Island with Deputy

14  Davis to pick up Mr. Martinez?

15  A    Yes.

16  Q    That was to be your assignment for the day?

17  A    That was it.

18  Q    And how was it communicated to you that Mr. Martinez

19  spoke Spanish?  Was it communicated to you?

20  A    Yes.

21  Q    And that is why you were there?

22  A    Yes.

23  Q    And no one communicated to you that Mr. Martinez also

24  spoke English; is that correct?

25  A    I don't think so, that's correct.

1070

1   Q    And you had time to interact with Mr. Martinez on

2   April 23, 2010; is that correct?

3   A    Yes.

4   Q    And overall, how long would you say you were with

5   him?

6   A    An hour and a half, two hours, max.

7   Q    And you were conversing with him; is that right?

8   A    Yes.

9   Q    And was it clear to you that he spoke Spanish?

10  A    It was very clear to me, yes.

11  Q    Did you have an understanding that he can speak in

12  English?

13  A    My feeling is that he can communicate at some minimum

14  level in English.  But Spanish was definitely his primary

15  language.

16  Q    Right.

17       And when you were conducting your interview or

18  otherwise talking to Mr. Martinez, you thought it prudent

19  to do that in Spanish; is that correct?

20  A    Absolutely.

21  Q    So, for example, when you gave him his Miranda

22  rights, you used the Spanish form; is that correct?

23  A    Yes.

24  Q    You didn't ask him to read anything in English,

25  right, you gave him the Spanish form and asked him to do

1071

1   that, read that?

2   A    Yes.

3   Q    And you just testified that you had lost your notes

4   in this case; is that right?

5   A    That's right.

6   Q    Okay.

7        And there are some mistakes on your report; is

8   that correct?

9   A    Two typographical errors.

10  Q    All right.

11       And you testified that you have a routine where

12  you use your notes, you make your 302, or the report, and

13  you cross the notes out as you go?

14  A    Yes.

15  Q    But despite that you made a mistake on this report;

16  is that correct?

17  A    That's right.

18  Q    And then you came back after to correct it, and you

19  actually made the same mistake again.  Is that correct?

20  A    Yes.

21  Q    And then your notes you have with regard to the

22  interview, they just disappeared; is that right?

23  A    I don't know if they just disappeared, but I don't

24  have them.

25  Q    Well, we don't have them now, right?

Heslin-Cross/Macedonio

1072

1    A    That's right.

2    Q    You don't have possession of them; is that right?

3    A    That's right.

4    Q    Certainly you looked for them, didn't you, Agent

5    Heslin?

6    A    You can't believe how much I looked for them.

7    Q    Okay.

8         But it is fair to say you didn't find them?

9    A    Fair to say.

10   Q    When you picked up Mr. Martinez, did you know

11   anything about the case he was about to be arraigned on?

12   A    No, I really didn't.  I believe I knew him as a -- it

13   as a murder ahead of time.  Beyond that, I didn't know

14   much else.

15   Q    And you were picking him up from Rikers Island, so

16   you understood there was a charge pending; is that

17   correct?

18   A    Yes.

19   Q    And you had been in the FBI for how long at that

20   point, 13 years?

21   A    15 years at that point.  Maybe 13.

22   Q    Two years ago now?

23   A    Yes.

24   Q    And before that you were with the Department of

25   Justice, did you say?

Heslin-Cross/Macedonio

1073

1   A    Yes, I was.

2   Q    And you were an attorney from the Department of

3   Justice; is that correct?

4   A    Yes.

5   Q    So you clearly understood when you picked up

6   Mr. Martinez in Rikers Island, knowing he had a pending

7   case, that he must have had an attorney; is that correct?

8   A    I'm sure whatever the pending case in the state

9   system is, that there was an attorney representing him in

10  that case.

11  Q    When you read him this form when it says if he wants

12  an attorney, and one will be appointed to you, you didn't

13  say to him you already have an attorney, do you want that

14  person to come out and help you fill out the forms?

15  A    I have never done it in 16 years.

16  Q    You knew he had a lawyer, right?

17  A    I'm assuming he had a lawyer in the state charge.

18  Q    You know that is the law, you are a lawyer; is that

19  right?

20  A    Yes.

21            MR. TIERNEY:  Objection.

22            THE COURT:  Overruled.

23  Q    Did you reach out and try to make any contact with

24  Mr. Martinez' lawyer before you decided to question him?

25  A    I actually didn't question him.  He kind of blurted

1074

1   stuff out.

2   Q    Well, you testified at another proceeding in this

3   matter; is that right?

4   A    Yes, I did.

5   Q    And in that testimony did you not say, I asked him if

6   there was anything he would like to talk to us about?  Did

7   you say that?

8   A    Yes, I did.

9   Q    And when you say you didn't question him, you read

10  him or gave him these Miranda warnings because you wanted

11  to talk to him, right?

12  A    Exactly right.

13  Q    You didn't just do this because you were processing

14  him.  You wanted to ask him some questions?

15  A    Well, that is part of the processing procedure, the

16  standard part.

17  Q    Okay.

18       But you did question him, you said, hey,

19  anything else you want to tell us, right?

20  A    Absolutely.

21  Q    Now, you testified after Mr. Martinez waived his

22  Miranda warnings, that he started to give you information

23  about two particular incidents; is that right?

24  A    There were at least two incidents we discussed.

25  Q    You testified about the El Rancho murder; is that

Heslin-Cross/Macedonio

1075

1    right?

2    A    The one in Hempstead?

3    Q    Yes.

4    A    Yes.

5    Q    And you also testified about the double homicide as

6    well?

7    A    Yes.

8    Q    And even though you didn't know anything about the

9    case, at this point you are an experienced FBI agent; is

10   that right?

11   A    Yes.

12   Q    So you understood that, gee, perhaps this gentleman

13   has something important to offer you, although I don't

14   know anything about the case, he is talking, right?

15   A    Yes.

16   Q    And then you testified that despite the fact that

17   Mr. Martinez was giving information about what you would

18   understand to be very significant cases, you rushed him

19   out the door and took him to Central Islip for

20   arraignment; is that right?

21   A    I was desperate to keep him talking.  I was told he

22   had to be presented and so he had to go.

23   Q    I'm placing before you what is marked as 3500-CM-5.

24        Do you recognize that document?

25   A    Yes.

1076

1    Q    What is that document?

2    A    A waiver of speedy arraignment.

3    Q    What does a waiver of speedy arraignment do?

4    A    It allows the subject to waive arraignment and gives

5    us time to interview him, or whatever we have to do, to

6    make arrangements with an attorney and with the

7    government.

8    Q    For example, if the FBI were questioning someone and

9    they were giving very important information about

10   homicides but they needed to get to court to be arraigned,

11   you can have that person execute a waiver of speedy

12   arraignment and they can stay in the FBI office and

13   continue to talk to you; is that right?

14   A    As you showed me, this form here, on this form, this

15   is for the case agent on this matter.  I was not the case

16   agent for that matter.  So it was not within my authority

17   to keep him or even ask for him to be kept.

18   Q    Understood.

19        But this is something available to the FBI when

20   they are questioning someone; is that correct?

21   A    Yes.

22   Q    And it is also something done routinely, correct, the

23   defendants can waive speedy arraignment and they can

24   continue to talk to you about something you were

25   interested in pursuing; is that correct?

Heslin-Cross/Macedonio

1077

1    A    It is an option available.

2    Q    It is an option available and certainly the FBI

3    employs it?

4    A    The FBI doesn't employ it without speaking with the

5    assistant and the concurrence of the assistant.

6          In this instance I didn't know who the

7    assistants on this case were.

8    Q    In this instance it was not done; is that right?

9    A    No.

10   Q    It was not done?

11   A    No.

12   Q    Now, the statement you claim you took from

13   Mr. Martinez, you didn't have -- you didn't have him write

14   it out in his own hand, did you?

15   A    No, I did not.

16   Q    You wrote those out on your notes which you have now

17   lost; is that correct?

18   A    That's correct.

19          MS. MACEDONIO:  May I have a moment?

20          THE COURT:  Sure.

21          (Whereupon, at this time there was a pause in

22   the proceedings.)

23          MS. MACEDONIO:  No further questions.  Thank

24   you, your Honor.

25          THE COURT:  Ms. Rantala, anything?

1078

1     MS. RANTALA:  No, your Honor.

2     THE COURT:  Redirect?

3     MR. TIERNEY:  Yes, your Honor.

4

5   REDIRECT EXAMINATION

6   BY MR. TIERNEY:

7   Q    Agent Heslin, you testified that you picked the

8   defendant up from Rikers Island; is that correct?

9   A    Yes.

10  Q    And Rikers Island is a city jail?

11  A    Yes.

12  Q    And it houses -- it houses prisoners being prosecuted

13  in what jurisdiction?

14  A    New York City primarily.

15  Q    And what was your understanding of what murder the

16  defendant was in custody for?

17  A    My understandings is that he was in custody for a

18  murder that occurred in Queens.

19  Q    And the murder of the bouncer, where did that occur?

20  A    That occurred in Hempstead, here in Nassau County,

21  Long Island.

22  Q    And did the defendant have an attorney on April 23

23  for his Nassau County charges?

24  A    No, he did not.

25  Q    And the murder that occurred, the double homicide,

Heslin-Redirect/Tierney

1079

1    where did that occur?

2    A    It occurred in Suffolk County, Long Island.

3    Q    On April 23, did this defendant have an attorney for

4    his Suffolk County charges?

5    A    No, he did not.

6              MR. TIERNEY:  Thank you.

7              MS. MACEDONIO:  That's all I have.

8              THE COURT:  You can step out.

9              (Whereupon, the witness leaves the witness

10    stand.)

11              THE COURT:  Why don't we take the afternoon

12    break now so we can go straight through to 4:30 with the

13    next witness.

14              Please do not discuss the case.

15              (Whereupon, at this time the jury leaves the

16    courtroom.)

17              THE COURT:  Please be seated.

18              Who is the next witness?

19              MR. DURHAM:  We are trying to figure it out.  We

20    have a couple of scheduling issues right now.  One of the

21    witnesses has to leave by 3:30.  We may call them out of

22    order.

23              THE COURT:  I didn't realize.  Do I need to give

24    the warning to the next witness?

25              MR. DURHAM:  No, your Honor.  She will be

Heslin-Redirect/Tierney

1080

1    testifying about the El Rancho, Hempstead murder.

2              THE COURT:  She has to be out by 3:30?

3              MR. DURHAM:  Yes.

4              THE COURT:  Try to keep this one for ten minutes

5    then.

6

7              (Whereupon, a recess was taken.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1081

```
 1          THE COURT:  Ready for the jury?

 2          MR. DURHAM:  We are, your Honor.

 3          THE COURT:  So I know for the next witness, you

 4    say she will be short, and we can go right to the next

 5    witness?

 6          MR. DURHAM:  Yes.

 7          The next witness will be Joseph Marino, and then

 8    Sonya Ventura.

 9          THE COURT:  Do we need to stop?

10          MR. DURHAM:  No, your Honor.

11          There will be an additional witness later in the

12    trial who has information about multiple murders, these

13    witnesses are not on that murder.

14          THE COURT:  All right.

15          Let's bring in the jury.

16          Is the jury here -- the witness here?

17          MR. DURHAM:  Yes, your Honor.

18          THE COURT:  Please bring her in.

19          Please have a seat, ma'am, while we bring the

20    jury in.

21          (Whereupon, the jury at this time entered the

22    courtroom.)

23          THE COURT:  Please be seated.

24          Who is the government's next witness?

25          MR. DURHAM:  Your Honor, the government calls
```

1082

1   Jessica Herrera, H-E-R-R-E-R-A.

2          THE COURT:  Please stand while the oath is

3   administered.

4

5   J E S S I C A   H E R R E R A,

6              called as a witness, having been first

7              duly sworn, was examined and testified

8              as follows:

9          THE COURT:  Please be seated.  Please state your

10  name for the record and spell your last name.

11         THE WITNESS:  H-E-R-R-E-R-A.

12         THE COURT:  State your first name.

13         THE WITNESS:  Jessica Herrera.

14         THE COURT:  Ms. Herrera, I will ask you to sit

15  very close to the microphone and keep your voice up so the

16  whole courtroom can hear you, okay?

17         THE WITNESS:  Yes.

18         THE COURT:  Mr. Durham.

19         MR. DURHAM:  One moment, your Honor.

20         (Counsel confer.)

21

22  DIRECT EXAMINATION

23  BY MR. DURHAM:

24  Q    Good afternoon.  How old are you?

25  A    26.

Herrera-Direct/Durham

1083

1   Q    Right now are you working or going to school?

2   A    Yeah, I'm going to school.

3   Q    What are you going to school for?

4   A    Criminal justice.

5   Q    Back in March of 2010, were you working then?

6   A    Yes.

7   Q    And where were you working?

8   A    Rancho Bar.

9   Q    Is that the El Rancho, R-A-N-C-H-O, Bar?

10  A    Yes.

11  Q    And where was that located?

12  A    In Hempstead.

13  Q    And what did you do at El Rancho?

14  A    I was a bartender.

15  Q    And approximately how long did you work there?

16  A    Umm, six months, five or six months.

17  Q    Do you remember when you stopped working there?

18  A    After what happened, the incident that happened in

19       the bar, I stopped working there.

20  Q    And when you say the incident, what are you referring

21       to?

22  A    After David got shot.

23  Q    All right.

24            Who is David?

25  A    The security guard.

1084

1  Q    Is that David Moreno?

2  A    Yes.

3  Q    And what did David -- did David work at the bar?

4  A    Yes.

5  Q    He was a security guard?

6  A    Yes.

7  Q    For how long did you know him?

8  A    For the time he was working there.

9  Q    A period of months?

10  A    Yes.

11  Q    I put a photograph in front of you that is marked as

12  Government's Exhibit 337.

13        Do you recognize that?

14  A    Yes.

15  Q    And what is it?

16  A    That is David.

17  Q    That is a photograph of him?

18  A    Yes.

19  Q    And is that a fair and accurate depiction of the way

20  he looked?

21  A    Umm, yeah.

22        MR. DURHAM:  Your Honor, at this time the

23  government offers Exhibit 337.

24        MS. MACEDONIO:  No objection.

25        MS. RANTALA:  No objection.

1085

1   THE COURT:  337 is admitted.

2   (Whereupon, Government's Exhibit 337 was

3   received in evidence.)

4   MR. DURHAM:  Thank you, your Honor.

5   May I publish?

6   THE COURT:  Yes.

7   (At this time a document was exhibited on

8   courtroom screen.)

9   Q    Ms. Herrera, looking at the screen in front of you,

10  is that the photograph you knew of the person named David

11  Moreno?

12  A    Yes.

13  Q    And I want to direct your attention to February of

14  2010.

15       Was there a night you were working where there

16  was a problem at the El Rancho Bar?

17  A    Yes.

18  Q    And was David Moreno also working that night?

19  A    Yes.

20  Q    And approximately how long did that occur before he

21  was murdered?

22  A    It was like maybe two weeks before.

23  Q    About two weeks?

24  A    Yes.

25  Q    Okay.

1086

1      Can you explain to the jury what happened that

2    night?

3    A    Umm, well, it was four guys, and they -- he didn't

4    want them to be there.  And I'm not sure if it was 20 or

5    40 dollars, and they made it into a big deal and wouldn't

6    pay.  And David came, and I told him they didn't want to

7    pay me.  And they started to just screaming.

8    Q    They were screaming?

9    A    Yes, at David.

10   Q    What types of things were they screaming?

11   A    I don't remember.

12   Q    And the dispute was over the bar bill?

13   A    Yes.

14   Q    And at any point did the dispute turn physical?

15   A    Umm, after David closed the door and one of them

16   tried to just get out.  They got into a big argument, and

17   we don't remember, but one of them -- I don't remember,

18   but one of them just took a knife out.  And David came and

19   took his pepper spray out and he started spraying them.

20   Q    He had a canister of pepper spray?

21   A    Yes.

22   Q    And he sprayed it at the men when he was having a

23   problem?

24   A    Yes.

25   Q    When he sprayed them, what if anything did the men

Herrera-Direct/Durham

1087

1    say?

2    A    One of them said, I'm going to come back.

3    Q    They said they were going to come back?

4    A    Yes.

5    Q    And the four men you described who had the

6    altercation with David, would you recognize them if you

7    saw them today?

8    A    No, I wouldn't recognize them.

9    Q    But generally how did they look?

10   A    They were dressed with like -- they were like light

11   skin.

12   Q    Could you tell what race they were?

13   A    Spanish.

14   Q    Approximately how old were they?

15   A    In their 20's.

16   Q    20's?

17   A    Yes.

18   Q    And how did you say they were dressed?

19   A    With hoodies.

20   Q    And during the course of that night, did you observe

21   any of the individuals use hand signs?

22   A    I don't remember.

23   Q    You don't remember, okay.

24        Did they say anything that led you to believe

25   they might be gang members?

1088

1   A    I don't remember that exactly.

2   Q    Okay.

3          I want to jump ahead to March 6th of 2010.

4          Were you working that night?

5   A    Yes.

6   Q    And approximately how many other people were working

7   that night?

8   A    I'm not sure, but I think there were like six others

9   there, or seven of us.  I'm not sure.

10  Q    What about David, was he working that night?

11  A    Yes.

12  Q    And directing your attention to a little after

13  11:00 o'clock that evening, what, if anything, happened?

14  A    There was music on, so I couldn't hear anything.  I

15  heard a gunshot, and then David just fell.

16  Q    So you heard a gunshot?

17  A    Yes.

18  Q    And then you looked over, and what did you see?

19  A    I seen David laying down on the floor.

20  Q    David was on the floor?

21  A    Yes.

22  Q    And after you saw him on the floor, what did you do

23  next?

24  A    We all ran to him.

25  Q    When you ran to him, how did he look?

1089

1   A    With all blood.

2   Q    Could you tell where the blood was coming from?

3   A    His forehead.

4   Q    Approximately where?

5   A    Right here (indicating).

6        MR. DURHAM:  Your Honor, for the record, the

7   witness is indicating the center of the forehead, right

8   between the eyes.

9        THE COURT:  Yes.

10  Q    You went over to try to help him and he was bleeding.

11       What did you do then?

12  A    One of the girls called the police.  And they didn't

13  talk English so I had to talk for them.

14  Q    So you spoke to the police?

15  A    Yes.

16  Q    And were you able to see who shot David?

17  A    No.

18  Q    And when you went over to him and he was bleeding,

19  was he still alive?

20  A    Yes.

21  Q    Was he saying anything?

22  A    He was crying.

23       MS. MACEDONIO:  Objection.

24       THE COURT:  Sustained.

25  Q    I will ask you to look at a document I placed before

Herrera-Direct/Durham

1090

1    you labeled Government's Exhibit 325.

2           Do you recognize that?

3    A    Yes.

4    Q    And what is it?

5    A    It is the bar.

6    Q    Is that essentially a sketch or a schematic of the

7    bar?

8    A    Yes.

9    Q    Is that an accurate representation of the way the bar

10   was set up that evening?

11   A    Yeah.

12          MR. DURHAM:  Your Honor, the government will

13   offer Exhibit 325.

14          MS. MACEDONIO:  No objection, your Honor.

15          MS. RANTALA:  No objection.

16          THE COURT:  325 is admitted.

17          (Whereupon, Government's Exhibit 325 was

18   received in evidence.)

19          MR. DURHAM:  May I publish, your Honor?

20          THE COURT:  Yes.

21          (At this time a document was exhibited on

22   courtroom screen.)

23   Q    Ms. Herrera, are you able to see that in front of

24   you?

25   A    Yes.

Herrera-Direct/Durham

1091

1    Q    And looking at that floor plan, could you show the

2    jury approximately where the front door of the bar is?

3    A    It is right here (indicating).

4    Q    If you can describe it.

5    A    It is by the words -- by the dance floor, kind of.

6    Q    Okay.

7              Looking at the bar, it is a rectangular shape,

8    right?

9    A    Yes.

10   Q    Is it fair to say it is at the bottom right-hand

11   corner?

12   A    Yes.

13   Q    And that is the front door?

14   A    Yes.

15   Q    And then looking at the schematic, could you explain

16   to the jury approximately where you are standing when you

17   heard the gunshot?

18   A    By the bar.

19   Q    And the bar, is it fair to say that is in the top

20   left-hand quadrant of the floor plan?

21   A    Yes.

22   Q    And so you were standing by the bar?

23   A    Yes.

24   Q    And when you saw David -- you heard the shot and you

25   looked and you saw David on the ground?

Herrera-Direct/Durham

1092

1   A    Yes.

2   Q    Approximately where was he?

3   A    By the door -- by the dance floor here kind of.

4   Q    Inside the bar or out?

5   A    Inside the bar.

6   Q    Inside, adjacent to the front door?

7   A    Yes.

8   Q    And I will ask you next to look at some photographs I

9   put in front of you.  They are labeled as

10  Government's Exhibit 306, 314, 316, and 318.

11        Do you recognize those photos?

12  A    Yes.

13  Q    What are they photos of?

14  A    From the day he got shot.

15  Q    They are photographs of the El Rancho Bar?

16  A    Yes.

17  Q    And are they fair and accurate depictions of the way

18  the bar looked like that night?

19  A    Yes.

20        MR. DURHAM:  Your Honor, the government offers

21  306, 314, 316 and 318.

22        MS. MACEDONIO:  No objection, Judge.

23        MS. RANTALA:  No objection, your Honor.

24        THE COURT:  They are admitted.

25        (Whereupon, Government's Exhibits 306, 314, 316

1093

1    and 318 were received in evidence.)

2            MR. DURHAM:  May I publish, your Honor?

3            THE COURT:  Yes.

4            (At this time a document was exhibited on

5    courtroom screen.)

6    Q    Ms. Herrera, looking at the screen in front of you,

7    showing you what is marked as Government's Exhibit 306,

8    would you describe to the jury what is shown there?

9    A    That is the bar.

10   Q    Is that the front, outside of the bar?

11   A    Yes.

12   Q    And is that a view of, I believe, Fulton Avenue, and

13   you are standing at Fulton Avenue looking at the bar?

14   A    Yes.

15   Q    And are you able to see the front door?

16   A    Yes.

17   Q    And where is that?

18   A    By where the AC.

19   Q    On the right side of the photograph there is an air

20   conditioning unit at the front door there; is that

21   accurate?

22   A    Yes.

23   Q    I will show you now Government's Exhibit 314.

24           Would you just explain to the jury what is shown

25   there.

1094

1   A   That is the entrance to the bar.

2   Q   Is that a close-up of the front door?

3   A   Yes.

4   Q   And the front door is open in that photograph?

5   A   Yes.

6   Q   And looking in, there is an object there, a red item

7   there.  Is that a chair?

8   A   Yes.

9   Q   What chair is that?

10   A   That is the chair when David would sit down.

11   Q   When he was working the door, that is where he would

12   sit?

13   A   Yes.

14   Q   And I'm showing you now Government's Exhibit 316.

15       Again, would you explain what is shown there.

16   A   That is the entrance of the bar when he got shot.

17   Q   Is that when you are standing inside the bar, you are

18   looking towards the front door?

19   A   Yes.

20   Q   And on the floor on the right side of that photograph

21   there is some blood.  Is that David's blood?

22   A   Yes.

23   Q   Showing you Government's Exhibit 318, on the left

24   side there is a sweatshirt.

25       Whose sweatshirt is that?

1095

1  A    To clean the blood and to try to hold the blood.

2  Q    That is something you and the other employees used to

3  try to help him?

4  A    Yeah.

5  Q    Now, you said you stopped working at El Rancho

6  shortly after David's murder?

7  A    Yes.

8  Q    Did you stop right away or after a little while?

9  A    Like after a little while.

10  Q    Why did you keep working there?

11         MS. MACEDONIO:  Objection.

12         THE COURT:  Sustained.

13  Q    Why did you stop working there?

14         MS. MACEDONIO:  Objection.

15         THE COURT:  Sustained.

16         MR. DURHAM:  Your Honor, may I approach?

17         THE COURT:  Yes.

18         (Continued on next page.)

19

20

21

22

23

24

25

1096

1          (Whereupon, at this time the following took

2     place at the sidebar.)

3          MR. DURHAM:  I want to -- the bar went out of

4     business shortly after the murder.

5          THE COURT:  That is okay.

6          MS. MACEDONIO:  Okay.

7          (Continued on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1097

1    (Whereupon, at this time the following takes

2    place in open court.)

3    Q    Shortly after David's murder, did the bar go out of

4    business?

5    A    Yes.

6    Q    Why was that?

7    A    After --

8                MS. MACEDONIO:  Objection.

9                THE COURT:  Sustained.

10               MR. DURHAM:  No further questions.

11               THE COURT:  Okay.

12               Cross-examination.

13               MS. MACEDONIO:  I have no questions.

14               MS. RANTALA:  No questions, your Honor.

15               THE COURT:  You may step down, ma'am.  Thank

16   you.

17               (Whereupon, the witness at this time steps down

18   from the witness stand.)

19               THE COURT:  Next witness.

20               MS. CAPWELL:  Your Honor, the government calls

21   Joseph Marino.

22               (Whereupon, at this time there was a pause in

23   the proceedings.)

24               THE COURT:  Sir, take the witness stand, please.

25   Remain standing while the oath is administered once you

Marino-Direct/Capwell

1098

1    get there.

2              THE CLERK:  Please raise your right hand.

3

4    J O S E P H     M A R I N O,

5              called as a witness, having been first

6              duly sworn, was examined and testified

7              as follows:

8              THE CLERK:  Please state and spell name for the

9    record.

10             THE WITNESS:  Detective Joseph Marino,

11   M-A-R-I-N-O, shield 702.

12             THE COURT:  Sir, please keep your chair close to

13   the microphone and keep your voice up.

14

15   DIRECT EXAMINATION

16   BY MS. CAPWELL:

17   Q    Good afternoon, sir.

18   A    Good afternoon.

19   Q    What do you do for a living?

20   A    I'm a crime scene investigator for the Nassau County

21   Police Department.

22   Q    And how long have you been doing that?

23   A    42 years.

24   Q    Very well.

25             And do you have a job title?

Marino-Direct/Capwell

1099

1    A    Yes.

2    Q    What is that?

3    A    I'm a detective.

4    Q    And how long have you been a detective?

5    A    I have been a detective for 22 years.

6    Q    Generally speaking, what are your duties and

7    responsibilities as a detective within the crime scene

8    unit?

9    A    Well, generally called out by the detective division.

10   We respond to crime scenes.  We collect, photograph and

11   transport physical evidence.

12   Q    Are you typically the first law enforcement officer

13   on the scene?

14   A    No.

15   Q    How is the crime scene secured?

16   A    The first responders will usually secure the crime

17   scene.

18   Q    The first responders, who are you referring to

19   specifically?

20   A    In this instance it was the Hempstead Police

21   Department.

22   Q    And approximately how many cases do you work on each

23   year?

24   A    150, 200 cases.

25   Q    And of those, approximately how many involve

Marino-Direct/Capwell

1100

1    homicides?

2    A    Maybe 30, 40 percent.

3    Q    And I want to turn your attention now to the night of

4    March 6th, 2010, into the early morning hours of

5    March 7th, 2010.

6         Were you working on March 6th into March 7th,

7    2010?

8    A    Yes, I was.  I was working a 7:00 p.m. to 7:00 a.m.

9    tour of duty.

10   Q    And did you respond to a crime scene at a bar named

11   El Rancho in Hempstead?

12   A    Yes, I did.

13   Q    And at approximately what time did you arrive there?

14   A    I arrived at the scene at approximately 2:00 a.m.

15   Q    All right.

16        So that is March 7th?

17   A    Yes.

18   Q    And were you with anybody else?

19   A    Excuse me?

20   Q    Were you with anybody else, any other officers?

21   A    Yes.  I was with Detective O'Hara from the crime

22   scene unit, and Detective Sergeant Armstrong from the

23   crime scene unit.

24   Q    And what was your assignment that night?

25   A    To cover the scene.

Marino-Direct/Capwell

1101

1   Q    Were you the primary or were you assisting one of the

2   colleagues?

3   A    I was the primary.

4   Q    When you arrived at the scene, was the victim still

5   present?

6   A    No, he wasn't.

7   Q    What did you do when you arrived there?

8   A    When we first arrived at the scene, we spoke to the

9   detectives at the scene.  There were homicide detectives

10  there.

11  Q    What was the purpose in doing that?

12  A    They just give us generally what happened basically.

13  We do a walk-through of the scene with them, and they show

14  us what they found so far.

15  Q    Okay.

16       And speaking with respect to the crime scene at

17  the El Rancho Bar on March 6th into March 7th, when you

18  arrived, can you describe the walk-through that you did?

19  A    Yes.

20       We went in.  Basically it was a small scene.  It

21  was the vestibule area of the El Rancho Bar and Grill.  We

22  did the walk-through.  We saw the casing on the floor.

23  There was blood on the floor.  We walked outside and we

24  walked up and down the sidewalk.

25  Q    And, sir, when you walked up and down the sidewalk,

Marino-Direct/Capwell

1102

1   was it around Fulton Avenue?

2   A    Around Fulton Avenue, correct.

3   Q    And did you find anything of significance at that

4   point?

5   A    Yes.

6            As we were walking westbound on Fulton Avenue,

7   we saw a cell phone battery cover and a battery from a

8   cell phone.

9   Q    All right.

10           After you completed the walk-through of the

11  scene, both inside and outside the bar, what did you do

12  next that night?

13  A    We videotaped the scene.

14  Q    All right.

15           Did you take the video yourself?

16  A    Yes.

17  Q    And after you took the video of the scene, what did

18  you do?

19  A    I put out markers, and I used the yellow markers,

20  three markers.

21           Marking number one was the marking of the casing

22  in the vestibule.  Marker number two was the battery

23  cover, and marker number three was the cell phone battery.

24  Q    Okay.

25           Both of those, cell phone battery and cover,

Marino-Direct/Capwell

1103

1   were outside on the sidewalk?

2   A    Yes, on Fulton Avenue.

3   Q    After placing the three markers, what did you do

4   next?

5   A    Photographed the scene.

6   Q    Okay.

7        Did you take the photographs?

8   A    Yes, I did.

9   Q    After you took the photographs, what, if anything,

10  else did you do?

11  A    After I took the photographs we collected the

12  evidence.

13  Q    Prior to collecting the evidence, did you do any

14  dusting for fingerprints or swabbing for any other type of

15  material?

16  A    Yes.  I dusted the door, the interior and exterior of

17  the metal doors of the bar.  And I took a swab from the

18  vicinity of my marker number one.

19  Q    Marker one was a swab of what?

20  A    The bullet.

21  Q    After you collected all the evidence at the scene,

22  what did you do that night, or that morning, of March 7th?

23  A    After we collected it, we put it in an evidence bin

24  and it was transported back to the office, the crime scene

25  office where I typed up the paperwork.

1104

1    I placed the bar codes on the evidence.  I put

2    my stickers on the evidence, evidence tape, and initialed

3    it.  And I put it in the locker.

4    Q    All right.

5         And after you had processed the evidence back at

6    the precinct, did you have any further involvement with

7    this investigation?

8    A    No.

9    Q    I would like to show you now what is marked as

10   Exhibit 330.

11             (Handed to the witness.)

12             Do you recognize Government's Exhibit 330?

13   A    Yes, I do.

14   Q    And what is that?

15   A    This is the DVD of the crime scene.

16   Q    And how do you recognize that?

17   A    We looked at it yesterday as my -- it has my initials

18   and the date.

19   Q    Okay.

20             Does that video fairly and accurately depict the

21   crime scene as you saw it on March 7th, 2010?

22   A    Yes, it does.

23   Q    And approximately how long does that crime scene

24   video run?

25   A    It is short.  It is eight minutes.

Marino-Direct/Capwell

1105

1    MR. DURHAM:  Your Honor, the government will

2    move to admit Government's Exhibit 330 and to publish it

3    to the jury.

4    MR. LEVINE:  No objection.

5    MS. RANTALA:  No objection, your Honor.

6    THE COURT:  Government's Exhibit 330 is

7    admitted, and it can be played to the jury.

8    (Whereupon, Government's Exhibit 330 was

9    received in evidence.)

10   Q    As it plays, Detective Marino, if you describe what

11   is happening to the jury.

12   A    Yes.

13   Q    You have a laser button in front of you, it has a

14   button, the pointer, and if at any point you want to flash

15   the pointer at the laser screen, you can do that.

16   (Video is played.)

17   A    This is my title sheet, the date, myself and

18   Detective O'Hara, and the homicide number.

19   This is the exterior front of the El Rancho Bar

20   and Grill.

21   Q    Which way are we looking now?

22   A    I'm now panning west.  Now we are panning east.

23   Q    At 37.

24   A    Now I'm walking toward the front entrance.

25   Q    That's at 52.

Marino-Direct/Capwell

1106

1    A    That is the front door, the metal door.

2          Looking inside the vestibule, now panning west

3    again.

4    Q    Minute 109.

5    A    Now, that is east down Fulton Avenue.

6    Q    That is at 124.

7    A    What you see on the ground is marker three, some

8    gloves and sheets.

9          This is looking inside the vestibule area.  It

10   is a four and a half foot -- three and a half foot by

11   three and a half foot vestibule.  And there is the bar

12   stool.

13         That is looking down at the floor.

14   Q    Minute 155.

15         What are we looking at now?

16   A    Now looking at the blood.  This is where the victim

17   was laying.  There was also clothing and medical debris.

18   Q    And looking now at 222.

19   A    Yes.

20   Q    Go ahead.

21   A    Again, the vestibule area, the bar stool.  Now I'm

22   panning down to the casing.

23   Q    247.

24   A    That is the casing on the rug.

25   Q    Can you tell the jury briefly, what is a casing?

Marino-Direct/Capwell

1107

1    A    A casing is part of the bullet.  This is the -- this

2    is what holds the powder in the cartridge.

3    Q    And what type of casing was that?

4    A    It was a Remington .22 casing.

5    Q    And at 321, you are heading back outside?

6    A    Now heading back outside, and panning west.

7         There is the cell phone battery cover.

8    Q    At 337.

9    A    It is on Fulton Avenue.

10        Here is the cell phone battery.

11   Q    353.

12   A    On the sidewalk.

13   Q    You collected both those items, at the end of the

14   review of the crime scene you collected both of those

15   items?

16   A    Yes, I did.

17        Panning again south, and now we are looking

18   east.

19        Again in front of the car.

20        Now, that is the end.

21   Q    Thank you.

22        I have put a stack of photographs on the front

23   of the desk in front of you, behind the monitor.  They are

24   Government's 306 through 321, and I will ask you to look

25   through them.  When you are done, let me know if you

Marino-Direct/Capwell

1108

1    recognize those exhibits.

2    A    Yes, these are the photographs that I took.

3    Q    And those are from the crime scene at the El Rancho

4    Bar and Grill, March 6th to March --

5    A    Yes.

6    Q    And --

7    A    March 7th, 2010.  Yes.

8    Q    And they fairly and accurately depict the crime scene

9    that night?

10   A    Yes.

11            MS. CAPWELL:  The government moves 306 through

12   321, although I realize some of them are already in

13   evidence.

14            MS. MACEDONIO:  No objection.

15            MS. RANTALA:  No objection.

16            THE COURT:  306 through 321 are admitted.

17            (Whereupon, Government's Exhibit 306 through 321

18   was received in evidence.)

19            MS. CAPWELL:  I would like to publish a few of

20   those photographs?

21            THE COURT:  Yes.

22            (At this time a document was exhibited on the

23   courtroom screen.)

24   Q    306, what is that there?

25   A    The exterior front of the El Rancho Bar and Grill

1109

1   looking northbound.

2   Q    And 308 is now on the overhead, what view do we have

3   here?

4   A    A view of the sidewalk looking westbound on Fulton

5   Avenue.

6         You can see my markers, my yellow marks, number

7   two and three.

8   Q    Could you use the pointer and point it out on the

9   large screen behind you?

10  A    Here.

11  Q    What number is that?

12  A    That is two, and there is three.

13  Q    For the record, number two is toward the middle

14  bottom, center, a little bottom of the photograph, and

15  number three is center and about two or three inches on

16  top of where you pointed as marker number two?

17  A    Correct.

18  Q    I will now place Exhibit 312 on the overhead.

19        What does that photograph show?

20  A    This is my marker number two.  It shows the battery

21  cover, the cell phone battery cover.

22  Q    And this is Government's Exhibit 309 now.

23        What is that showing?

24  A    This is, again, looking westbound.  And it shows my

25  marker number three.

1110

1  Q    On the left corner of the photograph?

2  A    Correct.

3  Q    I will now show you Government's Exhibit 313.

4        What does this photograph show?

5  A    That is the cell phone battery on the floor by my

6  marker number three.

7  Q    Okay.

8        Can you just point out another piece of debris

9  on the photograph, so please point out where the battery

10 is?

11 A    Right here.

12 Q    The black and white object to the left of marker

13 number three?

14 A    That's correct.

15 Q    And Government Exhibit 314, what is that?

16 A    Looking northbound, looking into the entrance, into

17 the vestibule area.

18 Q    And I think you mentioned in the video there was some

19 medical debris, does this photograph capture that as well?

20 A    Yes.  Gloves, sheet.

21 Q    I will now place Government's Exhibit 317 on the

22 screen.

23        (At this time a document was exhibited on

24 courtroom screen.)

25        What does this photograph depict?

Marino-Direct/Capwell

1111

1   A     Here we are inside the bar looking towards the

2   vestibule.  You can see my marker number one here.

3   Q     And by vestibule, you are referring to the entryway

4   of the bar?

5   A     Yes, that's correct.  That is this area right here,

6   the vestibule.

7   Q     All right.

8         And marker number one would be almost in the

9   center of the photograph?

10  A     Correct.

11  Q     And what were you marking with that cone?

12  A     That was the casing.

13  Q     And on the left side of the picture there appears to

14  be a pool table?

15  A     Yes.

16  Q     And in the back of the picture, top back of the

17  picture, some windows and mirrors?

18  A     Yes, correct.

19  Q     All right.

20  A     This is the dance area here.

21  Q     And that is the bottom side of the photograph?

22  A     Correct.

23  Q     And showing you now 316.  What does this photograph

24  show?

25  A     Here we are looking eastbound into the vestibule.  It

Marino-Direct/Capwell

1112

1   shows my marker number one, clothing, medical debris on

2   the floor here.

3   Q    And where did you take the blood sample from that you

4   mentioned earlier?

5   A    It was in front of the window in this area here.

6   Q    Pointing to the bloody area on the floor under the

7   window?

8   A    Correct.

9   Q    All right.

10        320, what does that show?

11   A    My marker number one, with the casing on the floor.

12   Q    All right.

13        And here is a closer shot of that, 321, what do

14   we see here?

15   A    Again, the marker number one, with the casing on the

16   floor.

17   Q    And I believe you said it was a .22 Remington?

18   A    .22 Remington casing, yes.

19   Q    And, sir, I will ask you now to look at the couple of

20   plastic sleeves with items in front of you, and I will ask

21   you to take a look at them.  Specifically, we will start

22   with the plastic pouch that I have labeled 328-A, for

23   alpha.

24   A    Yes.

25   Q    And do you recognize the items contained within

Marino-Direct/Capwell

1113

1    328-A?

2    A    Yes, I do.

3    Q    What are they?

4    A    The plastic container that I put the casing in.  It

5    has the bar code on it with item number one.

6         It has my initials here and my shield number.

7    Q    Okay.

8         Within the plastic container, is there anything

9    inside it?

10   A    Yes.  There is the casing.

11   Q    Okay.

12        And that is the casing in the photograph behind

13   you marked by cone number one?

14   A    Correct.

15   Q    And are your initials on there?

16   A    Yes.  My initials and my shield number, yes, are on

17   there, yes.

18        MS. CAPWELL:  At this time the government moves

19   to admit Government's Exhibit 328-A.

20        MR. LEVINE:  Can I see it?

21        (Whereupon, at this time there was a pause in

22   the proceedings.)

23        THE COURT:  Any objection?

24        MR. LEVINE:  No.

25        MS. RANTALA:  No objection, your Honor.

Marino-Direct/Capwell

1114

1    THE COURT:  328-A is admitted.

2         (Whereupon, Government's Exhibit 328-A was

3    received in evidence.)

4         MS. CAPWELL:  Your Honor, may I place it on the

5    overhead?

6         THE COURT:  Yes.

7         (At this time a document was exhibited on

8    courtroom screen.)

9    Q    It may be a little hard to see because of the glare,

10   but I put 328-A on the overhead.

11        Can you see the small plastic box that you

12   described?

13   A    Yes, I can.

14   Q    And do you see that there appears to be some red tape

15   on it?

16   A    Yes.

17   Q    What is that red tape?

18   A    That is the evidence tape that we put on there to

19   seal it.

20   Q    And did you place the red tape on there?

21   A    Yes, I did.

22   Q    And at what point did you do that?

23   A    After I put it in the box, in the plastic box, I put

24   the red tape on to seal it.  And then I initialed it and

25   put my shield number.

1115

1    Q    I will try to -- am I pointing to your initials right

2    there?

3    A    Yes, JM, yes, that's correct, and 702.

4    Q    That is your shield number?

5    A    Yes.

6    Q    And you had mentioned also, I believe, that you had

7    bar coded it once you got back to the precinct?

8    A    Yes.

9    Q    And is that the yellow sticker that is on there?

10   A    That's correct.

11   Q    And this was item number one?

12   A    Item number one, yes.

13   Q    And then inside the container is the casing; is that

14   correct?

15   A    Yes.

16   Q    I will try to zoom in on that.

17         The item I was moving in that box, is that the

18   casing?

19   A    Yes, it is.

20   Q    Okay.

21         Were you -- I believe I placed two other items

22   on the desk there in front of you.  Would you look at what

23   is marked as 331-A and 331-B.

24   A    Yes.

25   Q    Do you recognize the items marked 331-A and 331-B?

Marino-Direct/Capwell

1116

1   A     Yes.

2   Q     And can you tell us what 331-A is?

3   A     331-A is the cell phone cover that I recovered.  I

4   placed it in the paper bag, in this paper bag.

5   Q     And just for the record, the sticker Exhibit 331-A,

6   is it on the double cover itself or is it on the brown

7   evidence bag?

8   A     The sticker is on the brown evidence bag.

9   Q     And how do you recognize the brown evidence bag?

10  A     It has the evidence tape on it.  And it has my shield

11  number and my initials.

12  Q     And then turning to item 331-B, it should be within

13  the same plastic bag you are holding, the same one as

14  331-A.

15  A     This is 332-A .

16  Q     Okay, just looking at 331-B, what is that?

17  A     That is the cell phone battery cover.

18  Q     And there is a 331-A, and B, they are both inside

19  clear zip-lock bags?

20  A     Yes.

21  Q     And did you just recently open the brown evidence

22  bag, which is 331-A, and remove 331-B, which is the cell

23  phone cover?

24  A     Yes.

25  Q     Did you do it yesterday in the U.S. Attorney's

Marino-Direct/Capwell

1117

1    Office?

2    A    Yes.

3    Q    And then placed the -- them both in the zip-lock bag?

4    A    Yes.

5              MR. DURHAM:  The government moves to admit 331-A

6    and B.

7              MR. LEVINE:  I have no objection.

8              MS. RANTALA:  No objection, your Honor.

9              THE COURT:  They are both admitted.

10             (Whereupon, Government's Exhibits 331-A and

11   331-B were received in evidence.)

12   Q    Sir, I will now ask you to turn to the exhibit marked

13   332-A and B.

14             Do you recognize those exhibits?

15   A    Yes, I do.

16   Q    And what is 332-A.

17   A    This is the cell phone battery that I picked up.

18   Q    Does 332-A refer to the brown evidence bag you used

19   to place the battery into?

20   A    Yes, it does.

21   Q    And the actual cell phone battery is marked as 332-B?

22   A    Yes.

23   Q    How do you recognize those items?

24   A    I placed it in this particular paper bag.  It has my

25   evidence tape on it, the red evidence tape.  It has my

Marino-Direct/Capwell

1118

1    initials and my shield number.

2    Q    And to be clear, this is the cell phone battery you

3    recovered on the sidewalk outside the bar?

4    A    Yes.

5    Q    And you placed it in the brown evidence bag and

6    sealed it?

7    A    Yes.

8    Q    And now those items are both contained within a clear

9    zip-lock bag; is that correct?

10   A    Yes.

11   Q    And did you do that yesterday also at the U.S.

12   Attorney's Office?

13   A    Yes.

14   Q    And you removed the battery from the brown evidence

15   bag?

16   A    Yes.

17            MS. CAPWELL:  Your Honor, the government moves

18   to admit Exhibits 332-A and B.

19            MR. LEVINE:  No objection.

20            MS. RANTALA:  No objection, your Honor.

21            THE COURT:  332-A and B are admitted.

22            (Whereupon, Government's Exhibits 332-A and

23   332-B were received in evidence.)

24            MS. CAPWELL:  Thank you, your Honor.  May I

25   publish them to the jury?

Marino-Direct/Capwell

1119

1    THE COURT:  Yes.

2         (At this time a document was exhibited on the

3    courtroom screen.)

4    Q    I have 331-B on the overhead projector.

5         What is that?

6    A    The cell phone cover.

7    Q    All right.

8         And within the same plastic bag marked as 331-A

9    is the brown evidence bag?

10   A    Yes, it is.

11   Q    Showing you the other side of this exhibit, do you

12   see your initials -- are you able to see your initials

13   despite the glare?

14   A    Yes.

15        It has my initials and my shield with the red

16   tape that I put on there, the evidence tape, the red tape,

17   shield 702.

18   Q    Thank you.

19        I will now place what is marked as

20   Government's Exhibit 332-B on the overhead, as well as

21   332-A.  And 332-B, what is that?

22   A    The cell phone battery.

23   Q    And 332-A is in the same zip-lock bag as the evidence

24   bag that you used to collect it in?

25   A    Correct.

1120

1   Q    I will show you Government's Exhibit 325, which is

2   already in evidence.

3           Is that coming up on your screen?

4   A    No.

5           (At this time a document was exhibited on

6   courtroom screen.)

7   Q    Do you recognize this diagram?

8   A    Yes.  The sketch of the barmaid by Detective Rinaldi

9   from our crime scene.

10  Q    Was he there with you that night at the crime scene?

11  A    Yes.

12  Q    All right.

13          And can you, just using the laser pointer, does

14  the sketch show where you found the various pieces of

15  evidence?

16  A    Yes, it does.

17  Q    And if you can show us number one where the casing

18  was found.

19  A    This is number one.

20  Q    And that is in the vestibule area?

21  A    That's correct.

22  Q    And number two, the cell phone cover on the diagram?

23  A    Number two is here.

24  Q    And that is depicted on the diagram as number two?

25  A    Yes.  On Fulton Avenue, right.

1121

```
1   Q    And then the cell battery location?

2   A    Number three.

3   Q    And then you say there was a blood sample as well, is

4   that shown on the diagram?

5   A    Yes.  Blood sample was number four in front of the

6   window.

7   Q    Okay.

8        And what do five and six refer to?

9   A    Five and six are the latent fingerprints that I

10  recovered from the interior of the door.

11           MS. CAPWELL:  Thank you very much.  No further

12  questions.

13           THE COURT:  Okay.

14           Cross-examination.

15

16  CROSS-EXAMINATION

17  BY MR. LEVINE:

18  Q    Good afternoon, detective.

19  A    Good afternoon.

20  Q    When you arrived at the scene the early morning of

21  March 7th, 2010, how many law enforcement people would you

22  say were there?

23  A    There were homicide detectives there.  There were

24  Third Squad detectives there.  There was Hempstead

25  officers there.
```

1122

```
1   Q    Can you give us an estimate of how many people you
2   saw there?
3   A    Estimate of ten to fifteen.
4   Q    And you obviously went into the bar; is that correct?
5   A    Yes.
6   Q    When you went into the bar were there any patrons
7   there?
8   A    Yes.  I think there were some patrons in the bar.
9   Q    Were there any employees in the bar?
10  A    Yes.  I think there were employees, yes.
11  Q    To your knowledge had any patrons or employees left
12  the bar from the time of the shooting until the time you
13  got there?
14  A    I don't know.  I'm sure they did.  But I'm not aware
15  of that.
16  Q    You said you found a casing; is that correct?
17  A    Yes.
18  Q    And that would indicate to you that there was likely
19  a semi-automatic pistol; is that correct?
20  A    Yes.
21  Q    And the semi-automatic pistol ejects the casing from
22  the gun?
23  A    Correct.
24  Q    And there is no real way to predict where that casing
25  is going to end up when that casing is ejected from the
```

1123

1    gun, right?

2    A    That's right.

3    Q    In some guns it ejects from the right side of the gun

4    and others it ejects to the left side of the gun?

5    A    Yes.

6    Q    It also depends how the person is holding the gun?

7    A    Yes.

8    Q    And depends if they are holding it straight up or

9    sideways or some other way; is that correct?

10   A    Yes.

11   Q    And that casing when it comes out -- withdrawn.

12        You said the vestibule was three and a half feet

13   by three and a half feet?

14   A    Yes.

15   Q    A very small space?

16   A    Yes.

17   Q    And there was a stool in there, right?

18   A    Yes.

19   Q    Plus there was the outside door that was open, right?

20   A    Yes.

21   Q    And would you agree that if a gun was shot, a

22   semi-automatic pistol was shot in that area, there is a

23   good chance that that shell casing was going to strike

24   something in that vestibule area?

25   A    Possible, yes.

Marino-Cross/Levine

1124

1  Q    And in fact, in the 321, does that look like it might

2  be a bloody footprint?

3  A    Yes.

4  Q    And the shell casing is within the footprint?

5  A    Yes.

6  Q    And in fact there is some blood on the casing itself?

7  A    Yes.

8  Q    Indicating someone may have stepped on that casing;

9  is that correct?

10 A    Yes.

11 Q    All right.

12       You dusted the door for prints; is that right?

13 A    Yes.

14 Q    You got some latent prints off the door?

15 A    Yes, I got two.

16 Q    And those were from the interior of the door?

17 A    Yes.

18 Q    And did you get any from the exterior of the door?

19 A    No.

20 Q    Did you send those latents?

21 A    Yes, I did.

22 Q    You didn't do any comparison of them yourself?

23 A    No, I did not.

24 Q    The windows to the bar were blackened, right?  They

25 were dark?

Marino-Cross/Levine

1125

1   A    Dark, yes, you can see outside.

2   Q    You couldn't see outside?

3   A    You can see outside.

4   Q    From the outside of the bar, could you see inside?

5   A    I don't recall.  I know from the inside you could see

6   outside.

7   Q    Let me show you 317 in evidence.

8        The windows are the immediate right from the

9   door to -- in 317; is that correct?

10  A    Yes.

11  Q    There is something to the right of the window, there

12  appears to be a mirror there; is that right?

13  A    Yes.

14  Q    And with this photograph, could you see what is

15  outside the window?

16  A    I can see some lights on the outside.

17  Q    You can see some lights?

18  A    Yes.

19  Q    And you can't see details?

20  A    No, not from this picture, no.

21       MR. LEVINE:  Nothing further, thank you.

22       MS. RANTALA:  No questions, your Honor.

23       THE COURT:  Redirect?

24       MS. CAPWELL:  No, your Honor.  Thank you.

25       THE COURT:  You can step down.

1126

1           (Whereupon, the witness at this time steps down

2     from the witness stand.)

3           THE COURT:  Next witness.

4           MS. CAPWELL:  The next witness is Sonia Ventura.

5     She will require the Spanish interpreter.  May we use our

6     interpreter?

7           THE COURT:  Sure.

8           Will the interpreter go over.

9           Please remain standing, ma'am, while I

10    administer the oath.

11          Please raise your right hand.

12

13    S O N I A     V E N T U R A,

14                  called as a witness, having been first

15                  duly sworn through the interpreter, was.

16                  examined and testified as follows:

17          MS. RANTALA:  Your Honor, my client can't hear,

18    nor Mr. Martinez.

19          (Pause.)

20          THE COURT:  Okay now?

21          MS. RANTALA:  Yes.

22          THE COURT:  Let me do it again.

23

24

25

Ventura-Direct/Capwell

1127

```
 1    S O N I A    V E N T U R A,

 2                    called as a witness, having been first

 3                    duly sworn through the interpreter, was.

 4                    examined and testified as follows:

 5              THE COURT:  You can be seated.

 6              Please state and spell your name for the record.

 7              THE WITNESS:  Sonia.

 8              THE COURT:  Last name.

 9              THE WITNESS:  Ventura.

10              THE COURT:  Please spell it.

11              THE WITNESS:  S-O-N-I-A    V-E-N-T-A.

12              MS. CAPWELL:  Your Honor, it is V-E-N-T-U-R-A.

13              THE COURT:  Clear that up.

14              Spell it again, ma'am.

15              THE WITNESS:  V-E-N-T-U-R-A.

16              THE COURT:  All right.  Go ahead.

17              MS. CAPWELL:  Thank you, your Honor.

18

19    DIRECT EXAMINATION

20    BY MS. CAPWELL:

21    Q    Good afternoon, Ms. Ventura.

22    A    Good afternoon.

23    Q    How old are you?

24    A    27 years.

25    Q    And I'm going to take you back now to about three
```

1128

1    years ago to March 6th, 2010, okay?

2    A    Yes.

3    Q    Were you working that night?

4    A    Yes.

5    Q    Where were you working?

6    A    At the El Rancho Bar in Hempstead.

7    Q    And can you describe what kind of bar or business

8    that was?

9    A    Where alcoholic beverages are sold.

10   Q    And is there a dance floor?

11   A    Yes.

12   Q    And a pool table?

13   A    Yes.

14   Q    What did you do there?

15   A    I was a waitress.

16   Q    About how long were you a waitress prior to

17   March 6th, 2010?

18   A    Two months.

19   Q    What shift or hours were you working on that night in

20   2010?

21   A    From 9:00 to 4:00 in the morning.

22   Q    So from 9:00 p.m. on March 6th to 4:00 a.m. on

23   March 7th?

24   A    Yes.

25   Q    And what happened that night at the El Rancho Bar?

Ventura-Direct/Capwell

1129

1   A   David was killed.

2   Q   All right.

3       When you say David, who was David?

4   A   The security from the bar.

5   Q   Did you know David's full name?

6   A   No, I never learned it.

7   Q   I will place Exhibit 337 on the monitor in front of

8   you.

9       Do you recognize the person in that photo?

10      (At this time a document was exhibited on

11  courtroom screen.)

12  A   Yes.

13  Q   Who is that?

14  A   David.

15  Q   Now, tell us what happened on the night that David

16  was killed.

17  A   He was shot and killed.

18  Q   All right.

19      Where were you when he was shot?

20  A   At the corner of the bar.

21  Q   Were you in the front corner of the bar or toward the

22  back of the bar?

23  A   To the rear of the bar.

24  Q   What were you doing?

25  A   I was sitting.

1130

1   Q    Okay.

2          And how did you become aware that David had been

3   shot?

4   A    Because one of the girls that worked there said that

5   he had been shot, he had been killed.

6   Q    Do you recall who it was that said that?

7   A    Yes.

8   Q    And what is her name?

9   A    Jessica.

10  Q    Now, in addition to Jessica saying David had been

11  shot, did you hear or see anything?

12  A    I only heard a shot.

13  Q    Okay.

14          You heard a shot?

15  A    Yes.

16  Q    And describe how loud was it?

17  A    It was a shot.  It was a loud sound.  I didn't think

18  that he had been shot or anybody had been shot.

19  Q    Now, after you heard that sound, the shot, what did

20  you do?

21  A    Nothing.  I remained seated.  I didn't imagine

22  someone had been shot.

23  Q    Now, what, if anything, did you see soon after you

24  heard the shot?

25  A    Two men left running immediately after the shot.

Ventura-Direct/Capwell

1131

1   Q    And did you see them?

2   A    I only saw them from the back.  I didn't see their

3   faces.

4   Q    When you saw them, were they inside the bar or

5   outside the bar?

6   A    They were outside of the bar.  They were running.

7   Q    And how did you see them?

8   A    Umm, two men, not too big, kind of small.

9   Q    Okay.

10       You mentioned you did not see their faces; is

11   that correct?

12   A    No.  I didn't see the faces.

13   Q    What were they wearing?

14   A    They were wearing sweatshirts with a zipper and hat.

15   Q    Did you see them through the window in the front of

16   the bar?

17       THE COURT:  Sustained.  Rephrase the question.

18   Q    You testified you were inside the bar, toward the

19   rear of the bar.  How did you see these two men who were

20   running outside the bar?

21   A    Well, there was not that many people.  And when there

22   are a few persons, you can see easily on the outside.

23   Q    This might be obvious, but how from the inside of the

24   bar, how did you see toward the outside of the bar?

25   A    Because the glass that is toward the front of the

Ventura-Direct/Capwell

1132

1   street, it is clear.  You can see easily through it.

2   Q    All right.

3        When you saw the two individuals running as you

4   were looking out the window, which way were they running,

5   to the left or to the right?

6   A    Towards the right.

7   Q    And could you tell, were they men or women?

8   A    Yes.

9   Q    And how did you know that?

10  A    Because of the clothing they were wearing, they

11  looked like men.

12  Q    You saw the two men running outside.  Did you see the

13  person who shot David inside the bar?

14        THE INTERPRETER:  Again, please?

15        MS. CAPWELL:  Sure.

16  Q    You saw the two men running outside the bar, at any

17  point did you see the person who shot David inside the

18  bar?

19  A    No.

20  Q    And I believe you earlier described --

21  A    Not at that moment.

22  Q    I believe you earlier stated what the two individuals

23  were wearing.  I ask you to repeat that, please.

24  A    They were wearing a sweatshirt with zipper and a hat.

25  Q    Okay.

Ventura-Direct/Capwell

1133

1   What do you mean by a hat?

2   A   Something that you wear like this (indicating).

3        MS. CAPWELL:  Let the record reflect the witness

4   indicated from her shoulders to the top of her head?

5        THE COURT:  Yes, indicating throwing something

6   over the top of her head.

7        THE WITNESS:  Yes.

8   Q   And the thing that the two individuals were wearing

9   over the top of their head, was it attached to their

10  sweater or sweatshirt?

11  A   It is part of the sweater that they wear.

12  Q   It was part of the same clothing?

13  A   Yes.

14  Q   And what color were these two men wearing?

15  A   One in black, and the other one in a gray color.

16  Q   Now, after David was shot, did you stay at El Rancho

17  until police arrived?

18  A   Yes.

19  Q   And did you stay -- after the police arrived, did you

20  continue to stay at the El Rancho Bar?

21  A   Yes.

22  Q   Let me ask you briefly about David.

23       What were his responsibilities at the bar with

24  respect to security?

25  A   He would check the people as they are getting into

1134

1   the bar.  Sometimes they carry weapons, or something like

2   weapons?

3   Q    And did he have any other responsibilities?

4   A    When someone wouldn't pay, he had the responsibility

5   to make them pay.

6            THE INTERPRETER:  The interpreter would like to

7   correct that.

8            Not to make them pay.  To collect.

9   Q    To collect?

10  A    Yes.

11  Q    And did you witness any problem that David had at the

12  bar in the days prior to the shooting?

13  A    Yes.

14  Q    Tell us what happened.

15  A    There were four men.  They ordered four beers.  They

16  didn't pay.  And then --

17  Q    And then what happened?

18  A    He collected from them, and they started fighting .

19  Q    Okay.

20           Let me just take you back a couple of steps.

21           Were you waiting on these four men as their

22  waitress?

23  A    Yes.

24  Q    Did you know them?

25  A    No.

Ventura-Direct/Capwell

1135

1    Q    As best you can, can you describe them, their age,

2    their appearance.

3    A    They were men, younger than 30.  They were not tall.

4    They were more on the short size.

5    Q    Did they speak Spanish?

6    A    Yes.

7    Q    Okay.

8              Did you try to collect money from them for the

9    beer?

10   A    I got the money once only.

11   Q    And let's be clear.  Did they pay you the one time?

12   A    No. They didn't pay.

13   Q    Okay.

14             Did you attempt to get money from them, to get

15   payment from them?

16   A    Okay.

17             Yes, I tried to collect, and they didn't pay.

18   Q    All right.

19             After they would not pay their bill, what, if

20   anything, did you do?

21   A    I told the security.

22   Q    And by security, who specifically did you go to?

23   A    David.

24   Q    After you went to David, what did you tell David?

25   A    That these men didn't want to pay.

Ventura-Direct/Capwell

1136

1   Q    After that, what if anything did David do?

2   A    He attempted to collect.  And they said they wasn't

3   going to pay, and started fighting.

4   Q    Okay.

5        Did the fight start inside the bar?

6   A    No, it was outside.

7   Q    Who was outside fighting?

8   A    They got out with David.

9   Q    Let me just clarify.

10        The four guys were outside?

11  A    Yes.

12  Q    And was David outside also?

13  A    He went out to attempt to collect when they were

14  leaving .

15  Q    Okay.  Now, with the attempt to collect, was it the

16  money that they owed?

17  A    Yes.

18  Q    And what happened when David went outside?

19  A    He had -- they had started fighting.

20  Q    I'm sorry?

21  A    They had started fighting.

22  Q    Was that with David that they started fighting?

23  A    Yes.

24  Q    And what happened?

25  A    And they shouted they would come back later.

Ventura-Direct/Capwell

1137

1   Q    And at some point did David come back inside?

2   A    Yes.

3        He came in and shut the door.

4   Q    And by shutting the door, did he lock the door?

5   A    Yes.

6   Q    And when he returned inside, did you notice anything

7   in particular?

8   A    There was a smell of pepper spray -- pepper gas.

9   Q    Okay, and what was that from?

10  A    From the outside.

11  Q    Did David carry pepper spray as part of the job?

12  A    Yes.

13  Q    And do you know whether he sprayed it at the guys

14  outside?

15  A    Yes.  He is the one who had sprayed them with pepper

16  gas.

17       MS. CAPWELL:  I think I have less than five

18  minutes left, your Honor.

19       THE COURT:  Can the jury stay a few minutes so

20  we can get the jury -- the witness done?

21       (The jury indicates in the affirmative.)

22  Q    Now, the men there, you said they -- you did not know

23  them?

24  A    No, I did not.

25  Q    Were they with anybody or speaking with anybody that

Ventura-Direct/Capwell

1138

1   you did know?

2   A    Yes.

3   Q    Who was that that they were speaking to?

4   A    Princessa.

5   Q    Who is Princessa?

6   A    He is a gay person.

7   Q    And you said that that is a gay man?

8   A    Yes.

9   Q    And how did you know him?

10  A    He would come to the bar to dance there.

11  Q    You had seen him at El Rancho in the past?

12  A    Yes.

13  Q    And does he know the four gays that you described as

14  later having the fight with David?

15  A    Yes, because when they arrived he said hello to them

16  and he was there chatting with them.

17  Q    And what type of beer did El Rancho sell when you

18  worked there?

19  A    Corona, Heineken, Modelo Especiale, and Coors Light.

20       MS. MACEDONIO:  Objection, your Honor,

21  relevance.

22       MS. CAPWELL:  My next question will deal with

23  and explain the relevance.

24  Q    Where is Modelo Especiale from?

25  A    Mexico.

Ventura-Direct/Capwell

1139

1      THE COURT:  It didn't clear up relevance, unless

2  you want to approach?

3      MR. DURHAM:  Yes, and briefly, your Honor.

4      (Continued on next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ventura-Direct/Capwell

1140

1    (Whereupon, at this time the following took

2  place at the sidebar.)

3    MS. CAPWELL:  It goes to the interstate aspect

4  that we have to establish.  This bar is selling beers from

5  outside the country.  They went out of business, and that

6  is it.  I have two questions more to go.

7    (Continued on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ventura-Direct/Capwell

1141

1    (Whereupon, at this time the following takes

2    place in open court.)

3    THE COURT:  Objection overruled.

4    Q    You can answer.  Where is the beer, Modelo Especiale,

5    from?

6    A    Mexico.

7    Q    And how about Corona?

8    A    Mexico.

9    Q    Let me just quickly show you a photograph which is in

10   evidence as Government's Exhibit 317.

11   Ms. Ventura, is this the inside of the El Rancho

12   Bar?

13   (At this time a document was exhibited on

14   courtroom screen.)

15   A    Yes.

16   Q    And towards the rear of the photograph, near the

17   front door, are those the windows that you were referring

18   to earlier in your testimony?

19   A    Yes.

20   Q    And are those the windows from which you could see

21   the two men running after David was shot?

22   A    Yes.

23   Q    And after David's shooting, did you continue to work

24   at El Rancho?

25   MS. MACEDONIO:  Objection.

Ventura-Cross/Levine

1142

1     THE COURT:  Overruled.  The same ruling with

2   respect to the prior?

3     MS. CAPWELL:  Yes.

4     THE COURT:  You can answer that.

5   A    Yes, only for two days.

6   Q    All right.

7     And what happened after those two days?

8   A    The business was closed.

9     MS. CAPWELL:  Your Honor, no further questions.

10    THE COURT:  Cross-examination.

11

12  CROSS-EXAMINATION

13  BY MR. LEVINE:

14  Q    Good afternoon, Ms. Ventura.

15  A    Good afternoon.

16  Q    Did you see or hear Princessa offer to buy those four

17  men drinks?

18  A    No.

19  Q    When you went to collect money from the four men, did

20  any of them express surprise that it hadn't already been

21  paid for?

22  A    No.

23  Q    Did anybody say to you, did any of those four men

24  say, didn't Princessa pay?

25  A    No.

Ventura-Cross/Levine

1143

1    MR. LEVINE:  Nothing further.

2    MS. RANTALA:  No questions, your Honor.

3    MS. CAPWELL:  No redirect, your Honor.

4    THE COURT:  All right.

5    You may step down.

6    I appreciate everybody staying a few minutes

7    late to finish the witness.

8    (Whereupon, the witness leaves the witness

9    stand.)

10    THE COURT:  We don't have court tomorrow.  And

11    we will reconvene at 9:30, Monday.

12    Don't read anything about the case or listen to

13    anything about the case.  Do not read about the case, do

14    not discuss the case with anyone.

15    Have a safe trip home.

16    (Whereupon, at this time the jury leaves the

17    courtroom.)

18    THE COURT:  Please be seated.

19    Can you just tell me who the witnesses are for

20    Monday.

21    MR. DURHAM:  At the pace we are going most of

22    the week, we thought these witnesses would be on.

23    I believe it is going to be Joel Calderon and

24    Detective Robert DePietro, Detective Milton Aponte.

25    THE COURT:  All right.

1144

1    MR. DURHAM:  Your Honor, depending if we get

2    that far, there is also a medical examiner, Dr. Catanese,

3    C-A-T-A-N-E-S-E, I think.

4            THE COURT:  And one of them is a cooperating

5    witness?

6            MR. DURHAM:  Yes, your Honor.

7            THE COURT:  You feel you are a little behind the

8    scheduling we had.

9            MR. DURHAM:  I wish every day is Thursday,

10   Thursday we get a lot done.  I was pessimistic at the

11   beginning of the day.  I would say we are a little behind

12   but not as far behind as I thought we would be.

13           THE COURT:  Any issues you wish to raise with

14   respect to any of the witnesses?

15           MS. MACEDONIO:  No, Judge.

16           MS. RANTALA:  With regard to Calderon, I have

17   spoken with the agent, and I need to go through some of

18   the hieroglyphics, to coin that phrase, with regard to the

19   notes that were taken.  And they agreed to do that with

20   me.

21           THE COURT:  All right.

22           I will see you all on Monday.

23           Have a good weekend.

24           (Case on trial adjourned until 9:30 o'clock,

25   Monday, February 25, 2013.)

1145

## I-N-D-E-X

### W-I-T-N-E-S-S-E-S

C A R L A   S A N T O S                           937
CROSS-EXAMINATION                                 937
BY MS. MACEDONIO
CROSS-EXAMINATION                                 954
BY MS. RANTALA
REDIRECT EXAMINATION                              960
BY MR. DURHAM
RECROSS-EXAMINATION                               971
BY MS. MACEDONIO
RECROSS-EXAMINATION                               974
BY MS. RANTALA
FURTHER REDIRECT EXAMINATION                      974
BY MR. DURHAM

R A L P H   R I V E R A                           975
DIRECT EXAMINATION                                976
BY MR. TIERNEY:
CROSS-EXAMINATION                                 1020
BY MS. MACEDONIO
REDIRECT EXAMINATION                              1036
BY MR. TIERNEY

E D W A R D   H E S L I N                         1044
DIRECT EXAMINATION                                1044
BY MR. TIERNEY
CROSS-EXAMINATION                                 1069
BY MS. MACEDONIO
REDIRECT EXAMINATION                              1078
BY MR. TIERNEY

J E S S I C A   H E R R E R A                     1082
DIRECT EXAMINATION                                1082
BY MR. DURHAM

J O S E P H   M A R I N O                         1098
DIRECT EXAMINATION                                1098
BY MS. CAPWELL
CROSS-EXAMINATION                                 1121
BY MR. LEVINE

S O N I A   V E N T U R A                         1126
DIRECT EXAMINATION                                1127
BY MS. CAPWELL
CROSS-EXAMINATION                                 1142
BY MR. LEVINE

1146

**E-X-H-I-B-I-T-S**

| | |
|---|---|
| Government Exhibit 114 was received in evidence | 986 |
| Government Exhibit 116 was received in evidence | 993 |
| Government Exhibit 117-A was received in evidence | 998 |
| Government Exhibit 118-A was received in evidence | 1001 |
| Government Exhibit 115A received in evidence | 1010 |
| Government's Exhibit 128 was received in evidence | 1056 |
| Government's Exhibit 337 was received in evidence | 1085 |
| Government's Exhibit 325 was received in evidence | 1090 |
| Government's Exhibits 306, 314, 316 and 318 were received in evidence | 1092 |
| Government's Exhibit 330 was received in evidence | 1105 |
| Government's Exhibit 306 through 321 was received in evidence | 1108 |
| Government's Exhibit 328-A was received in evidence | 1114 |
| Government's Exhibits 331-A and 331-B were received in evidence | 1117 |
| Government's Exhibits 332-A and 332-B were received in evidence | 1118 |